**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CANOPY GROWTH SECURITIES LITIGATION | Case No. 1:23-cv-04302<br><br>CLASS ACTION<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Chen Li ("Lead Plaintiff") and additional named plaintiffs Christiann Kantner and Thinh Nugyen (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' attorneys, for their First Amended Complaint (the "Complaint") against Canopy Growth Corporation ("Canopy" or the "Company"), David Klein ("Klein"), Judy Hong ("Hong"), and Michael Lee ("Lee"), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, interviews with former employees, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Canopy securities between November 5, 2021 and June 22, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors of Canopy, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

2.      Canopy distributes and sells a diverse range of cannabis, hemp, and consumer packaged goods ("CPG") products for recreational and medical use. The Company conducts business through its subsidiaries and a variety of joint ventures, including Tweed, Spectrum Therapeutics, and Martha Stewart CBD, and BioSteel Sports Nutrition Inc. ("BioSteel").

3.      BioSteel, a subsidiary of Canopy, is a sports nutrition and hydration brand originally formulated for professional athletes. Defendants widely touted Canopy's BioSteel business throughout the Class Period, including its purported "meaningful year-over-year gains in BioSteel distribution and sales velocity" and the entry of BioSteel into various partnerships and agreements with star athletes and professional sports organizations.

4.      Throughout the Class Period, Canopy misled investors about the success of its subsidiary, BioSteel, the risks associated with BioSteel, the financial success of Canopy as a whole, and Canopy's internal controls. Specifically, Defendants:

- Reported inflated revenue overall and related to Canopy's then core operating

2

segment, BioSteel, as well as inflated operating results;

- Made false affirmative statements about the performance of BioSteel;

- Omitted internally known problems about mounting aged BioSteel inventory;

- Omitted that in violation of Accounting Standards Codification ("ASC") Topic 606, Canopy had improperly recognized BioSteel-related revenue when such revenue had not actually been earned, because the Company lacked a basis to conclude that revenue from a sale was more likely than not to be collected, because control of the product had not been transferred to the customer, because the product was shipped without a legally enforceable contract, or because the product was not accepted by the customer, often because the product did not have the required remaining shelf life to be sold through by the customer in a primary sales channel;

- Omitted disclosing material weaknesses in internal controls over financial reporting; and

- Falsely certified the efficacy of Canopy's internal controls over financial reporting.

5.      On February 9, 2023, before the market opened, Canopy announced its financial results for the third quarter of the Company's fiscal year 2023 through a press release.[1] Among other results,

---

1 Canopy operated on a non-standard fiscal year, which ends in March.  As a result, Canopy's periodic reports refer to the calendar periods ending as follows:

| FY 2022 | Q1 2023 | Q2 2023 | Q3 2023 |
|---------|---------|---------|---------|
| Mar. 31, 2022 | Jun. 30, 2022 | Sep. 30, 2022 | Dec. 31, 2022 |

the press release reported third quarter GAAP earnings per share ("EPS") of -C$0.54,[2] missing consensus estimates by C$0.31, and revenue of C$101.2 million, representing a year-over-year decrease of 28.2% and missing consensus estimates by C$15.16 million.  The Company admitted that "[g]ross margin in Q3 FY2023 was impacted primarily by [*inter alia*] . . . lower gross margins in the BioSteel business segment primarily attributable to the write-down of aged inventory," the first time the Company disclosed any problems with aged BioSteel inventory.

6.      On this news, Canopy's common share price, which closed the previous day at $27.40, fell $4.70 per share, or 17.15%, to close at $22.70 per share on February 9, 2023.

7.      On May 10, 2023, after the market closed, Canopy announced that its previously-announced consolidated financial statements for the fiscal year ended March 31, 2022 and the quarters ended June 30, 2022, September 30, 2022, and December 31, 2022 should no longer be relied upon, and would need to be restated. The Company also disclosed that it "identified certain trends in the booking of sales by the [BioSteel] business unit for further review." The Company specified that "although the BioSteel Review remains ongoing, the Company has preliminarily identified ***material misstatements***" and that "the correction of the misstatements is expected to reduce certain revenues previously recognized."[3]

8.      On this news, Canopy's stock price fell $2.56 per share, or 20.31%, from $12.60 to close at $10.04 per share on May 11, 2023, on unusually heavy trading volume.

9.      On May 12, 2023, *BNN Bloomberg* published an article citing former BioSteel employees, who portrayed BioSteel as "a dysfunctional organization rife with overspending." The

---

[2] References to "C$" followed by a number describe amounts in Canadian Dollars, whereas references to "$" followed by a number describe amounts in U.S. Dollars.
[3] Unless otherwise noted, all emphasis is supplied.

article noted, among other issues, that BioSteel's "co-founder John Celenza [was] ousted following a testy exchange with Canopy's Chief Executive Officer David Klein."

10.    Then, after the market closed on June 22, 2023, Canopy filed its delinquent Form 10-K for 2023, in which it restated the false financial statements it had previously filed for the fiscal year ended March 31, 2022 and the quarters ended June 30, 2022, September 30, 2022, and December 31, 2022. This restatement outlined how the Company's failure to recognize revenue pursuant to ASC 606, primarily in relation to the Company's "business-to-business" sales to customers, artificially inflated revenue by over C$26.6 million. Further, the Company's 2023 Form 10-K admitted that the Company identified material weaknesses in its internal control over financial reporting and needed to implement a 15-point plan to overhaul its internal control before it could be effective.  As a result of this final disclosure, which revealed the full depths of Defendants' accounting malfeasance, shares dropped $0.83 on June 23, 2023 from a prior day close of $6.01 to close at $5.18.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

1.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

3.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Pursuant to Canopy's most recent Form 10-Q, as of

November 7, 2023, there were 829,083,667 of the Company's common shares outstanding. Canopy's common shares trade in the U.S. on the Nasdaq Global Select Market ("NASDAQ"). The Company's chosen trading venue, NASDAQ, has significant facilities in this District. Additionally, there are presumably hundreds, if not thousands, of investors in Canopy's common shares located in the U.S., some of whom undoubtedly reside in this District.

4.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

5.      Lead Plaintiff Chen Li purchased Canopy securities at artificially inflated prices during the Class Period. As set forth in his previously filed certification, Mr. Li was damaged by the conduct alleged herein.

6.      Additional Plaintiff Christiann Kantner purchased Canopy securities at artificially inflated prices during the Class Period. As set forth in her previously filed certification, Ms. Kantner was damaged by the conduct alleged herein.

7.      Additional Plaintiff Thinh Nugyen purchased Canopy securities at artificially inflated prices during the Class Period. As set forth in his previously filed certification, Mr. Nugyen was damaged by the conduct alleged herein.

8.      Defendant Canopy is incorporated under the laws of Canada with its principal executive offices located in Smiths Falls, Ontario. Canopy's common shares trade in an efficient market on the NASDAQ under the ticker symbol "CGC".

9.      Defendant David Klein ("Klein") has served as Canopy's Chief Executive Officer at all relevant times.  As Chief Executive Officer, Klein had access to, ultimate authority, and oversight

6

over Canopy's business, including BioSteel, and the Company's internal control systems. Klein routinely certified filings with the SEC that affirmed that he had reviewed and evaluated Canopy's financial statements and internal control over financial reporting and concluded that those internal controls systems were effective and produced accurate numbers to investors. *See* Paragraphs 86, 95, 108, 120, 133, 149. Klein also routinely spoke with authority to investors at Canopy's earnings calls on Canopy's financial health, including its BioSteel subsidiary, and Canopy's financial reporting throughout the Class Period. *See* Paragraphs 80-81, 97, 102, 110, 122, 135.

10.     Defendant Judy Hong ("Hong") has served as Canopy's Chief Financial Officer since March 31, 2022. Hong also served as the Company's Interim Chief Financial Officer from November 18, 2021 until transitioning to the permanent Chief Financial Officer role on March 31, 2022. As Interim Chief Financial Officer and permanent Chief Financial Officer, Hong had access to, authority and oversight over Canopy's business, including BioSteel, and the Company's internal control systems. Hong routinely certified filings with the SEC that affirmed that she had reviewed and evaluated Canopy's financial statements and internal control over financial reporting and concluded that those internal controls systems were effective and produced accurate numbers to investors. *See* Paragraphs 95, 108, 120, 133, 149. Hong also routinely spoke with authority to investors at Canopy's earnings calls on Canopy's financial health, including its BioSteel subsidiary, and Canopy's financial reporting throughout the Class Period. *See* Paragraphs 112, 124, 137.

11.     Defendant Michael Lee ("Lee") served as Canopy's Chief Financial Officer from before the start of the Class Period to November 18, 2021. As Chief Financial Officer, Lee had access to, authority and oversight over Canopy's business, including BioSteel, and the Company's internal control systems. Lee certified filings with the SEC that affirmed that he had reviewed and evaluated Canopy's financial statements and internal control over financial reporting and concluded that those

internal controls systems were effective and produced accurate numbers to investors. *See* Paragraph 86. Lee also spoke with authority to investors at Canopy's earnings calls on Canopy's financial health, including its BioSteel subsidiary. *See* Paragraph 175.

12.    Defendants Klein, Hong, and Lee (collectively, the "Individual Defendants"), possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants' responsibilities as high-level officers at Canopy included overseeing BioSteel and other core operations, reviewing the accuracy of the Company's financial reporting and efficacy of its internal controls, and communicating with managers about performance and problems, including those highlighted by employees at the Company's Monthly Business Review meetings. Further, the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions, the responsibilities that attached to those positions, and the access to material non-public information available to them because of those positions, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Moreover, the Individual Defendants had the ability to control and correct the misleading statements that were being issued to investors throughout the Class Period. The Individual Defendants are liable for the false statements pleaded herein.

13.    Canopy and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.    Canopy and its Purchase of BioSteel**

14.    Canopy produces, distributes, and sells a diverse range of cannabis, hemp, and CPG products for recreational and medical use. Based out of Ontario, Canada, conducts business through its subsidiaries and a variety of joint ventures, including Tweed, Spectrum Therapeutics, and Martha Stewart CBD.

15.    On October 2, 2019, in an effort to branch out from its cannabis-related business, Canopy completed an all-cash transaction to purchase a majority stake in BioSteel, giving Canopy a 72% stake in BioSteel that was later valued at $50.7 million, with an agreed upon path to 100% ownership.

16.    BioSteel is a sports nutrition and hydration brand originally formulated for professional athletes. BioSteel was founded in 2009 by John Celenza ("Celenza") and Mike Cammalleri primarily as a sports drink company. BioSteel marketed itself as a hydration product for "high performance athletes."

17.    To further cultivate this image, BioSteel promoted a number of sponsorship deals with athletes and professional sports organizations.

18.    Canopy's stake in BioSteel continued to grow from 2019, so that by the time BioSteel eventually declared bankruptcy on September 17, 2023, Canopy owned 90%+ of the equity in BioSteel.

19.    Defendants widely touted Canopy's BioSteel business throughout the Class Period, including its purported "meaningful year-over-year gains in BioSteel distribution and sales velocity" and the entry of BioSteel into various partnerships and agreements with star athletes and professional sports organizations.

9

20.    These pronouncements were not out of line, as throughout the Class Period, BioSteel was the main driver of revenue for Canopy and buoyed the Company when other aspects of the Company failed.

21.    For example, in Canopy's Form 10-K for fiscal year 2022, filed on May 31, 2022, the Company reported that most of its channels of revenue saw a significant decrease in revenue from fiscal year 2021, with its global cannabis net revenue dropping by C$41.4 million. However, BioSteel was one of the few revenue channels that saw a (significant) gain from fiscal year 2021, increasing its revenue from the previous year by approximately C$16 million.

22.    Similarly, in Canopy's Form 10-Q for Q2 of 2023, filed on November 9, 2022, the Company reported that its recreational cannabis revenue for the quarter dropped from C$58.5 million in Q2 of 2022 to C$38 million in Q2 of 2023. However, again BioSteel was Canopy's saving grace, as the Company reported that BioSteel's net revenue increased from C$7.5 million in Q2 of 2022 to a whopping C$29.9 million for Q2 of 2023 – a near *quadruple* increase from the year before.

23.    Analysts covering Canopy consistently noted that, even when Canopy's cannabis revenue fell below estimates, the Company outperformed expectations explicitly due to revenues from BioSteel. *See, e.g.*, Michael S. Lavery, *BioSteel Sales Beat Estimates, Offsetting Cannabis Miss*, PIPER SANDLER, February 9, 2022, at 1 ("Canopy reported F3Q22 net revenue of C$141.0M, above our C$132.5M estimate and consensus of C$135.9M. The revenue beat was primarily driven by better-than-expected revenue from BioSteel (up 130%), more than offsetting softer global cannabis revenue (down 20%)."); Michael S. Lavery, *Hydration Salvation: BioSteel Drives Top-Line, Gross Profit*, PIPER SANDLER, November 9, 2022, at 1 ("[n]ear-term growth will likely be driven by BioSteel . . . [as] BioSteel revenues rose ~C22M while sales for the rest of the [Canopy] portfolio fell ~C$36M. BioSteel contributed 65% of total company adjusted gross profit . . . BioSteel gains

offset by broad portfolio declines in F2Q23").

## II.    Known Operational Problems Compromising BioSteel

24.    BioSteel's results (as well as the overall results of Canopy, for which BioSteel accounted for the majority of gross profit) were compromised by several internally known problems which were not disclosed to investors during the Class Period.  In addition to having material weaknesses in internal controls for financial reporting, BioSteel had mounting problem with aged soon-to-expire inventory, lacked enforceable contracts with certain distributors, and exacerbated the potential for revenue inflation by employing extreme pressure in its sales organization.

### A.    Distribution Issues

25.    BioSteel distributed its product directly to retail businesses, as well as to wholesale distributors who then provided the product to retail businesses.

26.    Starting in March 2020, Canopy employed Confidential Witness 1 ("CW1") as Director, eCommerce and Alternative Channels.  In 2021, CW1 became BioSteel's Director, eCommerce Amazon and 3P [Third-Party] Capabilities. CW1 ran all of BioSteel's business with Amazon, Walmart, Target and Instacart until CW1 left Canopy in February 2023.

27.    According to CW1, BioSteel did not have contracts with some of its wholesaler partners, including three to four distributors who received sizable amounts of BioSteel product.

28.    Starting in October 2021, Canopy employed Confidential Witness 2 ("CW2") as regional Vice President of Sales Enablement until May 2022. CW2's job involved working with various groups inside Canopy, including sales operations, sales planning, demand forecasting and business/travel, all to support Canopy's sales. Approximately 30% of CW2's time was spent working to support BioSteel's sales.

29.    According to CW2, disruptions in distribution channels caused shipments to be

delayed or never ultimately reach its distributors. BioSteel also attempted to expand into the European market to dump its excess and rapidly aging inventory. According to CW1, BioSteel aimed to sell its excess inventory that had accumulated through a distributor in Europe.

30.    Starting in October 2020, Canopy employed Confidential Witness 3 (CW3") as regional Head of Marketing for BioSteel until April 2023. CW3's job responsibilities included running the marketing team for BioSteel.

31.    According to CW1 and CW3, the European distributor was Alpha Trading Solutions ("Alpha"), based just outside of Munich. Alpha was not an established Consumer Packaged Good distributor, but rather was just getting into the business. CW1 noted that a factor in BioSteel's overstated revenue was product that went to Europe and was logged as revenue that never should have been recognized.

32.    Starting in March 2021, Canopy employed Confidential Witness 4 ("CW4") as Sales Director – Martha Stewart CBD and Sales Director – BioSteel Nutrition until June 2023. CW4 was tasked with helping commercialize BioSteel for retail in the United States.

33.    According to CW4, BioSteel's arrangement with Alpha involved only verbal agreements and lacked firm commitments or prepayment. As a result, while BioSteel shipped containers of product to Alpha, it was unable to secure payment.

**B.    Excess Inventory Issues**

34.    In part due to the distribution issues, numerous CWs confirmed that BioSteel began to accumulate a significant amount of excess product that it was unable to sell.

35.    Starting in December 2019, Canopy employed Confidential Witness 5 ("CW5") as a Vice President and General Manager – U.S. Region until April 2022. CW5 facilitated Canopy's CBD business in the United States, including managing the BioSteel portfolio for CBD products. CW5

initially reported to Klein, and then later reported to Chief Commercial Officer Julious Grant, who reported to Klein.

36.    According to CW5, this accumulation started around late 2021.

37.    The buildup of BioSteel product was especially problematic because, according to CW3, it had only a two to two-and-a-half year shelf life.

38.    A product's shelf life is critical to its marketability.  Wholesalers and retailers often have strict limits on the remaining shelf lifetime of any product they agree to purchase.

39.    According to CW5, many of BioSteel's large customers required at least a year or 75% of the life of the product in remaining shelf life to take on a product. Therefore, if BioSteel was unable to get its product out to retailers and wholesalers quickly, the product could be rejected, and BioSteel would be stuck with unsalable product.

40.    In addition to distribution issues, CW5 confirmed that BioSteel overproduced a lot of its product and could not sell in the amounts produced. CW5 affirmed that the problem became so bad by late 2021, BioSteel was offering employees dozens of free cases of the product rather than just sitting on the product until it expired.

41.    Starting in October 2020, BioSteel employed Confidential Witness 6 ("CW6") as a Regional Sales Director covering BioSteel's Great Lakes/Midwest territory until May 2023. CW6 was tasked with managing BioSteel's sales representatives.

42.    CW2 and CW6 confirmed CW5's accounts of excess inventory. CW6 also confirmed that a significant reason for BioSteel's excess inventory problem was an overproduction of the product.

43.    According to CW2, the problem of excess inventory became so bad that BioSteel offered to give away palettes to truckloads of its product. Indeed, after CW2 left Canopy, CW2 was

still receiving e-mails from BioSteel in the summer of 2022 offering free BioSteel product.

44.     According to CW5, Canopy conducted Monthly Business Review calls in which the excess inventory problem was discussed.  CW5 and Klein, Lee, and Hong participated in Monthly Business Review meetings.

45.     By early 2023, a significant amount of undistributed and unsold BioSteel product was expiring in warehouses, unsold and undistributed. This buildup of expiring product ultimately required Canopy to write down a significant amount of product.

**C.     Pressure to Meet Revenue Targets**

46.     BioSteel's distribution and inventory problems were compounded by the immense pressure by Canopy to hit aggressive revenue targets. According to CW3, given the significant funding Canopy had invested into BioSteel, there was tremendous pressure internally, from the top down, to achieve certain revenue numbers. For example, for Fiscal Year 2023, BioSteel had a revenue target that was well over $100 million, when even with the artificial inflation described herein, BioSteel was only capable of generating about $70 million.

47.     According to CW1, BioSteel's sales staff were regularly selling product at discount and cutting deals with wholesalers to work towards aggressive sales goals. These deals would include some type of terms where BioSteel would help wholesalers push product out to retailers with certain discounts, but then force wholesalers to bring in new inventory.  As a result of stuffing too much product into the sales channel, those who were stuck with excess product purchased at a discount offered it for sale, unauthorized, on third-party platforms like Amazon.

**III.     Relevant Accounting Policies and Principles**

**A.     GAAP Requirements Generally**

48.     In addition to known but concealed operational problems at Canopy's BioSteel unit,

Canopy concealed material weaknesses in its internal controls that compromised its financial reporting of BioSteel revenue. Canopy did not comply with U.S. Generally Accepted Accounting Principles ("GAAP") during the Class Period, and specifically violated Accounting Standards Codification ("ASC") Topic 606 by falsely inflating its revenue, both overall and for the BioSteel unit, resulting in further misstatement of operating profits and net income.

49.     GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB").

50.     The SEC requires that public companies present financial statements in accordance with GAAP. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.

51.     GAAP includes not only broad guidelines of general application, but also detailed practices and procedures, including implementation guidance and related examples. Those conventions, rules, and procedures provide a standard by which to measure financial presentations. Rules and interpretive releases of the SEC under the authority of the federal securities laws are also sources of relevant GAAP for SEC registrants. *See* ASC 105-10-05-01.

52.     While companies may supplement GAAP earnings with non-GAAP measures, all SEC Registrants must report revenue figures in compliance with GAAP. *See*, *e.g.*, SEC Regulation G (17 C.F.R. §244.100(a)).

## B.     Accounting Standards Codification Topic 606

53.     On May 28, 2014, FASB issued a new revenue recognition standard, Accounting Standards Codification Topic 606 ("ASC 606"), to help simplify and harmonize revenue recognition practices. The new standard established the principles to report useful information to users of financial

statements about the nature, timing, and uncertainty of revenue from contracts with customers. Specifically, the standard sets forth the principles that entities must apply when reporting revenue and cash flows arising from contracts associated with providing goods or services to customers. The revenue recognition standard affects all entities that enter into contracts with customers to transfer goods or services, unless those contracts are within the scope of other standards that are not at issue here.

54.    The core principle of ASC 606 is that an entity should recognize revenue to depict the transfer of goods or services to customers in an amount that reflects the consideration that the entity expects to be entitled to in exchange for those goods or services. To achieve this core principle, ASC 606 establishes the following five-step process that entities must apply:

Step 1: Identify the contract with the customer.

Step 2: Identify the performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: Allocate the transaction price to the performance obligations in the contract.

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

55.    In many situations, a company's expected revenue from the sale of a given product is something less than the listed sales price because various provisions in a contract, such as rebates or return policies, might force a company to give some money back to the customer. Therefore, under ASC 606, companies can only report revenue from sales when it is able to conclude that it is not likely to suffer a significant reversal and have to give some of the money back. ASC 606-10-05-4.

56.    Moreover, a company can only reach that conclusion after first analyzing a specified set of factors, including historical data on returns from that product or similar products, how long it will be before any uncertainty is resolved, and the relevance of circumstances beyond a company's

controls. ASC 606-10-32-12.

57.     If a company is not able to conclude that revenue from a particular sale is likely to ultimately be collected – either because it lacks enough information to make a sufficiently reliable estimate or because the information available suggests the risk of reversal – it cannot report revenue from that sale.

58.     When ASC 606 was issued, the FASB explained that: "Many respondents agreed that it was necessary to include some form of constraint on the recognition of revenue that results from variable consideration because a significant portion of errors in financial statements under previous revenue recognition requirements have related to the overstatement or premature recognition of revenue. . . . This is because revenue is an important metric and users of financial statements explained that it is critical that those estimates of variable consideration be included in revenue only when there is a high degree of confidence that revenue will not be reversed in a subsequent reporting period." FASB Accounting Standards Update No. 2014-09, at ¶BC204.

59.     ASC 606 became effective for all public companies after December 15, 2017, and for all private companies after December 15, 2018.

C.      **Relevant Internal Control Standards**

60.     The Committee of Sponsoring Organizations of the Treadway Commission Report *Internal Control – Integrated Framework* (the "COSO Framework") defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. COSO Framework, Executive Summary. Canopy indicates in its 2021 Form 10-K and 2022 Form 10-K that its management evaluates internal controls according to the standards of the COSO Framework.

17

61.    The term "reliable," as used in the COSO Framework, requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. The requirement of reliable financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

62.    Management is responsible for "adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." *See* Auditing Standard ("AS") 1001.03 (internal quotations omitted) (emphasis added).

63.    SEC Rule 13a-15(f) likewise requires management to establish and maintain adequate internal control over financial reporting. A company's internal control over financial reporting must be designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

64.    The COSO Framework recognizes that the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system . . . The influence of the CEO on an entire organization cannot be overstated." COSO Framework, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

IV.    **Canopy Violated GAAP and ASC 606, and had Undisclosed Material Weaknesses in Internal Controls Throughout the Class Period**

65.    Despite Defendants' factual representations throughout the Class Period that they "prepare and report [Canopy's] Financial Statements in accordance with U.S. GAAP" and that its internal controls were effective, after the Class Period Canopy finally admitted that they were not and as a result it had materially misstated revenue and financial results throughout the Class Period.

66.    Specifically, Defendants disclosed in the Company's Form 10-K for Fiscal Year 2023 ("2023 Form 10-K"), filed on June 22, 2023, that:

> misstatements in the Company's recognition of revenue pursuant to ASC 606 were identified, primarily in relation to the Company's "business-to-business" sales to customers in international markets, including wholesalers, distributors, and retailers. The Company concluded that revenue was incorrectly recognized in certain situations in which: (i) the product ordered by the customer had not been shipped, and therefore control of the product had not been transferred to the customer; (ii) the product was shipped without a legally enforceable written, oral or implied contract with the customer that specified each party's rights regarding the goods to be transferred and the payment terms; or (iii) product had been shipped, and ultimately not accepted by the customer, because the product did not have the required remaining shelf life to be sold through by the customer in a primary sales channel.

67.    In Canopy's 2022 Form 10-K and its Form 10-Qs for fiscal year 2023, Defendants improperly recognize more than twenty million dollars in violation of ASC 606.

68.    In the restatement of the 2022 Form 10-K, the "correction of the revenue misstatement . . . resulted in a decrease of [$9,862,000] in amounts receivable, net, and a corresponding increase in the deficit. Additionally, the correction of the misstatement described above resulted in a decrease in redeemable noncontrolling interest of [$3,700,000] and an increase in additional paid-in-capital of [$1,480,000]."

69.    The revenue misstatements in the 2022 Form 10-K also "resulted in a decrease of [$10,004,000] in net revenue and an increase in the net loss attributable to noncontrolling interests

and redeemable noncontrolling interest of [$2,220,000]. As a result, net loss attributable to Canopy Growth Corporation and comprehensive loss attributable to Canopy Growth Corporation were each impacted by [$7,862,000]."

70.     According to the 2023 Form 10-K, "[t]he correction of the [2022] revenue misstatement described above resulted in a decrease of [C$10,004,000] in revenue associated with the BioSteel reportable segment."

71.     In its Q1 2023 Form 10-Q, Canopy overstated its revenue by approximately C$4,195,000.

72.     In its Q2 2023 Form 10-Q, Canopy overstated its revenue by approximately C$12,445,000.

73.     In its Q3 2023 Form 10-Q, Canopy understated its revenue by approximately C$2,818,000.

74.     According to Canopy, Defendants had "evaluated the materiality of these misstatements both qualitatively and quantitatively in accordance with Staff Accounting Bulletin ('SAB') No. 99 Materiality, and SAB No. 108, Considering the Effects of Prior Year Misstatements in Current Year Financial Statements, and determined the effect of correcting these misstatements was material to the Prior Financial Statements."

75.     According to CW1, a significant cause of Canopy's overstatement of revenue was how the Company accounted for gross to net costs when determining revenue and profit. When calculating a net profit, a company generally takes the gross profit and subtracts the Costs of Goods Sold ("COGS"), such as marketing, promotions, freight, and commission costs. In the fall of 2021, CW1 became aware that Canopy's accounting team did not subtract the actual COGS to calculate its net profit, which CW1 estimated to be 23-26% of the gross profit, but instead used a standard 1% figure

for the COGS. In other words, Canopy took the gross profit from BioSteel and subtracted 1% of that gross profit to reach the net profit, as opposed to subtracting the actual COGS. Therefore, Canopy's reported net profit from BioSteel sales was inflated and did not represent the actual profit BioSteel received from the sale of its product.

76.     CW1 raised this issue internally with Canopy management, but the problem was not remedied until after February 2023 – shortly before the Company filed its Form 8-K with the SEC withdrawing reliance on previously-issued 2022 and 2023 financial statements because Canopy "identified certain trends in the booking of sales by the [BioSteel] business unit for further review."

77.     As detailed herein, Canopy has now also admitted that, despite repeated representations to the contrary during the Class Period, its internal control over financial reporting was riddled with material weaknesses and its Class Period financial statements were all inflated.

## V.     Defendants Make Materially False and Misleading Statements Issued During the Class Period

### A.     November 5, 2021 Form 8-K for Q2 2022

78.     The Class Period begins on November 5, 2021. On that day, the Company announced its second quarter 2022 financial results in a press release issued that day and attached to a Form 8-K filed with the SEC, stating, in relevant part:

> The Company remains optimistic about its growth opportunities in the U.S. for both its BioSteel ready-to-drink ("RTD") beverages and its portfolio of CBD brands. Brand awareness continues to rise, velocity is tracking in-line with expectations and feedback from distributors and retailers has been positive. BioSteel is expected to see its distribution ramp up over the balance of FY2022 and into FY2023 driven by increased listings with national and regional chain accounts.
>
> * * *
>
> BioSteel RTD beverages continued to build distribution throughout Q2 FY2022, with All Commodity Volume ("ACV") increasing to 6.5% in the latest 13-weeks ending October 3, 2021 in IRI. BioSteel has recently secured new distribution with

a number of key retailers, and active discussions underway with additional national and regional chain retailers.

* * *

BioSteel sales in Q2 FY2022 increased 47% over Q2 FY2021 driven by the launch of RTD beverages and expanded distribution in the U.S. market.

79.    The above statements identified in Paragraph 78 were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

**B.    Q2 2022 Earnings Call**

80.    On November 5, 2021, Defendants held a conference call with investors and analysts (the "Q2 2022 Earnings Call"). During the Q2 2022 Earnings Call, when asked by an analyst about BioSteel's outlook, Klein falsely touted positive retailer response to BioSteel while omitting known adverse information:

**Q: Vivien Azer**

Hi, thank you. Good morning. I wanted to dive in on the BioSteel outlook and specifically the timing of the distribution gains. I appreciate the timing of shelf reset is a little bit more volatile or dynamic with COVID and all that. But given the deep institutional relationships, David, that you have with these distributors and retailers, as well as your partners at Constellation Brands, I'm a little bit surprised that it seems to cut you off guard a little bit. You know we certainly talked about it extensively last time that we were together. So if you can offer just any more color on what changed and when, I think that would be very helpful. Thank you.

**A: David Klein**

Yes. So, Vivien, we're working through the contracting cycle with many of the major national accounts, as you know, it's kind of time of the year that happens. And we expected sooner cuttings and sooner loadings for those resets. ***I will say, and I think Mike called this out in his script there, we're seeing really good retailer response to BioSteel. And so, we remain as bullish, as ever, in aggregate on the BioSteel brands.*** It's kind of timing of cuttings that -- that's the risk that we're seeing. And so I think we need to, we need to wait till we have the orders in hand at this point before we can say whether it's fourth-quarter orders or first-quarter orders, when we start getting those initial cuttings. So it's really not -- with BioSteel there hasn't been a change of view. The timing has -- with a little bit really in, in terms of when we get into the market.

81.    Additionally, in response to another question about BioSteel, Klein continued to laud that BioSteel and its total revenue was "going to see a very hard ramp[.]"

82.    The above statements identified in Paragraphs 80-81 were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

**C.    November 8, 2021 Q2 2022 Form 10-Q**

83.    On November 8, 2021, Canopy filed its Form 10-Q with the SEC for the second quarter of fiscal year 2022, ended September 30, 2021 (the "Q2 2022 Form 10-Q"). The Q2 2022 Form 10-Q was signed by Klein and Lee. Therein, the Company stated, in relevant part:

Revenue from BioSteel was $7.5 million in the second quarter of fiscal 2022, a year-over-year increase of $2.4 million due primarily to (i) the expansion of our United States distribution network beginning in the fourth quarter of fiscal 2021;

23

(ii) new "ready-to-drink" product launches during the last year; and (iii) the adverse impact on revenue in the second quarter of fiscal 2021 related to COVID-19 related restrictions on retailers.

84.     The above statements identified in Paragraph 83 were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

85.     In addition, the Q2 2022 Form 10-Q stated the following regarding the Company's internal controls:

> There have been no changes in our "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

86.     Appended as exhibits to the Q2 2022 Form 10-Q were signed certifications by Klein and Lee certifying that the Q2 2022 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [the Company][,]" and Defendants disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

87.    The statements identified in Paragraphs 85-86 were materially false and misleading when made because, as Canopy has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and had material weaknesses during the quarter ended September 30, 2021.

88.    In response to Canopy's Q2 2022 financial results and Defendants' misleading statements, Canopy's stock rose by $22.30, or 18.9%, over a two-day period, from $117.40 at the start of November 8, 2021 to close at $139.70 on November 9, 2021.

89.    On November 19, 2021, Canopy put out a press release and announced that Lee would step down from his role "effective immediately" and would depart from the Company on December 31, 2021. Canopy announced in the same press release that Hong was named as interim Chief Financial Officer and would report directly to Klein.

**D.    February 9, 2022 Form 8-K for Q3 2022**

90.    On February 9, 2022, Canopy issued a press release announcing its financial results for the third quarter of fiscal year 2022, ended December 31, 2021, which was attached to a Form 8-K filed that day with the SEC. The February 9, 2022 Form 8-K was signed by Hong. The press release stated, in relevant part:

> Significant gains in BioSteel distribution drove record quarterly revenue in Q3 FY2022.
> ***
> BioSteel sales in Q3 FY2022 increased 130% over Q3 FY2021 driven by the launch of ready-to-drink "RTD" beverages and expanded distribution in the U.S. market.

91.    The above statements identified in Paragraph 90 were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were

25

artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

**E.      February 9, 2022 Q3 2022 Form 10-Q**

92.      Also on February 9, 2022, Canopy filed its Form 10-Q with the SEC for the third quarter of fiscal year 2022, ended December 31, 2021 (the "Q3 2022 Form 10-Q"). The Q3 2022 Form 10-Q was signed by Klein and Hong.  Therein, the Company stated, in relevant part:

> Revenue from BioSteel was $17.0 million in the third quarter of fiscal 2022, a year-over-year increase of $9.6 million due primarily to (i) the expansion of our United States distribution network beginning in the fourth quarter of fiscal 2021; (ii) new "ready-to-drink" product launches during the last year; and (iii) higher international sales of ready-to-drink products and beverage mixes.

93.      The above statements identified in Paragraph 92 were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

94.      In addition, the Q2 2022 Form 10-Q stated the following regarding the Company's internal controls:

There have been no changes in our "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

95.     Appended as exhibits to the Q3 2022 Form 10-Q were signed certifications by Klein and Hong certifying that the Q3 2022 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [the Company][,]" and Defendants disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

96.     The statements identified in Paragraphs 94-95 were materially false and misleading when made because, as Canopy has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and had material weaknesses during the quarter ended December 31, 2021.

**F.     Q3 2022 Earnings Call**

97.     On February 9, 2022, Defendants held a conference call with investors and analysts (the "Q3 2022 Earnings Call"). During the Q3 2022 Earnings Call, Klein spoke about BioSteel, stating, in relevant part:

Looking to the U.S. in the areas of greatest opportunity for long-term growth. I'd like to now highlight the momentum of our CBD business as well as review the advancement of our THC ecosystem. ***The U.S. is our area of greatest potential***

*and we've been highly encouraged by both Storz & Bickel and BioSteel performance*.

***

*Canopy's hydration beverage brand, BioSteel, also delivered a record revenue quarter, driven by gains in distribution of BioSteel ready-to-drink. We're seeing continued momentum with the recent signing of retail authorizations by Albertsons, Rite Aid, Food Lion, Stop & Shop, and Sheetz, and over 20 additional authorizations across grocery, convenience, and drug chains. Combined, these authorizations add nearly 15,000 stores across the U.S.*

98.     The above statements identified in Paragraph 97 were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

99.     In reaction to the false and inflated results Defendants reported for Canopy's Q3 2022, led by BioSteel's strong numbers, Canopy's stock rose on February 9, 2022 from $82.40 by $6.10, or 7.4%, to close at $88.50.

100.    Deceived by the inflated revenue and omitted deficiencies regarding BioSteel, analysts gushed about BioSteel's performance and its impact on Canopy's overall net revenue, stating, "Canopy reported F3Q22 net revenue of C$141.0M, above our C$132.5M estimate and consensus of C$135.9M. The revenue beat was primarily driven by better-than-expected revenue from BioSteel (up 130%), more than offsetting softer global cannabis revenue (down 20%)." Michael S. Lavery, *BioSteel Sales Beat Estimates, Offsetting Cannabis Miss*, PIPER SANDLER, February 9,

2022, at 1.

### G.    May 27, 2022 Form 8-K for 2022 Year End

101.    On May 27, 2022, Canopy issued a press release announcing its financial results for the fourth quarter and fiscal year 2022, ended March 31, 2022, that was attached to a Form 8-K filed that same day.  The May 27, 2022 Form 8-K was signed by Hong.  The press release reported that Canopy's:

- Net revenue was C$520,325,000;

- Net loss was C$320,485,000; and

- BioSteel's net revenue was C$44,600,000.

102.    Additionally, the Company's press release stated, in relevant part:

Increased distribution of BioSteel hydration products drove year-over-year revenue growth in FY2022 of 56% versus FY2021. Focusing strategic investments to accelerating brand growth with aspiration to be top 4 player in the North American sports drink market.

* * *

The Company generated Net revenue of $520 million in FY2022, representing a decline of 5% versus FY2021.

* * *

"Achieving profitability is critical and we have undertaken additional initiatives to streamline and drive efficiencies for our global cannabis business. In FY2023, we are focused on executing our path to profitability in Canada, while we continue to invest in high potential opportunities – particularly in BioSteel, and further developing our U.S. THC ecosystem, which we believe remains significantly under-appreciated by the market."- [Defendant] Hong, Chief Financial Officer

103.    The statements identified in Paragraphs 101-102 were materially false and misleading when made because, as the Company has admitted in its 2023 Form 10-K, the statements falsely inflated Canopy's revenue and BioSteel's segmented revenue by approximately C$10,004,000.

29

Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

**H.    2022 Form 10-K**

104.    On May 31, 2022, Canopy filed its Form 10-K with the SEC for the fiscal year ended March 31, 2022 (the "2022 Form 10-K"). The 2022 Form 10-K was signed by Klein and Hong. Therein, the Company stated, in relevant part:

> Net revenue was $520.3 million in fiscal 2022, as compared to $546.6 million in fiscal 2021. The year-over-year decrease is attributable to a revenue decline of 11% in our global cannabis segment, as declines across our organic Canadian recreational and medical cannabis businesses were only partially offset by net revenue attributable to the acquisitions, in the first quarter of fiscal 2022, of Supreme Cannabis and Ace Valley. ***The revenue decline in this segment was only partially offset by growth of 9% in our other consumer products segment, which was primarily driven by the growth in our BioSteel business.***
>
> * * *
>
> ***Revenue from BioSteel was $44.6 million***, a year-over-year increase of $16.1 million due primarily to (i) the expansion of our United States distribution network beginning in the fourth quarter of fiscal 2021; (ii) new "ready-to-drink" product launches during the last year; and (iii) higher international sales of ready-to-drink products and beverages mixes.

105.    The statements identified in Paragraph 104 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$10,004,000. Additionally,

the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

106.    The 2022 Form 10-K also affirmed that Canopy's internal controls were effective, stating:

> Management conducted an assessment of the effectiveness of our internal control over financial reporting as of March 31, 2022, based on the framework established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on the assessment, ***management has determined that our internal control over financial reporting as of March 31, 2022, was effective***.

107.    Further, Defendants affirmed that:

> There were no changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) that occurred during our most recent quarter, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

108.    Appended as exhibits to the 2022 Form 10-K were signed certifications by Klein and Hong certifying that the 2022 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [the Company][,]" and Defendants disclosed "[a]ll significant deficiencies and material weaknesses in

the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

109.    The statements identified in Paragraphs 106-108 were materially false and misleading when made because, as Canopy has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and had material weaknesses during the quarter ended March 31, 2022.

**I.    2022 Year End Earnings Call**

110.    On May 27, 2022, Defendants held a conference call with investors and analysts (the "2022 Year End Earnings Call"). During the 2022 Year End Earnings Call, Klein spoke misleadingly about BioSteel, stating in relevant part:

> ***BioSteel saw gains in distribution and sales velocity of the ready-to-drink products, which drove a 50% increase in revenue in fiscal '22 versus fiscal '21. We believe that this challenger brand is quickly turning into a winner*** as we watch members of team BioSteel dominate in the playoffs, including Luka Doncic of the Dallas Mavericks, Connor McDavid of the Edmonton Oilers, and Andrew Wiggins with the Golden State Warriors.
>
> ***

> Our second priority is driving growth of our high potential CPG brands. ***We will be making strategic investments in marketing and new product development for our high growth CPG brands of Storz & Bickel and BioSteel. There's considerable runway for both brands and investment will be to further build brand awareness in visibility amongst consumers and building a robust distribution pipeline***. I'd like to reiterate that Storz & Bickel is already CADl00 million brand with attractive margins. ***And BioSteel is the fastest growing sports hydration drink in North America. And our near-term aspiration is to grow the brand into a top 5 position as we significantly increased distribution through continued onboarding of major retailers***.

111.    The statements identified in Paragraph 110 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, the positive pronouncements about BioSteel were

based on a foundation of overstated revenue and undisclosed issues in BioSteel's business. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

112.    Further, Hong spoke about Canopy's revenue for the fiscal year 2022, as well as that of BioSteel, and stated:

> In Q4, healthy performance in our CPG business was offset by softness in our Canadian recreational business, and adjusted EBITDA was further impacted by continued gross margin challenges despite a strong operating expense discipline. ***In Q4, we generated net revenue of CAD112 million, representing a 25% decline over the prior year***. Excluding the impact from acquired businesses and divestiture of C3, net revenue in Q4 declined 26%. Details and drivers of net revenue in Q4 and fiscal 2022 are provided in the press release that we issued earlier today.

> ***

> That said, we expect the execution of our premiumization strategy in Canada, our cost savings initiatives, and growth in BioSteel and Storz & Bickel will, over time, result in strong revenue growth, attracted margin profile, and free cash flow generation that are in line with premium branded CPG company. So with that in mind, let me offer some perspectives on our outlook for fiscal '23. ***First, we expect significant revenue growth from BioSteel as the team drive higher distribution and sales velocity, which is supported by sizable marketing investments in fiscal '23***. We expect another year of solid growth from Storz & Bickel, building on a strong foundation with investments to increase higher awareness.

113.    The statements identified in Paragraph 112 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$10,004,000. Additionally,

the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

**J.      August 5, 2022 Form 8-K for Q1 2023**

114.     On August 5, 2022, Canopy issued a press release announcing its financial results for the first quarter of fiscal year 2023, ended June 30, 2022, that it attached to a Form 8-K filed that day with the SEC.  The August 5, 2022 Form 8-K was signed by Hong.  The press release reported that Canopy's:

- Net revenue was C$110,115,000;

- Net loss was C$2,087,556,000; and

- BioSteel's net revenue was C$17,900,000.

115.     Additionally, the August 5, 2022 Form 8-K listed the following highlights:

- Q1 FY2023 net revenue was flat compared to Q4 FY2022.

- Company maintained #1 share of combined premium flower and pre-rolled joint ("PRJ") segment in Q1 FY2023.

- Increased share of the combined mainstream flower and PRJ segment by 35 bps to 4.0% in Q1 FY2023.

- International medical cannabis net revenue approximately doubled versus Q1 FY2022 driven primarily by strong sales in Israel and Australia.

- ***Record BioSteel revenues in Q1 FY2023 increased 169% versus Q1 FY2022. Secured retail agreement with Walmart Stores covering 2,200 stores in 39***

> ***states. Entered partnership to become the Official Hydration Partner of the NHL and NHLPA.***
>
> - Cost reduction program on track with operating expenses[] in Q1 FY2023 decreasing by 13% versus Q1 FY2022.
>
> \* \* \*
>
> Net revenue of $110 million in Q1 FY2023 declined 19% versus Q1 FY2022. Total global cannabis net revenue of $66 million in Q1 FY2023 represented a decline of 29% over Q1 FY2022 driven in part by a decline in value flower sales in the Canadian recreational cannabis market due to a deliberate business transition to focus on higher margin, premium and mainstream products. Other consumer products revenue of $44 million in Q1 FY2023, represented an increase of 1% over Q1 FY2022. Excluding the impact from acquired businesses and divestiture of C3, net revenue declined 17% and global cannabis net revenue declined 28% versus Q1 FY2022.

116.    The statements identified in Paragraphs 114-115 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$4,195,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

### K.    Q1 2023 Form 10-Q

117.    On August 9, 2022, Canopy filed its Form 10-Q with the SEC for the first quarter of fiscal year 2023, ended June 30, 2022 (the "Q1 2023 Form 10-Q"). The Q1 2023 Form 10-Q was signed by Klein and Hong.  Therein, the Company stated, in relevant part:

Net revenue was $110.1 million in the first quarter of fiscal 2023, as compared to $136.2 million in the first quarter of fiscal 2022. The year-over-year decrease is attributable to a revenue decline of 29% in our global cannabis segment, which was primarily due to a decline in our organic Canadian recreational business and the divestiture of all of our interest in C3 Cannabinoid Compound Company GmbH ("C3") in the fourth quarter of fiscal 2022. Revenue in our other consumer products segment grew 1% relative to the first quarter of fiscal 2022, as growth in our BioSteel business was largely offset by declines in our Storz & Bickel and This Works businesses.

* * *

***Revenue from BioSteel was $17.9 million in the first quarter of fiscal 2023, a year-over-year increase of $11.2 million due primarily to (i) continued growth in our distribution channels and sales velocities across North America; and (ii) higher international sales of ready-to-drink products and beverage mixes.***

118.    The statements identified in Paragraph 117 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$4,195,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

119.    In addition, the Q1 2023 Form 10-Q stated the following regarding the Company's internal controls:

There have been no changes in our "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial

reporting.

120.    Appended as exhibits to the Q1 2023 Form 10-Q were signed certifications by Klein and Hong certifying that the Q1 2023 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [the Company][,]" and Defendants disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

121.    The statements identified in Paragraphs 119-120 were materially false and misleading when made because, as Canopy has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and had material weaknesses during the quarter ended June 30, 2022.

**L.    Q1 2023 Earnings Call**

122.    On August 5, 2022, Defendants held a conference call with investors and analysts (the "Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call, Klein spoke about BioSteel's performance, stating:

> ***Q1 was a record quarter for BioSteel, with revenue of CAD18 million***. And we feel this brand truly has the potential to transform the sports hydration market. A notable highlight in Q1 was welcoming Wal mart as a BioSteel RTD retailer in the U.S. This initial agreement will bring BioSteel RTD beverages to 2,200 Wal mart stores across 39 states. Initial shipments began in June and we expect additional shipments to these stores over the coming months. We're also pleased to welcome Bruce Jacobson to the BioSteel team in the new role of President. Bruce, together

with co-founders, John Celenza and Mike Cammalleri, will be responsible for accelerating the growth of BioSteel. Bruce joined BioSteel with a wealth of experience from the beverage industry, including as an experienced brand builder and business strategist who has led organizations to best-in-class growth. Another important growth driver for BioSteel is the multi-year partnership, naming BioSteel as the official hydration partner of the NHL and the NHL Players Association. This agreement provides BioSteel with league-wide ring-side marketing and product supply rights, retail activation rates and the community engagement platform. Beginning in the '22, '23 NHL seasons, fans will see NHL players hydrating with BioSteel during 1,400 games each season. We're off to a fast start with this partnership, having signed distribution agreements with several new retail chains in priority NHL markets, representing over 1,100 doors and are in positive discussions with additional retailers. We see the investment in this partnership as a key element of increasing BioSteel brand awareness, distribution and trial, which is critical to growing BioSteel to be a top-five sports hydration beverage over time. ***With the ongoing load-in into additional retailers, as well as increases in sales velocity, driven by our brand activations, we are expecting to see a significant jump in BioSteel sales over coming quarters***.

123.    The statements identified in Paragraph 122 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$4,195,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

124.    Further, Hong spoke about Canopy's Q1 2023 results, stating:

Let's start with the review of our Q1 fiscal '23 financial results. In Q1, we had strong performance from our international Cannabis businesses, ***BioSteel had its best revenue quarter ever, and the Canadian business stabilized this revenue. Gross margin and adjusted EBITDA also improved sequentially compared to Q4,***

*as we begin to execute on our cost savings initiatives that we announced in April. We generated net revenue of CAD110 million, representing a 19% decline over the prior year, but down just 1% compared to Q4. Excluding the impact from divestiture of C3, net revenue in Q1 increased 1% as compared to Q4*.

125.    The statements identified in Paragraph 124 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$4,195,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

126.    In response to Canopy's Q1 2023 Form 10-Q numbers, analysts noted that while parts of Canopy's business were struggling, the overall gross margin improved from the previous quarter, "primarily driven by . . . BioSteel margins improving[.]" Aaron Grey, *In-Line Q w Biosteel As the Standout*, ALLIANCE GLOBAL PARTNERS, August 5, 2022, at 1.

### M.    November 9, 2022 Form 8-K for Q2 2023

127.    On November 9, 2022, Canopy issued a press release announcing its financial results for the second quarter of fiscal year 2023, ended September 30, 2022, which it attached to a Form 8-K filed that same day with the SEC. The November 9, 2022 Form 8-K was signed by Hong. The press release reported that Canopy's:

- Net revenue was C$117,863,000;

- Net loss was C$231,911,000; and

- BioSteel's net revenue was C$29,922,000.

128.    Additionally, the November 9, 2022 Form 8-K stated:

- Delivered net revenue growth of 7% in Q2 FY2023 relative to Q1 FY2023, despite the continued impacts of macroeconomic headwinds and evolving Canadian cannabis market dynamics.

- ***Achieved 299% net revenue increase for BioSteel as compared to the prior year, driven by increased investment. Acquired manufacturing facility subsequent to quarter end, which is expected to support ongoing rapid U.S. expansion for the brand and drive gross margin improvement.***

* * *

***Net revenue of $118 million in Q2 FY2023 declined 10% versus Q2 FY2022.*** The decrease is primarily attributable to increased competition in the Canadian adult-use cannabis market, the divestiture of C3 Cannabinoid Compound Company GmbH ("C3"), and softer performance from This Works, ***offset by revenue growth at BioSteel.*** Excluding the impact from the divestiture of C3, net revenue declined 1% versus Q2 FY2022. When adjusting for both the impact of C3 and the ongoing divestiture of our Canadian retail business, revenues for the period increased 2% versus Q2 FY2022. Net revenue increased 7% in Q2 FY2023 relative to Q1 FY2023, despite the continued impacts of macroeconomic headwinds and evolving Canadian cannabis market dynamics.

129.    The statements identified in Paragraphs 127-128 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$12,445,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was

40

experiencing a mounting problem with aged inventory.

**N.    Q2 2023 Form 10-Q**

130.    Also on November 9, 2022, Canopy filed its Form 10-Q with the SEC for the quarter

ended September 30, 2022 (the "Q2 2023 Form 10-Q").  The Q2 2023 Form 10-Q was signed by

Klein and Hong.  Therein, the Company detailed the following about its net revenue:

> ***Net revenue was $117.9 million in the second quarter of fiscal 2023, as compared
> to $131.4 million in the second quarter of fiscal 2022***. The year-over-year decrease
> is primarily attributable to: (i) the continuing decrease in net revenue from our
> Canada cannabis segment, as increased competition in the Canadian recreational
> market has resulted in lower sales velocities, continued price compression and
> reduced traffic at our corporate-owned retail stores; (ii) the divestiture of all of our
> interest in C3 Cannabinoid Compound Company GmbH ("C3") in the fourth
> quarter of fiscal 2022; and (iii) softer performance in our This Works business.
> These declines were partially offset by continued growth in our BioSteel business
> resulting from the continued expansion of our distribution and retail channels, and
> strong international sales growth.

* * *

> BioSteel
>
> ***Revenue from BioSteel was $29.9 million in the second quarter of fiscal 2023, as
> compared to $7.5 million in the second quarter of fiscal 2022. The year-over-year
> increase is primarily attributable to: (i) continued growth in our distribution and
> retail channels, which resulted in increased sales velocities across North
> America; and (ii) strong international sales growth***. All of BioSteel's major
> product lines contributed to the year-over-year revenue growth.

131.    The statements identified in Paragraph 130 were false and misleading because, as the

Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's

segmented revenue through the improper recognition of approximately C$12,445,000. Additionally,

the statements were materially false and misleading when made because: (1) BioSteel revenue, and

as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2)

the statements omitted to disclose the following material adverse information necessary to make the

statements made not misleading: (a) the Company had material weaknesses in its internal controls

over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

132.    In addition, the Q2 2023 Form 10-Q stated the following regarding the Company's internal controls:

> There have been no changes in our "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

133.    Appended as exhibits to the Q2 2023 Form 10-Q were signed certifications by Klein and Hong certifying that the Q2 2023 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [the Company][,]" and Defendants disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

134.    The statements identified in Paragraphs 132-133 were materially false and misleading when made because, as Canopy has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and had material weaknesses during the quarter ended September 30, 2022.

O.    **Q2 2023 Earnings Call**

135.    On November 9, 2022, Defendants held a conference call with investors and analysts

(the "Q2 2023 Earnings Call"). During the Q2 2023 Earnings Call, Klein spoke about BioSteel's

quarter, stating:

> Next, I'll speak to progress in our CPG portfolio. ***First, BioSteel delivered another***
> ***record quarter in Q2, helped by strategic investments that have driven***
> ***distribution and velocity gains. This resulted in nearly $30 million in revenue in***
> ***the quarter, which represents sequential, quarterly and year-over-year growth of***
> ***67% and 299%, respectively***. In the first half of fiscal '23, BioSteel secured
> distribution with major retailers including Wal mart, Rite Aid and Winn Dixie. This
> has helped increase ACV to 34% in the US, which represents a sequential increase
> of 520 basis points according to IRI data for the 13 weeks ended on October 2. Now
> moving to Canada. ***BioSteel is seeing strong market share growth***. According to
> Nielsen data covering the convenience and gas channel for the four week period
> ended October 8, BioSteel's share of isotonic beverage sales in Ontario reached
> 11.2%, representing an increase of 630 basis points versus the prior year. BioSteel's
> share nationally was 7.4%, which is 450 basis points higher than the prior year
> period. A homegrown Canadian brand, BioSteel was born in an NHL locker room
> and resonates with athletes from across the country. This is a blueprint for the
> growth that we're starting to see in the United States with a multi-year partnership
> that names BioSteel as the official hydration partner of the National Hockey League
> and the National Hockey League Players Association. The partnership provides
> BioSteel with ring side marketing, product supply and retail activation rights as
> well as community engagement platforms. If you watch hockey, the brand is highly
> visible on and off the ice, and we've secured several distribution agreements in the
> US as a result. We anticipate additional growth for the brand as the hockey season
> continues and athletes, both professional and aspiring, enjoy the benefits of clean,
> healthy hydration, courtesy of BioSteel.

136.    The statements identified in Paragraph 135 were false and misleading because, as the

Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's

segmented revenue through the improper recognition of approximately C$12,445,000. Additionally,

the statements were materially false and misleading when made because: (1) BioSteel revenue, and

as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2)

the statements omitted to disclose the following material adverse information necessary to make the

statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

137.    Further, Hong spoke about the Company's financial success, stating:

> ***Let's start with a review of our second quarter fiscal '23 financial results. In Q2, we generated net revenue of $118 million representing a 10% decline over the prior year period.*** When adjusting for both the impact of C3 and the impact of our Canadian retail business which we're divesting, revenues increased 2%. Sequentially, net revenues increased 7% compared to Q1.

138.    The statements identified in Paragraph 137 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they overstated Canopy's revenue and BioSteel's segmented revenue through the improper recognition of approximately C$12,445,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

139.    As a result of Canopy's false and inflated Q2 2023 financial results, analysts again considered BioSteel to be Canopy's saving grace.  A Canaccord Genuity analyst report concluded: "Canopy's non-cannabis CPG segments contributed heavily to the overall top-line beat for the quarter . . . BioSteel sports drinks jumped by ~67% QoQ (to C$29.9M) as the product line continues to expand its distribution channels (including Wal-Mart and Rite Aid) in addition to its partnership

with the NHL." Matt Bottomley and Yewon Kang, *FQ2/23 first look: BioSteel expansion leads to top-line beat while operating losses*, CANACCORD GENUITY, November 9, 2022, at 1. Similarly, an analyst from Piper Sandler noted BioSteel's reported (but false) "299% revenue growth" and was comforted that that "[n]ear-term growth will likely be driven by BioSteel . . . [as] BioSteel revenues rose ~C22M while sales for the rest of the [Canopy] portfolio fell ~C$36M. BioSteel contributed 65% of total company adjusted gross profit." Michael S. Lavery, *Hydration Salvation: BioSteel Drives Top-Line, Gross Profit*, PIPER SANDLER, November 9, 2022, at 1.

## VI.    The Truth Begins to Emerge

### A.    February 9, 2023 Form 8-K for Q3 2023

140.    On February 9, 2023, before the market opened, Canopy announced its financial results for the third quarter of fiscal year 2023, ended December 31, 2022, which was attached to a Form 8-K filed that day (the "February 9, 2023 Form 8-K"). The February 9, 2023 Form 8-K was signed by Hong. Among other results, the press release reported third quarter GAAP EPS of -C$0.54, missing consensus estimates by C$0.31, and revenue of C$101.2 million, representing a year-over-year decrease of 28% and missing consensus estimates by C$15.16 million. The Company also disclosed new cost-reduction initiatives, including, among other things, "transitioning to an asset-light model", "the organizational restructuring of certain corporate functions," and "significantly reducing the overall size of [the Company's] organization."

141.    Most notably, in discussing the results, the Company also disclosed that "[g]ross margin in Q3 FY2023 was impacted primarily by [*inter alia*] . . . **lower gross margins in the BioSteel business segment primarily attributable to the write-down of aged inventory**[.]"

142.    On this partial disclosure, Canopy's common share price, which closed the previous day at $27.40, fell $4.70 per share, or 17.15%, to close at $22.70 per share on February 9, 2023.

143.    Despite this decline in the Company's share price, Canopy securities continued trading at artificially inflated prices because the full truth concealed by Class Period misrepresentations had not been disclosed and because Defendants made continued misstatements and omissions which served to maintain artificial prices for Canopy shares.

144.    For example, the February 9, 2023 Form 8-K stated, in relevant part:

> Net revenue of $101 million in Q3 FY2023 declined 28% versus Q3 FY2022. The decrease is primarily attributable to increased competition in the Canadian adult-use cannabis market, the divestiture of C3 Cannabinoid Compound Company GmbH ("C3"), a decline in our U.S. CBD business, and softer performance from Storz & Bickel and This Works. When adjusting for both the impact of the divestiture of C3 and our Canadian retail business, revenues for the period decreased 23% in Q3 FY2023 versus Q3 FY2022.

145.    The statements identified in Paragraph 144 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they misstated Canopy's revenue and BioSteel's segmented revenue through the improper failure to recognize approximately C$2,818,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

### B.    Q3 2023 Form 10-Q

146.    Also on February 9, 2023, Canopy filed its Form 10-Q with the SEC for the quarter ended December 31, 2022 (the "Q3 2023 Form 10-Q"). The Q3 2023 Form 10-Q was signed by Klein and Hong.  Therein, the Company stated, in relevant part:

Net revenue was $101.2 million in the third quarter of fiscal 2023, as compared to $141.0 million in the third quarter of fiscal 2022. The year-over-year decrease is primarily attributable to: (i) the continuing decrease in net revenue from our Canada cannabis segment, as increased competition in the Canadian adult-use market has resulted in lower sales velocities and continued price compression; (ii) the divestiture of our interest in C3 Cannabinoid Compound Company GmbH ("C3") in the fourth quarter of fiscal 2022; (iii) a decline in our U.S. CBD business, as we focused our product and brand portfolio; and (iv) softer performance in our Storz & Bickel and This Works businesses.

\* \* \*

BioSteel

Revenue from BioSteel was $16.4 million in the third quarter of fiscal 2023, as compared to $17.0 million in the third quarter of fiscal 2022. The year-over-year decrease is primarily attributable to timing shifts in the distribution and sales of our products into our key markets.

147.    The statements identified in Paragraph 146 were false and misleading because, as the Company has admitted in its 2023 Form 10-K, they misstated Canopy's revenue and BioSteel's segmented revenue through the improper failure to recognize approximately C$2,818,000. Additionally, the statements were materially false and misleading when made because: (1) BioSteel revenue, and as a result, Company-wide revenue and results were artificially inflated and falsely reported; and (2) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) the Company had material weaknesses in its internal controls over financial reporting rendering unreliable the results reported to investors; (b) BioSteel lacked enforceable distribution contracts with many key distributors; and (c) BioSteel was experiencing a mounting problem with aged inventory.

148.    In addition, the Q3 2023 Form 10-Q stated the following regarding the Company's internal controls:

There have been no changes in our "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred

47

during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

149.    Appended as exhibits to the Q3 2023 Form 10-Q were signed certifications by Klein and Hong certifying that the Q3 2023 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [the Company][,]" and Defendants disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

150.    The statements identified in Paragraphs 148-149 were materially false and misleading when made because, as Canopy has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and had material weaknesses during the quarter ended December 31, 2022.

151.    On May 10, 2023, after the market closed, Canopy filed a Form 8-K with the SEC announcing that certain previously issued financial statements should no longer be relied upon because it "identified certain trends in the booking of sales by the [BioSteel] business unit for further review." The Form 8-K admitted that:

> ***management of the Company identified certain trends in the booking of sales by the BioSteel Sports Nutrition Inc. ("BioSteel") business unit for further review***. The Company, together with independent external counsel and forensic accountants, and under the oversight of the Audit Committee (the "Audit Committee") of the Board of Directors (the "Board") of the Company, initiated an

internal review of the financial reporting matters related to BioSteel (the "BioSteel Review").

Although the BioSteel Review remains ongoing, *the Company has preliminarily identified material misstatements in the Prior Financial Statements (as defined below) related to sales in the BioSteel business unit that were accounted for incorrectly. In particular, on May 4, 2023, the Company, in consultation with the Audit Committee, concluded that the Company's (i) audited consolidated financial statements for the fiscal year ended March 31, 2022, included in the Company's Annual Report on Form 10-K for the fiscal year ended March 31, 2022 (the "2022 10-K"), and (ii) unaudited consolidated financial statements for the quarterly periods ended June 30, 2022, September 30, 2022 and December 31, 2022, included in the Company's Quarterly Reports on Form 10-Q for such quarterly periods (collectively, the "Form 10-Qs" and together with the 2022 10-K, the "Prior Financial Statements"), should no longer be relied upon because of certain material misstatements contained in the Prior Financial Statements*. In addition, the reports of the Company's independent registered public accounting firm included in the 2022 10-K should no longer be relied upon.

*Based on the preliminary findings of the BioSteel Review to date, the Company currently anticipates that (i) the BioSteel Review generally will focus on the timing of revenue recognition in accordance with U.S. generally accepted accounting principles under Accounting Standards Codification ("ASC") 606 and (ii) the correction of the misstatements is expected to reduce certain revenues previously recognized and adjust related balance sheet items in the Prior Financial Statements*, including certain segment disclosures. The Company is unable to quantify the impact of the BioSteel Review and the related corrections to the Prior Financial Statements at this time because the BioSteel Review is ongoing. The Company cannot provide assurance that other errors will not be identified or impact additional prior accounting periods.

The Company has determined that it is appropriate to correct the misstatements by restating the Prior Financial Statements (the "Restated Financial Statements") and plans to file the Restated Financial Statements as soon as practicable. The Company does not expect to file its Annual Report on Form 10-K for the fiscal year ended March 31, 2023 (the "2023 10-K"), until the Restated Financial Statements are completed. The Company is working diligently to complete the BioSteel Review and the Restated Financial Statements, and expects to complete them as soon as practicable. At this time, however, the Company cannot predict with certainty when the BioSteel Review or such assessment work will be completed.

*As a result of the preliminary findings of the ongoing BioSteel Review, including the discovery of misstatements, the Company is continuing to assess its disclosure controls and procedures and internal control over financial reporting. The Company expects to report one or more material weaknesses in internal control*

*over financial reporting with respect to some or all impacted periods following completion of the review*.

152.    On this news, Canopy's stock price fell $2.56 per share, or 20.31%, from $12.60 at the start of the day on May 10, 2023 to close at $10.04 per share on May 11, 2023, on unusually heavy trading volume.  However, the full inflation was not dissipated because the Company was "unable to quantify" the full amount of overstatement, and otherwise withheld important details regarding Defendants' financial malfeasance and concealment of known problems at BioSteel.

153.    On May 12, 2023, *BNN Bloomberg* published an article, titled "Accounting errors, overspending lead Canopy to sour on its $50M BioSteel investment", detailing how former BioSteel employees portrayed BioSteel as "a dysfunctional organization rife with overspending." The article stated, in relevant part:

> When Canopy Growth Corp. announced it took a controlling stake in a near-insolvent BioSteel Sports Nutrition Inc. nearly three years ago to help make a line of CBD-infused sports drinks, investors cheered the move, pushing its stock up as much as five per cent that day.
>
> Now, that same investment has suddenly emerged as an albatross for the stumbling cannabis player, forcing Canopy to announce the embarrassing move of restating its financial statements for its 2022 fiscal year while *former employees paint a picture of a dysfunctional organization rife with overspending*.
>
> * * *
>
> In addition to that revelation that sent Canopy's stock plunging by more than 14 per cent on Thursday, *the company's once-lauded acquisition has been caught in a sweeping re-organization that's seen its co-founder John Celenza ousted following a testy exchange with Canopy's Chief Executive Officer David Klein in March*, two people familiar with the situation told BNN Bloomberg.
>
> * * *
>
> *Sources who worked for BioSteel and its partners described the working environment at the company as chaotic and, at times, disorganized.* While the specific nature of the arguments between the executives is not fully known, *sources said BioSteel's spending plans often clashed with Canopy's need to rein in costs* within its struggling cannabis ventures.

While BioSteel's revenue has purportedly climbed 56 per cent in 2022 to $44.6 million, a rare bright spot in Canopy's floundering Canadian cannabis business, *those sales may have come at a steep cost with costly endorsement deals awarded to a slew of NHL, NFL, MLB, and NBA players, the source said. Industry sources suggested endorsement deals with well-known athletes could start at $100,000, while contracts with professional teams could often be at least triple that amount.*

A Canopy spokesperson declined to confirm whether Celenza was part of a recent wave of BioSteel departures *that saw about 20 staff leave the company*, citing a policy where they do not comment on individual departures. *Those staff cuts were tied to an announcement Canopy made in February that it would transition to an asset-light model* and close its Smiths Falls, Ont. headquarters. That announcement also reaffirmed management's expectations that those recent closures would result in positive adjusted EBITDA in its fiscal 2024, *with the noted exception of its BioSteel business*.

**C.    2023 Form 10-K**

154.    On June 22, 2023, Canopy filed its Form 10-K for the fiscal year 2023. The 2023 Form 10-K revealed both the full nature and amount of Canopy's misstatements of revenue and financial results, as well as the material weaknesses in Canopy's internal controls over financial reporting.  It stated:

> misstatements in the Company's recognition of revenue pursuant to ASC 606 were identified, primarily in relation to the Company's "business-to-business" sales to customers in international markets, including wholesalers, distributors, and retailers. The Company concluded that revenue was incorrectly recognized in certain situations in which: (i) the product ordered by the customer had not been shipped, and therefore control of the product had not been transferred to the customer; (ii) the product was shipped without a legally enforceable written, oral or implied contract with the customer that specified each party's rights regarding the goods to be transferred and the payment terms; or (iii) product had been shipped, and ultimately not accepted by the customer, because the product did not have the required remaining shelf life to be sold through by the customer in a primary sales channel. *See also supra* at Section IV.

155.    The 2023 Form 10-K also admitted that Canopy's "internal control over financial reporting and [the Company's] disclosure controls and procedures were not effective as of March 31, 2023." The Company conceded the following material weaknesses:

- An ineffective control environment, resulting from a lack of the required number of trained operational and IT personnel with the appropriate skills and knowledge and with appropriate assigned authorities, responsibilities and accountability related to the design, implementation and operating effectiveness of internal control over financial reporting. The control environment material weakness contributed to the following material weaknesses:

  o The accounting for sales recorded by the BioSteel segment, which resulted in material misstatements relating to revenue and trade receivables, particularly with respect to the timing and amount of revenue recognition. Specifically, we did not design and maintain effective controls to sufficiently assess the timing, amount, and appropriateness of revenue recognition. This included a lack of segregation of duties in the review of customer orders, inadequate controls over the review and approval of sales returns, and inadequate controls relating to revenue recognition policies and procedures. This also contributed to the failure to impair goodwill related to the BioSteel reporting unit on a timely basis as changes in the performance of BioSteel were not identified in a timely manner, and the failure to accurately record the redeemable noncontrolling interest.

  o IT general controls deficiencies that aggregated to a material weakness. These deficiencies specifically related to: (i) logical access management, including untimely periodic access review, access provisioning and modification, removal of user access and change management controls with respect to a payroll system implemented during the year; and (ii) untimely and inconsistent monitoring and oversight of third-party service organizations. Although we have identified no instances of any adverse effects due to these deficiencies, business processes that depend on the affected information systems or that depend on data from the affected information systems, could be adversely impacted.

156.    As a result, the 2023 Form 10-K announced that it would implement the following remedial measures to address the material weaknesses rampant in Canopy's internal control:

Control environment:

- Enhancing the assignment of control responsibilities and accountability to responsible operational and IT personnel;

- Implementing training aimed at improving employee knowledge and skills in sales recording and revenue recognition matters as well as applicable IT General Controls related to logical access and oversight of relevant third-party service organizations;

BioSteel business-to-business sales:

- Enhancing formal policies, processes and procedures relating to financial reporting, including revenue recognition matters;

- Improving the retention of sufficient supporting documentation related to business-to-business customers purchase orders and related sales agreements, including pricing, shipping and return terms and credit limits;

- Improving business-to-business customers sales orders review and approval procedures prior to the shipment of the purchased goods;

- Improving business-to-business customers review and approval procedures over credit notes and sales returns;

- Improving the retention of sufficient review evidence regarding business-to-business sales accounts receivables aging analysis including timely review of overdue amounts;

- Implementing certain management changes and appropriate personnel actions; and

- Ensuring sufficient resources are available to perform and document business-to-business sales and revenue recognition controls on a timely basis, as per policies and procedures.

IT General Controls:

- Performing timely and sufficient review of all in-scope systems for user access including privileged access;

- Conducting a review of the tools and processes that are relied upon to ensure users terminations or transfers are timely updated in systems. Formally document and communicate related processes;

- Ensuring that all access approval requirements are documented and communicated to all employees and proper approval is provided prior to granting/modifying user access;

- Ensuring sufficient resources are available to timely perform and document periodic review of user access, user access changes and access provisioning/modification;

- Performing timely and consistent monitoring and oversight of relevant third-party service organizations through review of third-party service organization control reports to assess their impact in relation to the control environment; and

- Improving the retention of sufficient supporting documentation related to access review, access provisioning and modification, access requests and approvals.

    157.    As a result of this final disclosure, capping the end of the Class Period, Canopy shares

declined $1.01 per share to a low of $5.00 before rebounding slightly to close at $5.18 on June 23,

2023, down from a prior day close of $6.01.

158.   On September 17, 2023, Canopy announced that it would seek bankruptcy protection for BioSteel.

159.   On November 9, 2023, Canopy entered into a purchase agreement with the Coachwood Group to sell BioSteel and its affiliated business, BioSteel Manufacturing LLC, to another third party, for aggregate gross proceeds of C$30.4 million ($22.44 million). In other words, the amount by which Defendants inflated Class Period revenue accounted for nearly 100% of BioSteel's actual value once the truth was disclosed.

## VI.   Additional Allegations of Scienter

### A.   Defendants Were Motivated to Overstate BioSteel's Revenue and Hide Problems Impacting BioSteel to Prop Up Canopy's Only Successful Business as the Rest of Canopy Faltered

160.   Throughout the Class Period, Canopy's cannabis business was consistently underperforming expectations. As outlined in its Q3 2023 Form 10-Q, this was due to "increased competition in the Canadian adult-use cannabis market . . . a decline in our U.S. CBD business, and softer performance from [Canopy subsidiaries like] Storz & Bickel and This Works."

161.   Indeed, from the start of the Class Period on November 9, 2021 until February 9, 2023, when Canopy began to tell the truth about BioSteel, Canopy's stock price had dropped from $127.80 per share to $25.20 per share – *a decrease of $102.60, or 80.2%*

162.   However, the one bright spot propping up Canopy's business was BioSteel. As analysts noted throughout the Class Period, BioSteel not only drove Canopy's revenue, but also offset losses in Canopy's cannabis business. *See*, *e.g.*, Michael S. Lavery, *BioSteel Sales Beat Estimates, Offsetting Cannabis Miss*, PIPER SANDLER, February 9, 2022, at 1 ("Canopy reported F3Q22 net revenue of C$141.0M, above our C$132.5M estimate and consensus of C$135.9M. The revenue beat

was primarily driven by better-than-expected revenue from BioSteel (up 130%), more than offsetting softer global cannabis revenue (down 20%)."); Matt Bottomley and Yewon Kang, *FQ2/23 first look: BioSteel expansion leads to top-line beat while operating losses*, CANACCORD GENUITY, November 9, 2022, at 1 ("Canopy's non-cannabis CPG segments contributed heavily to the overall top-line beat for the quarter . . . BioSteel sports drinks jumped by ~67% QoQ (to C$29.9M) as the product line continues to expand its distribution channels (including Wal-Mart and Rite Aid) in addition to its partnership with the NHL."); Michael S. Lavery, *Hydration Salvation: BioSteel Drives Top-Line, Gross Profit*, PIPER SANDLER, November 9, 2022, at 1 ("[n]ear-term growth will likely be driven by BioSteel . . . [as] BioSteel revenues rose ~C22M while sales for the rest of the [Canopy] portfolio fell ~C$36M. BioSteel contributed 65% of total company adjusted gross profit."); Michael S. Lavery, *Lowering Estimates On Softer Momentum; BioSteel Drives >100% of F23 Growth*, PIPER SANDLER, March 31, 2022, at 1 ("Canopy's sales trends remain under pressure across key parts of its business . . . BioSteel continues to build distribution, and now drives more than 100% of F23 sales growth expectations. . . . ***these gains are more than entirely driven by BioSteel***, which we model up C$77M in [fiscal year 2023], more than offsetting cannabis declines."); Michael S. Lavery, *Hydration Salvation: BioSteel Drives Top-Line, Gross Profit*, PIPER SANDLER, November 9, 2022, at 1 ("BioSteel contributed 65% of total company adjusted gross profit."); Michael S. Lavery, *BioSteel Retailer Inventories Look Too Big; Cutting Target to $1*, PIPER SANDLER, May 1, 2023, at 3 ("BioSteel is Canopy's biggest driver of revenue growth, and we believe it depends on BioSteel's success, especially for scale in the US.").

163.    However, as that remaining bright spot began to fade, Defendants were motivated to hide material risks and known problems, while also to overstate revenue so that the Company looked better than it actually was in order to sustain investor interest in its failing business.

164.    Further, Individual Defendants' positions as high-level executives at Canopy provided the opportunity to conceal the damaging facts about BioSteel and misstate the Company's revenue.

**B.    Defendants Not Only Had Access to Information Contradicting their Public Statements, But Received Actual Notice of Problems at BioSteel**

165.    Defendants not only had access to information about BioSteel's excess inventory and distribution issues, but had actual knowledge of the excess inventory and distribution issues that undermined their statements to investors throughout the Class Period.

166.    As set forth above, Individual Defendants routinely certified that they evaluated Canopy's financial statements, financial information included in their report, and internal control over financial reporting and knew all significant deficiencies and material weaknesses within the Company. *See* Paragraphs 86, 95, 108, 120, 133, 149. Therefore, by Individual Defendants' own admission, they had access to information that belied Defendants' claims about the Company's financial results and that Canopy's internal control was effective.

167.    Additionally, according to CW5, Canopy had Monthly Business Review calls that Klein, Lee, and Hong all attended. These Monthly Business Review calls included presentations from different employees, which were sent to Klein beforehand so that he could capture "action items" that would be discussed during the calls. These Monthly Business Review calls would generally last at least 90 minutes. Moreover, according to CW5, each General Manager in the Company tracked "action items" in Excel spreadsheets, which were shared with Klein. CW5 affirmed that BioSteel's excess inventory issue, known from at least late 2021, would have been discussed during these calls.

168.    Through their participation in the Monthly Business Calls, to the extent they did not already know, Defendants gained actual knowledge of the excess and aged inventory problems, as

well as distribution and collection problems impacting BioSteel.

### C.    The Magnitude of Defendants' Restatements Bolsters Scienter

169.    The scope and financial magnitude of Canopy's restatement demonstrates that Defendants acted with knowledge and/or reckless disregard throughout the Class Period when they failed to report financial results in accordance with GAAP and consistent with the requirements of ASC Topic 606.

170.    As alleged herein, this is not an instance where a publicly traded company was required to make immaterial adjustments to its historical financial results in order to account for minor misapplication(s) of applicable accounting rules. To the contrary, as a result of Canopy's complete failure to follow ASC 606's requirements, Canopy was required to issue restated financial results for fiscal year 2022 and the first three-quarters of 2023.

171.    Canopy's failure to comply with ASC 606 caused the Company to overstate its revenue by over C$26.6 million through the Class Period, Thus, the revised financial results issued in connection with the Restatement paint a dramatically different picture of Canopy's business and prospects, as well as Canopy's value-proposition for investors.

172.    Collectively, the additional facts and circumstances revealed by the Restatement – the dramatic divergence of the restated financial results, Defendants' near-total failure to carry out their obligations to design effective controls, and others described herein – demonstrate that Defendants acted with scienter when failing to report results in accordance with GAAP and consistent with the requirements of ASC 606.

### D.    That Defendants Held Themselves Out as Knowledgeable Bolsters Scienter

173.    Defendants' own statements show that they repeatedly held themselves out as extremely knowledgeable about BioSteel, its revenues, inventory and distribution channels, as well

as the financial statements that would later need to be revised due to the internal control failures at the Company.

174.    In earnings calls with investors, Klein, Lee, and Hong repeatedly spoke about Canopy's financial status, including its net revenue, as well as BioSteel in particular. *Supra* at Sections V-VI. For example, on May 27, 2022, Defendants held a conference call with investors and analysts where Klein spoke about BioSteel and stated, "BioSteel saw gains in distribution and sales velocity of the ready-to-drink products, which drove a 50% increase in revenue in fiscal '22 versus fiscal '21."

175.    In that same conference call, Lee similarly discussed BioSteel, stating, "BioSteel grew 47% year-on-year, due primarily to the launch of BioSteel ready-to drink beverages in the US."

176.    On August 5, 2022, Defendants held a conference call with investors and analysts, where Hong spoke about Canopy's Q1 2023 results, stating, "Let's start with the review of our Q1 fiscal '23 financial results. In Q1, we had strong performance from our international Cannabis businesses, BioSteel had its best revenue quarter ever, and the Canadian business stabilized this revenue. Gross margin and adjusted EBITDA also improved sequentially compared to Q4, as we begin to execute on our cost savings initiatives that we announced in April. We generated net revenue of CAD110 million, representing a 19% decline over the prior year, but down just 1% compared to Q4. Excluding the impact from divestiture of C3, net revenue in Q1 increased 1% as compared to Q4."

177.    Only two inferences are plausible: that Defendants actually possessed the knowledge they claimed to have with respect to BioSteel and the accuracy of Canopy's financial reporting, and therefore knew the truth they concealed from investors, or Defendants, despite holding themselves out as knowledgeable, recklessly chose not to inform themselves of the truth and made no attempt to

avoid misleading investors.

> **E.    That Defendants' Misrepresentations Involved Canopy's Core Operations Bolsters Scienter**

178.    Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned Canopy's main subsidiary: BioSteel.

179.    BioSteel was not just a subsidiary of Canopy, but instead *the* driving factor of Canopy's revenue during the Class Period. *Supra* at Section I. For example, on March 31, 2022, investment bank Piper Sandler put out a report on Canopy that noted that while "Canopy's sales trends remain under pressure across key parts of its business . . . BioSteel continues to build distribution, and now drives more than 100% of F23 sales growth expectations." Michael S. Lavery, *Lowering Estimates On Softer Momentum; BioSteel Drives >100% of F23 Growth*, PIPER SANDLER, March 31, 2022, at 1. The report went on to note that it modeled Canopy's sales growth for fiscal year 2023 at C$61M, "but ***these gains are more than entirely driven by BioSteel***, which we model up C$77M in [fiscal year 2023], more than offsetting cannabis declines." *Id*. (emphasis added).

180.    This trend continued throughout the Class Period. On November 9, 2022, Piper Sandler again put out a report on Canopy that noted that "BioSteel contributed 65% of total company adjusted gross profit." Michael S. Lavery, *Hydration Salvation: BioSteel Drives Top-Line, Gross Profit*, PIPER SANDLER, November 9, 2022, at 1. On May 1, 2023 analysts determined that "BioSteel is Canopy's biggest driver of revenue growth, and we believe it depends on BioSteel's success, especially for scale in the US." Michael S. Lavery, *BioSteel Retailer Inventories Look Too Big; Cutting Target to $1*, PIPER SANDLER, May 1, 2023, at 3.

181.    Therefore, it would be absurd to infer that Canopy's most senior executives were unaware of BioSteel's actual revenue or that it was necessary to use effective controls to calculate

those numbers or to certify its financial statements to investors without having assured such controls were in place.

**F.    The Temporal Proximity Between Defendants' Misleading Statements and the Disclosure of the Truth Bolsters Scienter**

182.    The temporal proximity between Defendants' misleading statements and the disclosures in early 2023 about BioSteel's overstated revenue, the significant issues within BioSteel, and the systemic and prevalent material weaknesses in Canopy's internal control systems further supports scienter.

183.    As of November 2022, Defendants were assuring investors that BioSteel was a profitable and thriving subsidiary of Canopy, and failed to disclose the issues impacting BioSteel, including its excessive and expiring inventory. Less than three months later, on February 9, 2023, Defendants finally disclosed its issue with its excessive inventory and the fact that it would need to write down its aged inventory.

184.    Nevertheless, on February 9, 2023, Canopy was still assuring investors that BioSteel was profitable and thriving, and that Canopy's internal controls were sufficient. Less than three months after that, Defendants admitting that BioSteel had vastly overstated revenue and the Company's internal controls were so replete with material weaknesses that its financial statements could not be trusted and 15-point plan to remediate the material weaknesses would be needed.

**G.    The Sharp Divergence Between Class Period Reassurances and Later Revelations Bolsters Scienter**

185.    Throughout the Class Period, Defendants assured investors that Canopy's internal control was effective and continually spoke highly of BioSteel and its revenues.

186.    In reality, Canopy's internal controls suffered from not just one material weakness, but several, and most were exceptionally severe and had already caused false reporting so substantial

that when BioSteel's true results were revealed, the division went from Canopy's star performer to deeply distressed, and soon declared bankruptcy.

187.    In Canopy's 2023 Form 10-K, Defendants admitted that, in order to remedy the material weaknesses within the Company's internal controls were so severe that they required no just one fix, but 15 measures:

Control environment:

- Enhancing the assignment of control responsibilities and accountability to responsible operational and IT personnel;

- Implementing training aimed at improving employee knowledge and skills in sales recording and revenue recognition matters as well as applicable IT General Controls related to logical access and oversight of relevant third-party service organizations;

BioSteel business-to-business sales:

- Enhancing formal policies, processes and procedures relating to financial reporting, including revenue recognition matters;

- Improving the retention of sufficient supporting documentation related to business-to-business customers purchase orders and related sales agreements, including pricing, shipping and return terms and credit limits;

- Improving business-to-business customers sales orders review and approval procedures prior to the shipment of the purchased goods;

- Improving business-to-business customers review and approval procedures over credit notes and sales returns;

- Improving the retention of sufficient review evidence regarding business-to-business sales accounts receivables aging analysis including timely review of overdue amounts;

- Implementing certain management changes and appropriate personnel actions; and

- Ensuring sufficient resources are available to perform and document business-to-business sales and revenue recognition controls on a timely basis, as per policies and procedures.

IT General Controls:

- Performing timely and sufficient review of all in-scope systems for user access including privileged access;

- Conducting a review of the tools and processes that are relied upon to ensure users terminations or transfers are timely updated in systems. Formally document and communicate related processes;

- Ensuring that all access approval requirements are documented and communicated to all employees and proper approval is provided prior to granting/modifying user access;

- Ensuring sufficient resources are available to timely perform and document periodic review of user access, user access changes and access provisioning/modification;

- Performing timely and consistent monitoring and oversight of relevant third-party service organizations through review of third-party service organization control reports to assess their impact in relation to the control environment; and

- Improving the retention of sufficient supporting documentation related to access review, access provisioning and modification, access requests and approvals.

188.    Additionally, Canopy not only announced that it would need to write down a significant portion of its inventory, and to restate Class Period revenue by over C\$29.4 million.

189.    The significant measures needed to be taken by the Company in order to remedy the material weaknesses in its internal control, the write down of its aged inventory, and the restatement that Canopy was forced to make in its 2023 Form 10-K, contrasted starkly with the rosy picture painted by Defendants during the Class Period, make it inconceivable that Defendants would not know, or did not recklessly disregard, the issues that led to their statements and financial reports to investors to be materially misleading.

**H.    That Defendants Oversaw BioSteel's Accounting Bolsters Scienter**

190.    That Canopy, and not anyone at BioSteel, oversaw and conducted the accounting for BioSteel and its false revenue, shows that the false and inflated accounting to investors was not the result of isolated problems at a subsidiary of which the parent company might be unaware.

191.    According to CW3, BioSteel not only did not do its own accounting, but did not

even have an internal Profit & Loss team. Instead, Canopy ran the books for BioSteel. Therefore, any misreporting of revenue was done by Canopy, and cannot be blamed on the actions of a rogue actor from a subsidiary.

I.     **That Lee Departed Shortly After His Misrepresentation and BioSteel Co-Founder John Celenza Was Ousted Around the Time of the Canopy's May Disclosure Bolsters Scienter**

192.    On November 5, 2021, Canopy filed its Form 8-K with materially misleading statements about BioSteel, and on November 8, 2021, Canopy filed its Form 10-Q with similarly misleading statements about BioSteel, all of which were approved of and certified by Lee. Within weeks of these misleading statements, Canopy announced that Lee would step down from his role "effective immediately" and depart the Company on December 31, 2021.

193.    On February 9, 2023, Canopy announced that, for Q3 2023, there were "lower gross margins in the BioSteel business segment primarily attributable to the write-down of aged inventory[.]" On May 10, 2023, Canopy announced the preliminary results of its "BioSteel Review" and its determination that Canopy issued financial statements that contained material misstatements related to sales in the BioSteel business. On or around March 3, 2023, amid the revelations about BioSteel, the Company ousted BioSteel's co-founder John Celenza, who had maintained a role running BioSteel through the Class Period.

194.    The temporal proximity between Lee's misrepresentations and his departure from Canopy, as well as the temporal proximity between Celenza's ouster from BioSteel and the revelations about Defendants' misrepresentations to investors contributes to a strong inference of scienter.

J.    **That Individual Defendants Certified Canopy's Filings to Investors Bolsters Scienter**

195.    Klein, Hong, and Lee's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certification in connection with Canopy's filing of its Form 10-Qs and Form 10-Ks with the SEC. These certifications certified, among other things, that the financial statements did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [the Company]".

196.    Defendants also certified that, "based on [their] most recent evaluation of internal control over financial reporting[,]" they disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

197.    If Individual Defendants had, in fact, made these assessments, then they were aware of the actual state of Canopy's financial reporting, including BioSteel's actual net revenue, and the Company's internal controls and should have informed investors of the truth. If they had not, then they were reckless in making such statements to investors.

## CLASS ACTION ALLEGATIONS

198.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Canopy securities between November 5, 2021 and June 22, 2023, both dates inclusive. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

199.    The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's 2023 Form 10-K, "As of June 20, 2023, there were approximately 734 holders of record of Canopy Shares. This number of holders of record does not represent the actual number of beneficial owners of Canopy Shares because shares are frequently held in 'street name' by securities dealers and others for the benefit of individual owners who have the right to vote their shares."  Moreover, throughout the Class Period, Canopy securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Canopy's most recent Form 10-Q indicates that it has approximately 829,083,667 outstanding common shares. Thus, Plaintiffs believe that there are several hundred or potentially more than a thousand members in the proposed Class. Record owners and beneficial owners may be identified from records maintained by Canopy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

200.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

201.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Lead

Plaintiff has no interests antagonistic to or in conflict with those of the Class.

202.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Canopy;

- whether the Individual Defendants caused Canopy to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Canopy securities during the Class Period were artificially inflated (or artificial inflation maintained) because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

203.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

204.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud- on-the-market doctrine in that:

- Defendants regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar

reporting services;

- Through these communications, Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- The omissions and misrepresentations were material;

- Canopy securities are traded in an efficient market;

- The Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- As a regulated issuer, Canopy filed periodic public reports with the SEC and/or the NASDAQ;

- Canopy's shares met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

- Canopy was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Canopy securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

205.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

206.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

207.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

208.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Canopy's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

209.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Canopy's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

210.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Canopy's financial well-being and prospects, as specified herein.

211.    Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Canopy's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Canopy and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

212.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team, or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

213.    Defendants had actual knowledge of the misrepresentations and/or omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Canopy's financial well-being and prospects from the investing public and supporting the artificially inflated and/or maintained artificial inflation in the price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

214.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Canopy's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Canopy's securities during the Class Period at artificially high prices and were damaged thereby.

215.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Canopy was experiencing, which were not disclosed by Defendants, Plaintiffs and other

members of the Class would not have purchased or otherwise acquired their Canopy securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

216.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

217.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

218.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

219.    During the Class Period, the Individual Defendants participated in the operation and management of Canopy, and conducted and participated, directly and indirectly, in the conduct of Canopy's business affairs. Because of their senior positions, they knew the adverse non-public information about Canopy's misstatements concerning the issues with BioSteel's business, the material weaknesses in the Company's internal controls over accounting and financial reporting, the overstatement of revenue, and the false financial statements that Canopy provided to investors.

220.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Canopy's financial condition and results of operations, including its subsidiary BioSteel, and to correct promptly any public statements issued by Canopy which had become materially false or misleading.

71

221.    Because of their control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Canopy disseminated in the marketplace during the Class Period concerning Canopy's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Canopy to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Canopy within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated and/or maintained artificial inflation in the market price of Canopy securities.

222.    Each of the Individual Defendants, therefore, acted as a controlling person of Canopy. By reason of their senior management positions and/or being directors of Canopy, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Canopy to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Canopy and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

223.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Canopy.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  January 22, 2024                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Christopher P.T. Tourek*

Joshua B. Silverman (admitted *pro hac vice*)
Christopher P.T. Tourek (admitted *pro hac vice*)
10 South LaSalle Street, Suite 350
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
ctourek@pomlaw.com

*Counsel for Lead Plaintiff Chen Li and Additional Named Plaintiffs and Lead Counsel for the Class*

**HAO LAW FIRM**
Junbo Hao
Room 3-401 No. 2 Building
No. 1 Shuangliubei Street
100024 Beijing People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Chen Li*

**BRONSTEIN, GEWIRTZ, & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600

New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com
eitan@bgandg.com

*Additional Counsel for Christiann Kantner*

**THE ROSEN LAW FIRM, P.A.**
Jacob Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

**ROBBINS LLP**
Brian J. Robbins
Stephen J. Oddo
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
Email: brobbins@robbinsllp.com
          soddo@robbinsllp.com

*Additional Counsel for Thinh Nugyen*