UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CANOPY GROWTH SECURITIES LITIGATION | 1:23-cv-04302 (PAE) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

James R. Carroll (*pro hac vice*)
Rene H. DuBois
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800

Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

Dated: March 7, 2024

*Attorneys for Defendants*
*Canopy Growth Corporation,*
*David Klein, Judy Hong, and Michael Lee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 3

A. Canopy Is A Producer Of Cannabis And Other Complementary Products ........ 3

B. Canopy Discloses Certain Trends In The Booking Of BioSteel Revenue And Initiates An Independent Internal Review ........ 4

C. Canopy Restates Its Consolidated Financials For Fiscal Year 2022 And Three Quarters In Fiscal Year 2023 ........ 5

D. This Action Is Reflexively Filed ........ 6

ARGUMENT ........ 7

I. PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ........ 7

A. Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior Or Recklessness ........ 8

1. The Restatement Is Inadequate To Demonstrate Scienter ........ 8

2. Plaintiffs' CW Allegations Do Not Support A Strong Inference Of Scienter ........ 9

3. Plaintiffs' Remaining Scienter Allegations Are Insufficient ........ 17

B. Plaintiffs Do Not Sufficiently Allege Motive To Commit Fraud ........ 24

C. The Alleged Facts Support A More Compelling Inference Of Non-Fraudulent Intent ........ 24

II. PLAINTIFFS FAIL TO PLEAD THAT MANY OF THE ALLEGED MISSTATEMENTS ARE MATERIALLY FALSE AND MISLEADING ........ 25

III. ALLEGATIONS AGAINST MR. LEE ARE GROSSLY INADEQUATE ........ 29

IV. COUNT II ALLEGING CONTROL PERSON LIABILITY SHOULD BE DISMISSED ........ 30

CONCLUSION ........ 30

**TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*Acito v. IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995)....................24

*In re Adient plc Securities Litigation*,
No. 18-cv-09116-RA, 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020), *aff'd*, No. 20-3846, 2022 WL 2824260 (2d Cir. July 2, 2022)....................14

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018)....................15

*In re AT&T/DirecTV Now Securities Litigation*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020), *aff'd sub nom. Steamfitters Local 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853 (2d Cir. Dec. 13, 2022)....................27

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010)....................10

*Chapman v. Mueller Water Products Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................10, 11, 12, 16, 30

*City of Brockton Retirement System v. Avon Products, Inc.*,
No. 11-cv-04665-PGG, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)....................3, 25

*City of Brockton Retirement System v. Shaw Group Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)....................8

*City of Omaha Civilian Employees' Retirement System v. CBS Corp.*,
679 F.3d 64 (2d Cir. 2012)....................1, 19

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................27

*In re CRM Holdings, Ltd. Securities Litigation*,
No. 10-cv-00975-RPP, 2012 WL 1646888 (S.D.N.Y. May 10, 2012)....................23

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018)....................18, 24

*In re Dell Inc., Securities Litigation*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)....................22

*In re Doral Financial Corp. Securities Litigation*,
563 F. Supp. 2d 461 (S.D.N.Y. 2008), *aff'd sub nom. W. Va. Inv. Management Board v. Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009) ....................14

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....................7, 8, 19

*In re Elan Corp. Securities Litigation*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008)....................10

*In re Express Scripts Holdings Co. Securities Litigation*,
773 F. App'x 9 (2d Cir. 2019) ....................8

*In re Fairway Group Holdings Corp. Securities Litigation*,
No. 14-cv-00950-LAK-AJP, 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)....................27

*In re Ferrellgas Partners, L.P., Securities Litigation*,
No. 16-cv-07840-RJS, 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019)....................21

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) ....................21

*Gavish v. Revlon, Inc.*,
No. 00-cv-07291-SHS, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)....................2

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................10

*In re Hain Celestial Group Inc. Securities Litigation*,
No. 16-cv-04581-LGD, 2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022), *report and recommendation adopted*, No. 16-cv-04581-LGD, 2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023) ....................18, 25

*Horowitz v. Green Mountain Coffee Roasters, Inc.*,
No. 10-cv-00227-WKS, 2013 WL 1149670 (D. Vt. Mar. 20, 2013)....................14, 15

*In re Iconix Brand Group, Inc.*,
No. 15-cv-04860-PGG, 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ....................8, 9, 25

*International Association of Heat v. IBM*,
205 F. Supp. 3d 527 (S.D.N.Y. 2016)....................17

*In re ITT Educational Services, Inc. Securities & Shareholder Derivatives Litigation*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)....................28

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)....................25

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)....................30

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)....................24

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)....................14

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................7, 11

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009)..........10, 22

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
518 F. Supp. 3d 772 (S.D.N.Y. 2021)....................12, 13

*In re Molycorp, Inc. Securities Litigation*,
No. 13-cv-05697-PAC, 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015)....................23

*In re Nokia Corp. Securities Litigation*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006)....................19

*Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Emps. Retirement Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)....................26

*Oklahoma Law Enforcement Retirement System v. Telefonaktiebolaget LM Ericsson*,
No. 18-cv-03021-JMF, 2020 WL 127546 (S.D.N.Y. Jan. 10, 2020) ....................20

*Pearlstein v. BlackBerry Ltd.*,
93 F. Supp. 3d 233 (S.D.N.Y. 2015)....................19

*In re Plug Power, Inc. Securities Litigation*,
No. 21-cv-02004-ER, 2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)....................9

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)....................17

*In re PXRE Group, Ltd., Securities Litigation*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.*, 357 F. App'x 393 (2d Cir. 2009)....................9

*Reilly v. U.S. Physical Therapy, Inc.*,
No. 17-cv-02347-NRB, 2018 WL 3559089 (S.D.N.Y. July 23, 2018) ............................17

*In re Renewable Energy Group Securities Litigation*,
No. 22-335, 2022 WL 14206678 (2d Cir. Oct. 25, 2022)................................................20

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..............................................................................................25

*South Cherry Street, LLC v. Hennessee Group LLC*,
573 F.3d 98 (2d Cir. 2009)................................................................................................24

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)...........................................................13, 18, 19, 23

*Shemian v. Research In Motion Ltd.*,
No. 11-cv-04068-RJS, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014)..........................................................................................21, 27

*Slayton v. American Express Co.*,
604 F.3d 758, 777 (2d Cir. 2010)......................................................................................18

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)..................................................................................................8

*In re Supercom Inc. Securities Litigation*,
No. 15-cv-09650-PGG, 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ............................22

*In re Synchronoss Technologies, Inc. Securities Litigation*,
No. 17-cv-02978-FLW, 2019 WL 2849933 (D.N.J. July 2, 2019)..................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).........................................................................................................3, 7

*Thomas v. Shiloh Industries, Inc.*,
No. 15-cv-07449-KMW, 2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018)..........................8

*In re Turquoise Hill Resources Ltd. Securities Litigation*,
No. 13-cv-08846-LGS, 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) .......8, 16, 18, 21, 22

*U.S. Education Loan Trust III, LLC v. RBC Capital Markets Corp.*,
No. 11-cv-00860-NRB, 2011 WL 6778480 (S.D.N.Y. Dec. 21, 2011) ............................14

*Woolgar v. Kingstone Companies*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)........................................................................17, 18

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ....................25

15 U.S.C. § 78u-4(b)(2)(A)....................7

**RULES**

Fed. R. Civ. P. 9(b) ....................1

17 C.F.R. § 240.10b-5....................7

## PRELIMINARY STATEMENT

Canopy Growth Corporation ("Canopy" or "Company") is a Canadian-based cannabis and consumer packaged goods company. Through this action, Plaintiffs concoct a theory of securities fraud based on accounting errors at one of Canopy's former non-core subsidiaries, which Canopy itself uncovered through an independent review, voluntarily disclosed to regulators and the public, and promptly remediated. In May 2023, Canopy told investors that it had discovered certain sales at one of its consumer packaged goods subsidiaries, BioSteel Sports Nutrition Inc. ("BioSteel"), that were accounted for incorrectly. Canopy disclosed that it initiated an independent review of the issue, overseen by the independent Audit Committee of Canopy's Board of Directors with assistance of outside accountants and legal counsel. After investigation, Canopy announced that BioSteel's revenue was overstated for certain reporting periods and, as a result, the Company restated its consolidated financial results to reflect a modest decrease of about 2% of net revenue for fiscal year 2022 and about 4% of net revenue for the nine months ended December 31, 2022.

Plaintiffs seize upon a drop in the Company's stock price following Canopy's announcement that its financials would be restated to allege -- with the benefit of hindsight -- that Canopy and certain current and former Canopy officers ("Individual Defendants") made knowingly false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Courts in this Circuit routinely hold that accounting restatements -- even violations of Generally Accepted Accounting Principles ("GAAP") -- standing alone, do not give rise to a claim for securities fraud. *City of Omaha Civilian Emp.'s Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 69 (2d Cir. 2012). Rather, the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b) require Plaintiffs to plead *with particularity* that *each* Defendant made materially false or misleading

statements with a strong inference of scienter that caused losses to investors in order to state a claim for securities fraud. Plaintiffs' claims fall short of these demanding standards, and the First Amended Complaint ("FAC") should be dismissed with prejudice for the following independent reasons:

*First*, Plaintiffs fail to plead particularized facts demonstrating a "strong inference" of scienter as to each Defendant. (*Infra* Section I) Plaintiffs point to Canopy's restatement as suggestive of fraud, but it is well settled that a restatement alone does not support even a weak inference of scienter. This is especially true here: the restatement was the result of misreported revenue at a single, non-core subsidiary and the misstatement was tiny compared to Canopy's total net revenue. Plaintiffs fail to plead any particularized facts -- no contemporaneous report, document or statement -- showing that Defendants knew or recklessly disregarded that the financial statements were false or misleading at the time they were issued.

Plaintiffs' reliance on vague, largely undated and conclusory allegations attributed to six so-called "confidential witnesses" ("CWs") adds nothing. Nowhere do Plaintiffs adequately allege that these CWs were in any position to know the purported information attributed to them and the FAC otherwise lacks specific factual allegations that courts in this Circuit require to credit anonymous witness allegations. As Judge Stein so plainly articulated, merely "affixing the phrase 'former employees have stated' to [an] otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA." *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004). Plaintiffs' grab-bag of additional scienter allegations, such as attempting to infer scienter from the Individual Defendants' executive positions or their certification of SEC filings, fails to satisfy Second Circuit precedent.

Nor can Plaintiffs articulate a theory of "motive and opportunity" that is either cogent or compelling. (*Infra* Section I.B.) The FAC contains zero allegations that any Individual Defendant sold shares of Canopy stock or otherwise obtained any "concrete and personal" benefit from the supposed fraudulent scheme. The far more plausible and compelling inference based on the facts alleged is that Defendants honestly believed the Company's financial statements were accurate when issued, promptly investigated and corrected them as soon as they learned otherwise. *See City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *24, *33 (S.D.N.Y. Sept. 29, 2014) (holding that the fact that company commenced "an internal investigation tends to undermine any inference of scienter" and strongly implies that defendants had not been aware of alleged issues before learning of the potential violations).

*Second*, Plaintiffs' claims fail for the independent reason that many of the challenged statements -- such as "*we remain as bullish as ever*" and "*this challenger brand is quickly turning into a winner*" -- are immaterial statements of corporate optimism or puffery, statements of opinion or otherwise not adequately alleged to be false or misleading. (*Infra* Section II.)

*Third*, Plaintiffs' control person claims fail because they have not pled a primary violation of Section 10(b). (*Infra* Section IV.)

## FACTUAL BACKGROUND[1]

### A. Canopy Is A Producer Of Cannabis And Other Complementary Products

Canopy is a Canadian-based producer of cannabis, hemp and complementary consumer packaged goods ("CPG"). (FAC ¶ 14; Ex. 1, 2023 10-K at 8.) Canopy operates its businesses

[1] The Court may consider documents referenced, incorporated in, or integral to, the FAC, matters of public record and SEC filings. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Such documents are attached as exhibits to the Declaration of Alexander C. Drylewski, dated March 7, 2024, cited herein as "Ex._".

through dozens of wholly-owned subsidiaries and joint ventures that offer products under diverse brands, including, but not limited to, its flagship cannabis brand Tweed, and its affiliated hemp brand Martha Stewart CBD. (FAC ¶ 14; Ex. 2, 2022 10-K at 5, 11; Ex. 1, 2023 10-K at 17-18.) During the relevant time period, Canopy's CPG brands included This Works, Storz & Bickel and BioSteel, all of which sold CPG that were "complementary . . . to [Canopy's] core cannabis product offering." (Ex. 1, 2023 10-K at 9, 17-18.)

In 2019, Canopy acquired an approximately 77% interest in Canadian-based BioSteel, a producer of sports nutrition and hydration products. (FAC ¶¶ 15-16, 19; Ex. 2, 2022 10-K at F-49.) An approximately 23% stake in BioSteel was retained by the then-current shareholders and management of BioSteel, which included its co-founders, John Celenza and Michael Cammalleri. (FAC ¶ 16; Ex. 2, 2022 10-K at F-49.) Canopy reserved the option to purchase half of the remaining equity interest from those minority shareholders following the third anniversary of the sale (i.e., in 2022) at a specified valuation based on a multiple of BioSteel's net revenue. (Ex. 2, 2022 10-K at F-50.) In October 2022, Canopy exercised that option and increased its stake in BioSteel to approximately 90%. (FAC ¶ 18; Ex. 3, 11/9/22 10-Q at 19.)

### B. Canopy Discloses Certain Trends In The Booking Of BioSteel Revenue And Initiates An Independent Internal Review

Canopy operates on a fiscal year that ends in March. (FAC ¶ 5 at 3 n.1.) Before the second quarter of fiscal year 2023 (i.e., ending September 31, 2022), Canopy had two reportable segments: global cannabis and other consumer products (which included BioSteel). (Ex. 1, 2023 10-K at 25.) Canopy thereafter changed its structure and began reporting its financial results in five reportable segments: (i) Cannabis (*Canada*), (ii) Rest-of-world cannabis (*ex-Canada*), (iii) Storz & Bickel, (iv) BioSteel, and (v) This Works. Canopy's consolidated financials consisted of these five reportable segments. (*Id.*)

In connection with the preparation of Canopy's consolidated financial statements for fiscal year 2023, Canopy became aware of certain trends in the booking of sales by the BioSteel segment. (FAC ¶ 151; Ex. 4, 5/10/23 8-K, Item 4.02.) On May 10, 2023, Canopy disclosed that it initiated an internal review under the oversight of the Company's independent Audit Committee of the Board of Directors, and that it retained independent external counsel and forensic accountants to assist the review. (*Id.*) Canopy disclosed that the review would focus on the timing of BioSteel's revenue recognition in accordance with GAAP under FASB Accounting Standards Codification ("ASC") 606, *Revenue from Contracts with Customers*. (*Id.*) Canopy further stated that it had determined it was appropriate to correct certain misstatements regarding BioSteel's previously recognized revenue for fiscal year 2022 and for three quarters in fiscal year 2023 and that the Company was working diligently to complete the review. (*Id.*) Canopy cautioned investors that it was assessing its internal control over financial reporting and that it expected to report one or more material weaknesses for the restated periods. (*Id.*) In light of the expected restatement, Canopy promptly notified the U.S. Securities and Exchange Commission ("SEC") and the Ontario Securities Commission about the internal review and received extensions to file the restatement before June 23, 2023. (Ex. 1, 2023 10-K at 66, 76.)

### C. Canopy Restates Its Consolidated Financials <u>For Fiscal Year 2022 And Three Quarters In Fiscal Year 2023</u>

On June 22, 2023, Canopy restated its consolidated financial results for the fiscal year ended March 31, 2022 and for the quarterly periods ended June 30, 2022, September 30, 2022, and December 31, 2022 (the "Restatement"). (FAC ¶ 154; Ex. 1, 2023 10-K at 2.) Canopy explained that its review revealed certain sales that were accounted for incorrectly, primarily in relation to BioSteel's "business-to-business" sales to wholesalers, distributors and retailers in international markets. (FAC ¶ 154; Ex. 1, 2023 10-K at F-15.) Canopy further disclosed that the

correction of the sales accounting resulted in an overstatement of approximately (i) $10 million in BioSteel's net revenue for the year ended March 31, 2022 -- or about 2% of Canopy's consolidated net revenue, and (ii) $14 million in BioSteel's net revenue for the nine months ended December 31, 2022 -- or about 4% of Canopy's consolidated net revenue. (FAC ¶¶ 73, 154; Ex. 5, 6/22/23 8-K, Ex. 99.1 at 2.)[2]

Canopy also disclosed its determination that it "did not maintain effective internal control over financial reporting," which contributed to material weaknesses in "[t]he accounting for sales recorded by the BioSteel segment," and "IT general controls deficiencies that aggregated to a material weakness" resulting in the Company's internal control over financial reporting not being effective as of March 31, 2023. (Ex. 1, 2023 10-K at 158-59.) As a result, Canopy explained that it was taking comprehensive remedial measures, which included updates to Canopy's processes and controls, and controls around BioSteel's business-to-business sales. (*Id.* at 160.) Canopy also announced that it was conducting "management changes and appropriate personnel actions," and "considering all legal options that may be available in connection with the associated overpayment made in FY2023 to the minority shareholders of BioSteel as a result of the overstatement of revenues." (Ex. 5, 6/22/23 8-K, Ex. 99.1 at 2.)[3]

### D. This Action Is Reflexively Filed

Following Canopy's disclosure of the BioSteel review, Canopy's stock price quickly declined by more than 20%. (FAC ¶ 8 at 4.) As night follows day and even before Canopy issued the Restatement -- and long before any factual investigation could have been performed --

2 All currency amounts are stated in Canadian dollars, Canopy's reporting currency.

3 On December 1, 2023, Canopy completed the sale of BioSteel so that it could focus on its core cannabis operations. (FAC ¶ 159; Ex. 6, 12/1/23 Press Release.)

multiple class actions were reflexively filed alleging securities fraud. (ECF No. 47 at 2-3.) On January 22, 2024, Plaintiffs filed their FAC, asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of investors who purchased Canopy securities on NASDAQ between November 5, 2021 and June 22, 2023. (FAC ¶ 1 at 2.) Plaintiffs challenge various statements made during the Class Period concerning (i) BioSteel's and Canopy's revenue, (ii) Canopy's internal control over financial reporting, and (iii) gains in BioSteel's distribution and sales velocity and future growth. (FAC ¶¶ 78-151.) All of Plaintiffs' claims are fraud by hindsight.

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must plead: (1) a misrepresentation or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 790 (S.D.N.Y. 2020) (Engelmayer, J.).

### I. PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Under the PSLRA, Plaintiffs must plead, with particularity, facts giving rise to a "strong inference" that each Defendant acted with an intent "to deceive, manipulate, or defraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2)(A)); *Tellabs*, 551 U.S. at 314. Plaintiffs must allege particularized facts demonstrating a strong inference of scienter with respect to each act or omission that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Scienter may be pled through particularized factual allegations of (i) both "motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Where, as here, a plaintiff fails

to adequately plead motive and opportunity to commit fraud, the allegations of conscious misbehavior or recklessness must be "correspondingly greater." *Id.* at 199.

### A. Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior Or Recklessness

To allege conscious misbehavior or recklessness, Plaintiffs must show "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (citation omitted). Recklessness requires allegations that defendant's conduct was "*highly unreasonable*" and "represents an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it*." *ECA*, 553 F.3d at 203 (emphasis added) (affirming dismissal of 10(b) claim on scienter grounds). Plaintiffs cannot rely on allegations of "fraud by hindsight." *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019).

#### 1. The Restatement Is Inadequate To Demonstrate Scienter

Plaintiffs' core theory is that Defendants "must have" intentionally inflated revenues during the Class Period because they later issued the Restatement. (FAC ¶ 65.) But it is "well settled that [the] mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008); *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *18 (S.D.N.Y. Oct. 25, 2017) (Gardephe, J.) (dismissing claim and finding no scienter despite two restatements, in part because plaintiff did not plead "particularized facts showing that Defendants actually knew that they were engaged in improper accounting practices"); *see also Thomas v. Shiloh Indus.*, Inc., 2018 WL 4500867, at *6 (S.D.N.Y. Sept. 19, 2018) (dismissing claim based on restatement caused by employee's wrongdoing because his superiors were "at worst" negligent in not detecting the fraud); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *4

(S.D.N.Y. Dec. 16, 2014) (Schofield, J.) (dismissing claim based on allegations of overstated revenue and "deficient internal accounting controls").

Here, while Plaintiffs seek to characterize the Restatement as a "dramatic divergence of the restated financial results" because it caused Canopy "to overstate its revenue by over C$26.6 million through the Class Period,"[4] (FAC ¶¶ 171-72), courts consistently hold that "the size of the [alleged] fraud alone does not create an inference of scienter." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) (Sullivan, J.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009); *Iconix*, 2017 WL 4898228, at *17 (dismissing claim and holding that the magnitude of the restatement "must be presented in tandem with other circumstantial evidence to suggest scienter"). In any event, the Restatement resulted from sales that were accounted for incorrectly at just one of Canopy's non-core subsidiaries, and it represented a small percentage of the Company's consolidated net revenue: about <u>2%</u> for fiscal year 2022 and about <u>4%</u> for the nine months ended December 31, 2022 (*supra* at 6). Such a modest restatement simply does not raise an inference that Defendants acted with an intent to deceive -- to the contrary, it undermines it. At its core, Plaintiffs' theory is predicated on the impermissible hindsight-based critique that Defendants *must have known* that BioSteel's revenue was misreported before Canopy's review discovered it. *In re Plug Power, Inc. Sec. Litig.*, No. 2022 WL 4631892, at *17 (S.D.N.Y. Sept. 29, 2022) (rejecting fraud-by-hindsight allegations of scienter simply based on the fact that there was a restatement).

### 2. Plaintiffs' CW Allegations <u>Do Not Support A Strong Inference Of Scienter</u>

Plaintiffs' attempt to plead scienter through statements attributed to CWs are insufficient.

---

[4] Taking into account the *under*statement of approximately $2.8 million in revenue for Q3 2023, the cumulative revenue overstatement was about $24 million. (FAC ¶¶ 70-73.)

Plaintiffs' CW allegations originate from six, primarily lower-level, former employees who worked in various regional sales positions at BioSteel or Canopy, and who are not described with sufficient particularity to plead that they had any knowledge about the alleged inventory and distribution issues, much less how those issues allegedly factored into the Restatement or that any Defendant was aware of the issues at the time any challenged statement was made (FAC ¶¶ 26-47). *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011) (observing that CWs must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").

*First*, for all but one of the CWs, the FAC does not allege that any CW even reported to any Individual Defendant or that any Individual Defendant was even in their reporting line.[5] (FAC ¶¶ 26, 28, 30, 32, 35, 41); *Chapman v. Mueller Water Prods. Inc.*, 466 F. Supp. 3d 382, 400 (S.D.N.Y. 2020) (Liman, J.) (rejecting CW allegations where they did not report to any defendant and were not in their reporting line). And none of the CWs is alleged to ever have spoken directly with any Individual Defendant, let alone to have communicated any of the alleged BioSteel inventory or distribution problems to any Individual Defendant. (FAC ¶¶ 26-47); *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (affirming dismissal and discounting statements of CWs because they had no contact with the individual defendants); *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) (dismissing case and discounting CW allegations where there was no evidence that they communicated any alleged

---

[5] Plaintiffs allege that CW5, who began at Canopy in December 2019, nearly two years *before* the beginning of the Class Period, "initially" reported to Mr. Klein and then at some unspecified time "later" reported to the Chief Commercial Officer. (FAC ¶ 35.) This vague and undated allegation does not allege facts indicating that CW5 had any knowledge about any communications with Canopy's senior management during the Class Period. *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008).

problems to the defendants), *aff'd,* 312 F. App'x 400 (2d Cir. 2009).

The only allegation in the FAC of a purported direct communication is insufficient. Plaintiffs allege that CW1 raised an issue of BioSteel's cost of goods sold being miscalculated "internally with Canopy management, but the problem was not remedied until February 2023." (FAC ¶ 76.) But *who* at "Canopy management" was told about the purpoted accounting issue?[6] *When* were they told? *What* were they told? The FAC provides no answers. *Chapman*, 466 F. Supp. 3d at 400 (disregarding CW allegation that issues were communicated to "senior management" where plaintiff failed to identify the "senior management"); *Long Miao*, 442 F. Supp. 3d at 799 (disregarding CW statements that were "entirely unmoored in time"). Nor do Plaintiffs adequately allege any facts to support the probability that CW1, "Director, eCommerce and Alternative Channels" and then in 2021 "BioSteel's Director, eCommerce Amazon and 3P [Third-Party] Capabilities" who "ran all of BioSteel's business with Amazon, Walmart, Target and Instacart," would be knowledgeable as to accounting or revenue recognition issues, much less how such accounting issues affected BioSteel's (or Canopy's) reported revenue (FAC ¶¶ 26, 75). *Chapman*, 466 F. Supp. at 400 (disregarding CW allegations where complaint failed to show that persons in non-accounting positions would know about GAAP accounting rules).

Plaintiffs also fail to describe CW4 and CW5 with sufficient particularity to support the basis of their knowledge. Plaintiffs allege that CW4 had knowledge about alleged issues with a European distribution agreement (FAC ¶¶ 31, 33) but fail to explain how CW4, a sales director who was allegedly "tasked with helping commercialize BioSteel for retail in the *United States*," would be in a position to know anything about the specifics of a *European* distributor. (*Id.* ¶ 32.)

6 The vague phrase "Canopy management" is itself uninformative. We are left to guess even who CW1 regards as "management." Canopy had thousands of employees, many in some form of management capacity. (Ex. 2, 2022 10-K at 22; Ex. 1, 2023 10-K at 24.)

Plaintiffs similarly rely on CW5 to allege that BioSteel had excess inventory problems yet CW5 is described as having been responsible for *CBD* products, not BioSteel's *sports drink products* -- the subject of the alleged excess inventory and challenged statements. (*Id.* ¶¶ 35-44.)

*Second*, even if the Court were to credit the allegations attributed to all the CWs, their statements are so vague, speculative and conclusory that they fall far short of supporting a strong inference of scienter. *Chapman*, 466 F. Supp. 3d at 399 (rejecting CW allegations that did not establish what specific contradictory information defendants received or when they received it).

***Statements About BioSteel Inventory***. Plaintiffs rely on CW2, CW5, and CW6 to allege that beginning sometime in "late 2021" through "early 2023" BioSteel accumulated "significant" amounts of excess inventory that eventually expired and went unsold, leading Canopy to "write down a significant amount of product" in early 2023. (FAC ¶¶ 24, 34-45.) Plaintiffs use these allegations to assert that each Defendant knew but failed to disclose that BioSteel had a "mounting problem with aged inventory" when making positive statements about BioSteel's business and financials. (*Id.* ¶ 78.) But Plaintiffs' excess inventory theory relies heavily on generalized allegations by CWs that contain no particularized facts -- no contemporaneous report, document, or statement -- specifying the nature, scope, or magnitude of any excess inventory issues that Defendants allegedly became aware of that would have contradicted their public statements, as is required to adequately allege scienter. *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (dismissing claim and rejecting allegations that defendants tracked and had access to inventory reports because they "fail[ed] to specify exactly what information was contained in the report or how said information contradicted Defendants' public statements" (cleaned up).)

For example, the CWs do not allege any particulars about the volume or amount of

excess inventory that BioSteel had accumulated, *how* much of that excess inventory was BioSteel unable to distribute or sell (and at *what* points in time) or *how* any excess inventory factored into BioSteel's reported revenue results. The CW allegations about excess inventory are instead riddled with vague adjectives that add nothing, such as: "BioSteel began to accumulate a ***significant amount*** of excess product . . ." (FAC ¶¶ 34, 45), "BioSteel ***overproduced a lot*** of its product . . ." (*id.* ¶ 40) and "the problem of excessive inventory became ***so bad*** that BioSteel offered to give away ***palettes to truckloads*** of its product" (*id.* ¶ 43) (emphases added). Stripped of hyperbole, Plaintiffs' CW allegations regarding excess inventory offer no basis to infer that any Defendant was aware of any specific adverse issues regarding BioSteel's inventory that would have rendered their public statements knowingly misleading at the time they were made. *Maloney*, 518 F. Supp. 3d at 780-81 (dismissing CW allegations that executives knew about "significant" inventory issues where allegations lacked specific contradictory information).[7]

The one attempt Plaintiffs do make to specifically plead Defendants' knowledge about excess inventory fails. Relying solely on CW5, Plaintiffs allege that the Individual Defendants participated in "Monthly Business Review calls" and that "presentations" and "spreadsheets" were sent to Defendant Klein that captured "action items" that would be discussed on the calls, and that BioSteel's excessive inventory issues "*would have been* discussed during these calls." (FAC ¶ 167 (emphasis added).) But *what* alleged "action items" were discussed and *what* specific information was shared in the spreadsheets and presentations? *Who* discussed the information? *How* was it contradictory to Defendants' statements? The FAC does not say.

---

[7] For these reasons, the allegation that CW2 and CW6 confirmed CW5's accounts of excess inventory (FAC ¶ 42) does not provide any credible corroboration. Plaintiffs also cannot allege that the purportedly adverse information "was known or common knowledge within the company" as "these assertions are too vague and conclusory to support" an inference of scienter. *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 306 (S.D.N.Y. 2019) (Caproni, J.).

Courts routinely find similar vague allegations wholly insufficient to support an inference of scienter. *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (dismissing 10(b) claim on scienter grounds and disregarding CW's statement that he attended meetings during which reports were circulated and questions were raised because "it contains no time frame within which the meetings occurred" and "no information regarding how extensively or in what manner the reports were discussed"), *aff'd sub nom. W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009).[8] And CW5's assertion that BioSteel's excess inventory issue "would have been discussed" during the calls is far "too speculative to give rise to a strong inference of scienter." *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) (rejecting statement that information would have been reviewed by defendants as speculative), *aff'd* 430 F. App'x 63 (2d Cir. 2011).

Plaintiffs' excess inventory allegations suffer from another fatal flaw: they are so disconnected from any challenged statement that they cannot give rise to a strong inference of scienter. *U.S. Educ. Loan Tr. III, LLC v. RBC Cap. Mkts. Corp.*, 2011 WL 6778480, at *11-12 (S.D.N.Y. Dec. 21, 2011) (dismissing 10(b) claim and finding no scienter where plaintiff failed to plead "a close nexus between the alleged misrepresentations and the alleged omission"). Notably, Plaintiffs do not challenge any affirmative statements made during the Class Period regarding BioSteel's inventory or any write downs. Nor do Plaintiffs allege particularized facts linking how the alleged excess inventory problems would have rendered Defendants' revenue

---

8 *See Horowitz v. Green Mountain Coffee Roasters, Inc.*, 2013 WL 1149670, at *6 (D. Vt. Mar. 20, 2013) (rejecting CW statements that inventory issues were discussed in weekly meetings where plaintiffs failed to allege specific adverse reports or information presented at the meeting); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27-28 (S.D.N.Y. Apr. 2, 2020) (rejecting CW allegations that defendants ran meetings about issues because allegations failed to explain what contradictory information was shared), *aff'd*, 2022 WL 2824260 (2d Cir. July 2, 2022).

statements false or misleading at the time they were made. *Horowitz*, 2013 WL 1149670, at *10 (dismissing claim that company should have known that generalized financial statements were likely to be false because it was allegedly aware of existing problems with the company's inventory management as too attenuated to support a finding of scienter). Plaintiffs' excess inventory allegations are premised on the same fraud-by-hindsight claims that doom their other scienter theories: because Canopy disclosed near the end of the Class Period (i.e., February 9, 2023) that BioSteel wrote down aged inventory (FAC ¶¶ 45, 183), Defendants "must have known" much earlier in time (i.e., from November 5, 2021) that the write down was assured.[9]

***Statements About Distribution***. Plaintiffs rely on CWs 1-4 to generally allege that (i) BioSteel "did not have contracts with some of its wholesaler partners" including a few who received "sizable amounts of BioSteel product," (ii) "disruptions in distribution channels caused shipments to be delayed or never ultimately reach its distributors" and (iii) BioSteel was unable to secure payment for shipped product to a single distributor because of an allegedly unenforceable agreement. (FAC ¶¶ 27-29, 31-33.) Missing from these vague and grossly generalized allegations are any particularized facts: *which* wholesaler partners lacked contracts, *what* amount of product was sold through these unidentified distributors, *what* disruptions were faced and *how* much product was affected, *what* amount of payments did BioSteel allegedly fail to obtain, and *what* impact, if any, did these distribution issues have on BioSteel's reported revenue. The FAC identifies only one distributor and then offers CWs' speculation that an

[9] Nor do Plaintiffs adequately state a claim as to challenged omissions about excess inventory on February 9, 2023 (FAC ¶¶ 144-45, Ex. 7, 2/9/23 8-K, Ex. 99.1 at 2; ¶¶ 146-47, Ex. 8, 2/9/23 10-Q at 50-51, 76) because Canopy already disclosed the write down due to aging inventory and its impact on results (FAC ¶ 141; Ex. 8, 2/9/23 10-Q at 52). *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) (holding that "defendants cannot be held liable for failing to disclose something that they disclosed"), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

unspecified amount of sales to that distributor should not have been recognized as revenue. (FAC ¶¶ 31, 34.) But again Plaintiffs offer no particularized facts about *what* amount of revenue was allegedly improperly recognized, *when* it happened, *who* knew about it, and *what* effect it had on reported revenue.

Critically, even if such particulars were alleged, nowhere do Plaintiffs allege that any Defendant had knowledge about any revenue recognition issues involving any distributor, the impact of those issues on BioSteel's or Canopy's reported financials, or *how* any such information contradicted any of the challenged statements at the time they were made. *Chapman*, 466 F. Supp. 3d at 401 (finding no inference of scienter where plaintiffs failed to allege whether and how defendants were aware of adverse information). And Plaintiffs' vague allegation that Defendants learned about unspecified "distribution and collection problems" through their Monthly Business calls (FAC ¶ 168) is wholly inadequate (*see supra* at 13-14).

***Statements About Revenue Targets***. Plaintiffs' reliance on allegations by CW1 and CW3 about revenue targets are so vague and irrelevant as to be meaningless. (FAC ¶¶ 46-47.) CW3 states that there was "tremendous pressure internally, from the top down" to achieve certain revenue targets and CW1 observed that BioSteel's sales staff were pressured to reach "aggressive sales goals." (*Id.*) Plaintiffs do not, however, allege whether the purported sales pressure came from the co-founders of BioSteel who managed the company (FAC ¶¶ 122, 193) or someone at Canopy, let alone that it involved any Individual Defendant or that any Individual Defendant was aware of these pressures. Nor do Plaintiffs allege how such information, even if known, would support an inference that Defendants acted with scienter as to the challenged misstatements. *Turquoise Hill*, 2014 WL 7176187, at *7 (rejecting CW allegations because they were not "tied to, or have any bearing on" defendants' state of mind).

### 3. Plaintiffs' Remaining Scienter Allegations Are Insufficient

Plaintiffs' remaining patchwork of scienter allegations (FAC ¶¶ 165-97) are insufficient.

***Senior-Level Positions***. Plaintiffs cannot rely on the Individual Defendants' executive positions at Canopy to suggest that they had access to adverse information about BioSteel or that they had an "opportunity to conceal" such facts and misstate BioSteel's or Canopy's revenue. (FAC ¶¶ 12, 164.) Courts routinely hold that "accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

***SOX Certifications***. Plaintiffs ask this Court to infer recklessness based on the Individual Defendants signing SOX certifications attesting to the accuracy of Canopy's financial statements and effectiveness of internal control over financial reporting. (FAC ¶¶ 166, 195-97.) The signing of a SOX certification alone is insufficient to plead scienter. *Int'l Ass'n of Heat v. IBM*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016) ("[A]llowing [SOX] certifications to create an inference of scienter in every case where there was an accounting error or auditing mistake made by a publicly traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA."); *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 239 (S.D.N.Y. 2020) (signing of SOX certifications and SEC filings are insufficient to support a strong inference of scienter). Because Plaintiffs do not plead that the Individual Defendants "had reason to know" of the statements' inaccuracy, the SOX certifications "add nothing substantial." *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018).[10]

---

[10] The SOX certifications are also not actionable. (FAC ¶ 86, Ex. 9, 11/8/21 10-Q, Exs. 31.1, 31.2; ¶ 95, Ex. 10, 2/9/22 10-Q, Exs. 31.1, 31.2; ¶ 108, Ex. 2, 2022 10-K, Exs. 31.1, 31.2; ¶ 120, Ex. 21, 8/9/22 10-Q, Exs. 31.1, 31.2; ¶ 133, Ex. 3, 11/9/22 10-Q, Exs. 31.1, 31.2; ¶ 149, Ex. 8, 2/9/23 10-Q, Exs. 31.1, 31.2.) The Individual Defendants' certifications were "based on [their] knowledge" at the time and thus were statements of opinion. *In re Hain*

*(cont'd)*

***Internal Control***. Plaintiffs' allegations concerning the effectiveness of Canopy's internal control over financial reporting (FAC ¶¶ 48, 65, 154-56) also do not give rise to a strong inference of scienter. Plaintiffs allege no particularized facts that Defendants were aware of any internal control weaknesses at any point before the completion of the internal review that led to the Restatement. *Woolgar*, 477 F. Supp. 3d. at 230 (granting motion to dismiss where plaintiffs did not show that defendants knew about material weakness in internal control prior to disclosure or anytime during class period); *Turquoise Hill*, 2014 WL 7176187, at *8 ("The accounting controls were an after-the-fact explanation for why the [financial reporting] error had occurred, not a red flag before it was discovered."); *Schiro*, 396 F. Supp. 3d at 307 (finding that "*ex post* discovery of inadequate internal controls . . . does not contribute to an inference of scienter"). Nor does the scope of the remediations that Canopy undertook to strengthen its internal controls suggest an intent to defraud. (FAC ¶¶ 186-89.) If anything, Canopy's comprehensive remedial efforts "was a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (cleaned up); *In re Hain*, 2022 WL 18859055, at *30 (E.D.N.Y. Nov. 4, 2022) (dismissing case and finding that voluntary remedial efforts to strengthen internal controls undermined scienter).[11]

---

*(cont'd from previous page)*
*Celestial Grp. Inc. Sec. Litig.*, No. 16-cv-04581-LGD, 2022 WL 18859055, at *23 (E.D.N.Y. 2022), *report and recommendation adopted*, 2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023). Plaintiffs do not (and cannot) allege any facts showing that the Individual Defendants did not genuinely believe their certifications were true when made or had actual knowledge of adverse facts. *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) (finding SOX certifications not actionable where they were qualified by knowledge and there were no allegations of actual knowledge of falsity).

[11] The internal control statements are also not actionable (FAC ¶ 85, Ex. 9, 11/8/2021 10-Q at 57; ¶ 86, Ex. 9, 11/8/21 10-Q, Exs. 31., 31.2; ¶ 87; ¶ 94, Ex. 10, 2/9/22 10-Q at 61; ¶ 95, Ex. 10, 2/9/22 10-Q, Exs. 31.1, 31.2; ¶ 96; ¶¶ 106-07, Ex. 2, 2022 10-K at 93-94; ¶ 119, Ex. 21, 8/9/2022 10-Q at 50; ¶ 132, Ex. 3, 11/9/2022 10-Q at 68; ¶ 133, Ex. 3, 11/9/22 10-Q, Exs. 31.1,
*(cont'd)*

***GAAP Violation***. Plaintiffs allege that Defendants "acted with scienter when failing to report results in accordance with GAAP and consistent with the requirements of ASC 606." (FAC ¶¶ 172, 65-67). But "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . [o]nly where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *ECA*, 553 F.3d at 200; *City of Omaha Civilian Emp.'s Ret. Sys.*, 679 F.3d at 69. As demonstrated here, the corresponding allegations of fraudulent intent are missing.

***Defendants' Own Statements***. Plaintiffs allege that scienter can be inferred from the Individual Defendants' periodic statements about BioSteel's "revenues, inventory and distribution channels" because they "repeatedly held themselves out as extremely knowledgeable" about those topics. (FAC ¶¶ 173-77.) Bare assertions that a defendant held himself out to investors as knowledgeable about a particular topic -- without particularized allegations of contemporaneous adverse facts -- do not raise an inference of scienter. *In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (dismissing case).

***Temporal Proximity And Divergence Between Statements And Disclosures***. Plaintiffs assert that the "temporal proximity" and "sharp divergence" between Defendants' positive statements about BioSteel and their disclosures in the Restatement support scienter. (FAC ¶¶ 173-77; 182-89.) Not so. Courts reject "temporal proximity" allegations such as those asserted here -- without particularized facts of Defendants' knowledge of adverse facts -- as insufficient to raise a circumstantial inference of fraud. *Pearlstein v. BlackBerry Ltd.*, 93 F.

---

*(cont'd from previous page)*
31.2; ¶ 134; ¶ 148, Ex. 8, 2/9/23 10-Q at 76; ¶ 149, Ex. 8, 2/9/23 10-Q, Exs. 31.1, 31.2; ¶ 150). The fact that Canopy ultimately "disclosed that its financial controls had not been effective" does not render Canopy's earlier representations about its internal control over financial reporting false when made. *Schiro*, 396 F. Supp. 3d at 299.

Supp. 3d 233, 247 (S.D.N.Y. 2015) (dismissing claim). And Plaintiffs' "sharp divergence" allegations amount to nothing more than "fraud-by-hindsight": Plaintiffs simply contrast Defendants' past optimism about BioSteel with later actual results and then claim that the differences must be attributable to fraud. If anything, the alleged "sharp divergence" is consistent with the more compelling inference that Defendants were genuinely optimistic about BioSteel's business at the time the challenged statements were made and once they became aware of the revenue misstatements, promptly investigated and corrected them.

***Core Operations***. Plaintiffs allege that BioSteel was Canopy's "main subsidiary" and the "driving factor of Canopy's revenue during the Class Period" and then speculate that it "would be absurd to infer that Canopy's most senior executives were unaware of BioSteel's actual revenue" or weaknesses in its internal control over financial reporting. (FAC ¶¶ 178-81.)

*First*, the core operations doctrine is no longer viable following the passage of the PSLRA. *See Okla. L. Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2020 WL 127546, at *7 (S.D.N.Y. Jan. 10, 2020) (expressing "considerable doubt" that the doctrine survived the PSLRA and noting "many courts have held that it is no longer valid"); *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022) (affirming dismissal of 10(b) claim on scienter grounds while noting that "[w]e have not clearly affirmed the validity of this doctrine following the passage of the PSLRA").

*Second*, even if the core operations doctrine were a viable theory, it would not apply here. The core operations doctrine provides that "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 (citations omitted). Thus, "[w]hen applying the doctrine, 'courts have

required that the operation in question constitute nearly all of a company's business before finding scienter.'" *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

Here, Plaintiffs seek to make it appear as if BioSteel was a "driving factor of Canopy's revenue during the Class Period" by selectively comparing gains in BioSteel's revenue to decreases in revenue in certain of Canopy's business segments during cherrypicked snapshots of time. (FAC ¶¶ 179; 20-22.) But Plaintiffs ignore that the BioSteel segment represented only between 6.78% and 17.29% of Canopy's total consolidated revenue during nearly the entirety of the Class Period.[12] BioSteel was therefore nowhere close to being "nearly all" of Canopy's business. *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (2d Cir. 2019) (dismissing claim where segment comprised about 30% of company's business), *aff'd*, 764 F. App'x 127 (2d Cir. 2019); *Frankfurt-Tr.*, 336 F. Supp. 3d at 225 (no strong inference of scienter where division constituted 25% of the company's business).

*Third*, even taking the allegation that BioSteel was a core operation for Canopy as true, core operation allegations "can provide supplemental support for allegations of scienter, [but] they cannot establish scienter independently." *Turquoise Hill*, 2014 WL 7176187, at *8. Because Plaintiffs' other allegations are insufficient to plead scienter, there is nothing for Plaintiffs' "core operations" allegations to supplement. *Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) (rejecting

---

[12] *See* Ex. 1, 2023 10-K at 78, 91, F-68, F-72 (for FY2022 BioSteel's revenue was $34,622,000 and Canopy's consolidated net revenue was $510,321,000 and for FY2023 BioSteel's revenue was $69,649,000 and Canopy's consolidated net revenue was $402,904,000). Even using the revenue figures that were originally reported before the Restatement, BioSteel represented about only 20% of Canopy's total consolidated revenue. (*Id.*)

"core operations" inference where remaining scienter allegations were insufficient); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *31-32 (S.D.N.Y. Oct. 10, 2018) (no scienter where plaintiff relied on core operations theory plus magnitude of the misstatement); *Turquoise Hill*, 2014 WL 7176187, at *7-8 (no scienter where plaintiff relied on core operations doctrine plus SOX certifications, magnitude of the restatement, and defendants' corporate positions).[13]

***Canopy's Oversight Of BioSteel's Accounting***. Plaintiffs allege that Canopy oversaw BioSteel's accounting and "ran the books for BioSteel" and therefore Defendants must have been aware of the revenue misstatements. (FAC ¶¶ 190-91.) Plaintiffs do not allege any particularized facts supporting this assertion, including *who* at Canopy allegedly oversaw the accounting or *what* specific accounting issues were allegedly overseen. (*Id.*) But even taking that allegation at face value, glaringly absent are any particularized facts that any Individual Defendant (or any other Canopy individual whose intent can be imputed to Canopy) was aware of, or recklessly disregarded, any accounting errors at BioSteel by virtue of Canopy having "overseen" BioSteel's accounting *at the time the challenged financial statements were issued*. *See Malin*, 499 F. Supp. 2d at 164 (no scienter where "there are allegations of accounting improprieties and a lack of internal controls at [the subsidiary], [but] there is no allegation that [the parent company] or any of the Individual Defendants were actually aware of those alleged improprieties"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009). Courts regularly dismiss vague and generalized allegations that defendants "oversaw accounting functions" as insufficient. *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 894 (W.D. Tex. 2008) (no inference of scienter where individual defendants "oversaw accounting functions" and plaintiffs alleged "nothing specific

[13] For this same reason, Plaintiffs' reliance on third-party analysts' opinions, predictions, and models of BioSteel's contributions to Canopy's business (FAC ¶¶ 179-80) is unavailing.

about what the Individual Defendants knew or intended"); *In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *19 (D.N.J. July 2, 2019) (same).

***Executive Departures***. Finally, Plaintiffs try to allege scienter by pointing to two executive departures. (FAC ¶¶ 192-94.) "For executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious." *Schiro*, 396 F. Supp. 3d at 303. A departure can establish scienter "only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind." (*Id.*) Plaintiffs must therefore allege facts linking "Defendants' [departures] to the alleged fraud." *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015). Plaintiffs fail to meet their burden.

*First*, there is nothing unusual and suspicious about Mr. Lee's resignation (FAC ¶ 192): Plaintiffs ignore that Mr. Lee left as part of strategic changes to Canopy's executive management team and that he remained with Canopy in an advisory capacity to support the transition. (*Id*; Ex. 22, 11/19/21 8-K, Ex. 99.1 at 2.) Mr. Lee's signing of a SEC filing and SOX certification within days of the start of the Class Period falls far short of demonstrating that his resignation was connected to any alleged fraud. (*See supra* Section I.A.3.)

*Second*, the termination of Mr. Celenza, who is not a named defendant in this action, does not create an inference of scienter on the part of Defendants. *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *29 (S.D.N.Y. May 10, 2012) (termination of non-party executive does not create inference of scienter as to named defendants). Nor can any inference of scienter be drawn against any Defendant from the temporal proximity between Mr. Celenza's termination and Canopy's disclosure of the internal review. (FAC ¶ 194.) That Canopy made management and personnel changes in response to that review does not lead to any "cogent inference that [Defendants] were aware of, or consciously disregarded, any fraud at the time it was committed."

*Das*, 332 F. Supp. 3d at 815 (no inference of scienter from termination of executive around the time that misconduct was disclosed because the more plausible inference was that the company took disciplinary action in response to misconduct).

### B. <u>Plaintiffs Do Not Sufficiently Allege Motive To Commit Fraud</u>

To raise a strong inference of scienter through "motive and opportunity," Plaintiffs must allege that Defendants benefited in some personal and concrete way from the purported fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs offer no allegations that any Individual Defendant stood to gain personally and concretely from the alleged misstatements. For example, Plaintiffs do not plead any unusual or suspicious selling of Canopy stock by any Individual Defendant during the Class Period, which itself negates an inference of scienter. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Plaintiffs speculate that Defendants were motivated to overstate BioSteel's revenue so that Canopy "looked better than it actually was in order to sustain investor interest in its failing business." (FAC ¶¶ 163, 160-62.) Plaintiffs cannot explain why Canopy would try to prop up one of its non-core business segments by inflating its revenue but accurately report the alleged failures of its core business. Of course, the more plausible inference to draw is that Defendants were trying their best to accurately report all aspects of their business. In any event, every public company is motivated to keep investors' interests high and all executives have a desire to sustain the appearance of corporate profitability. Plaintiffs' motive allegations are too generic to support scienter. *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (desire to "sustain the appearance of corporate profitability" does not support inference of scienter).

### C. The Alleged Facts Support A More <u>Compelling Inference Of Non-Fraudulent Intent</u>

The lack of any motive in this case raises the obvious and fundamental question: why

would Defendants intentionally misstate a small amount of revenue in one of Canopy's non-core business segments, only inevitably to have to restate those revenues with no personal benefit to Defendants? They would not. The facts alleged support the far more compelling inference that Defendants believed that BioSteel's reported revenues were accurate at the time and took steps to diligently investigate and correct the misstatements as soon as they became aware of them (*supra* at 4-6). *Avon Prods., Inc.*, 2014 WL 4832321, at *33. The candid and prompt manner with which Canopy identified and rectified the misstatements undermines rather than supports any inference of scienter. *See Iconix*, 2017 WL 4898228, at *19 (no scienter where "the Company took steps to correct the errors, including by forming a special committee of the independent directors, by cooperating with the SEC, and by issuing restatements of historical financial filings"); *In re Hain*, 2022 WL 18859055, at *33 (no scienter where company undertook an accounting review and self-reported that review to the SEC).[14]

## II. PLAINTIFFS FAIL TO PLEAD THAT MANY OF THE ALLEGED MISSTATEMENTS ARE MATERIALLY FALSE AND MISLEADING

To state a claim under Section 10(b), Plaintiff must allege either (i) an untrue statement of material fact or (ii) the omission of a material fact that was necessary to make a particular statement not misleading in light of the circumstances in which it was made. 15 U.S.C. § 78u-4(b)(1). Plaintiffs must do more than claim the statements were false and misleading; they must demonstrate with specificity *why* and *how* the statement is misleading. *Id*; *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). The law does "not create an affirmative duty to disclose any and all material information" simply because it may be relevant to an investor. *Okla.*

[14] Because Plaintiffs fail to adequately plead scienter as to any Individual Defendant or otherwise allege an "exceedingly rare instance[]" of a dramatic fraud, Plaintiffs do not plead corporate scienter as to Canopy. *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020).

*Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 565 (S.D.N.Y. 2018) (Engelmayer, J.), *aff'd sub nom. Ark. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019). Plaintiffs challenge various statements made during the Class Period concerning BioSteel's and Canopy's reported revenue[15] and Canopy's internal control over financial reporting (*see supra* at 18-19 n.11), and BioSteel's business and growth prospects. (FAC ¶¶ 78-150.) Many of the challenged statements are not adequately alleged to be false or misleading at the time they were made or are not actionable as a matter of law.[16]

***Optimistic Statements About BioSteel's Business And Growth Prospects***. Plaintiffs challenge numerous statements about BioSteel's prospects and growth opportunities that are quintessential statements of corporate optimism and provide no objectively verifiable facts on which a reasonable investor would rely. (FAC ¶¶ 78, 80, 97, 102, 110.) For example:

- "The Company ***remains optimistic about its growth opportunities*** in the U.S. for both its BioSteel ready-to-drink. . . ." (FAC ¶ 78 (Ex. 16, 11/5/21 8-K, Ex. 99.1 at 3).

- "We're seeing really good retailer response to BioSteel. And so, ***we remain as bullish, as ever,*** in aggregate on the BioSteel brands" (FAC ¶ 80, Ex. 19, 11/5/21 Tr. at 15).

- "The U.S. is our area of ***greatest potential*** and we've been ***highly encouraged*** by both Storz & Bickel and BioSteel performance. . . ." (FAC ¶ 97, Ex. 17, 2/9/22 Tr. at 5).

- "Focusing strategic investments to accelerating brand growth ***with aspiration to be***

---

[15] Plaintiffs' claims based on revenue statements fail because Plaintiffs do not adequately allege scienter as to those statements (*see* FAC ¶¶ 83, 90, 92, 97; ¶¶ 101-02, Ex. 11, 5/27/22 8-K, Ex. 99.1 at 1, 3, 7; ¶ 104, Ex. 2, 2022 10-K at 65-66; ¶¶ 110, 112, Ex. 18, 5/27/22 Tr. at 5-6; ¶¶ 114-15, Ex. 12, 8/5/22 8-K, Ex. 99.1 at 1-2, 4; ¶ 117, Ex. 21, 8/9/22 10-Q at 38; ¶ 124, Ex. 13, 8/5/22 Tr. at 6; ¶¶ 127-28, Ex. 14, 11/9/22 8-K, Ex. 99.1 at 1-2, 5; ¶ 130; Ex. 3, 11/9/22 10-Q at 45; ¶ 135, Ex. 15, 11/9/22 Tr. at 5; ¶ 137, Ex. 15, 11/9/22 Tr. at 6; ¶ 144, Ex. 7, 2/9/23 8-K, Ex. 99.1 at 2; ¶ 146, Ex. 8, 2/9/23 10-Q at 50-51; ¶ 151, Ex. 4, 5/10/23 8-K at 2, *supra* Section I).

[16] For the Court's convenience, attached hereto as Appendix A is a table listing all of the challenged statements in the FAC and summarizing the bases for dismissal as set forth herein.

*top 4 player* in the North American sports drink market. . . ." (FAC ¶ 102, Ex. 11, 5/27/22 8-K, Ex. 99.1 at 1).

- "***We believe*** that this challenger brand is ***quickly turning into a winner*** as we watch members of team BioSteel dominate in the playoffs. . . ." (FAC ¶ 110, Ex. 18, 5/27/22 Tr. at 5).

- "***There's considerable runway for both brands*** and investment will be to further build brand awareness in visibility amongst consumers and building a robust distribution pipeline" (FAC ¶ 110, Ex. 18, 5/27/22 Tr. at 6).

Courts routinely find similar statements inactionable as a matter of law. *Shemian*, 2013 WL 1285779, at *23 (statements about "exciting growth" and "bullish[ness]" were nonactionable puffery); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("aspirational" statements were nonactionable puffery); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523-24 (S.D.N.Y. 2020) (statement that company was "uniquely positioned to win market share" was nonactionable puffery), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015) (statement that company had "extremely large runway for near-term growth" was nonactionable puffery), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

***Statements About Distribution And Sales Velocity Growth***. Plaintiffs challenge various statements discussing gains in BioSteel's distribution networks in the U.S. and North America market and sales velocities,[17] and expected growth in those areas. These statements include:

- BioSteel expanded its U.S. distribution and that it expected further "ramp up"[18];

- BioSteel's increased revenues and gains were driven by increased distribution in the

[17] In the context of consumer packaged goods such as sports drink products, sales velocity measures how quickly products that are on the shelf at retailers are selling to end customers.

[18] (FAC ¶ 78, Ex. 16, 11/5/21 8-K, Ex. 99.1 at 3, 7; ¶ 81, Ex. 19, 11/5/21 Tr. at 17.)

U.S. market with major retailers and increased sales velocities[19]; and

- BioSteel expected significant sales growth from increased and expanded distribution and sales velocities in North America.[20]

Plaintiffs allege that these statements were rendered misleading by Canopy's failure to disclose that BioSteel "lacked enforceable distribution contracts with many key distributors" and "was experiencing a mounting problem with aged inventory" (FAC ¶¶ 79, 84, 91, 93, 98, 103, 105, 111, 113, 118, 123, 129, 131, 136). In addition to failing to allege scienter with respect to these purported omissions (*see supra* Section I.A.2), Plaintiffs fail to adequately allege a close nexus between the alleged misrepresentations and the alleged omissions. *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 578-79 (S.D.N.Y. 2012) (finding no nexus between statements regarding source of revenue and alleged omissions regarding aggressive sales tactics and quota system). Plaintiffs allege that BioSteel "lacked enforceable distribution contracts with many key distributors" but provide no particularized allegations as to *which* distributors lacked enforceable contracts, *where* they distributed product, *how* much product was sold through those distributors, or *how* the lack of these unidentified number of unenforceable distribution contracts rendered generalized statements that BioSteel saw gains and expansions in its distribution network and sales velocity false or misleading. The only identified distributor that allegedly had an unenforceable contract distributed product in Europe (FAC ¶ 31) and Plaintiffs make no attempt to tie a loss of sales to that *European* distributor to the challenged

---

19 (FAC ¶ 83, Ex. 9, 11/8/21 10-Q at 37; ¶ 90, Ex. 20, 2/9/22 8-K, Ex. 99.1 at 4, 7; ¶ 92, Ex. 10, 2/9/22 10-Q at 39; 97, Ex. 17, 2/9/22 Tr. at 5; ¶ 102, Ex. 11, 5/27/22 8-K, Ex. 99.1 at 1; ¶ 104, Ex. 2, 2022 10-K at 66; ¶ 110, Ex. 18, 5/27/22 Tr. at 5; ¶ 117, Ex. 21, 8/9/22 10-Q at 38; ¶ 130, Ex. 3, 11/9/22 10-Q at 45; ¶ 135, Ex. 15, 11/9/22 Tr. at 5.)

20 (FAC ¶ 112, Ex. 18, 5/27/22 Tr. at 8; ¶ 122, Ex. 13, 8/5/22 Tr. at 5; ¶ 128, Ex. 14, 11/9/22 8-K, Ex. 99.1 at 1; ¶ 130, Ex. 3, 11/9/22 10-Q at 45.)

statements about gains in distribution and sales velocity in the *U.S.* and *North America*.[21]

Nor do Plaintiffs explain why the alleged omission of BioSteel's "mounting problem with aged inventory" would have rendered BioSteel's statements that it achieved and expected gains in distribution and sales velocity false or misleading. In context, Defendants explained that BioSteel saw increased distribution and sales velocity because it had (i) secured additional agreements with major retailers (such as Walmart and Stop & Shop) and (ii) increased its investment in marketing and brand awareness, including by becoming the official hydration partner for the National Hockey League. (FAC ¶ 78, Ex. 16, 11/5/21 8-K, Ex. 99.1 at 4; ¶ 110, Ex. 18, 5/27/22 Tr. at 5; ¶ 115, Ex. 12, 8/5/22 8-K, Ex. 99.1 at 1; ¶ 122, Ex. 13, 8/5/22 Tr. at 5; ¶ 135, Ex. 15, 11/9/22 Tr. at 5.) Plaintiffs do not (and cannot) allege that BioSteel was *not* securing new distributions with retailers or that it was *not* seeing increased sales velocity from its strategic investments in marketing and brand awareness (*see* Ex. 1, 2023 10-K at 79, 92) or how such failure to disclose the alleged "mounting problem with aged inventory" rendered these challenged statements misleading at the time they were made. At most, Plaintiffs allege that Canopy wrote "down a significant amount of product" in February 2023 (FAC ¶ 45) but the occurrence of that write-down does not render earlier distribution and sales velocity statements misleading when made.

## III. <u>ALLEGATIONS AGAINST MR. LEE ARE GROSSLY INADEQUATE</u>

While all of the allegations about the Individual Defendants are inadequate, Plaintiffs'

---

[21] If Plaintiffs' distribution allegations rely on Canopy's disclosure about the revenue recognition issues it discovered (FAC ¶ 66), that reliance only highlights Plaintiffs' failure to allege an adequate nexus. Canopy explained that those issues were primarily in relation to BioSteel's business-to-business sales in *international* markets (i.e., outside of U.S. and Canada). (*Id.*) By contrast, the challenged distribution statements either expressly or in context refer to BioSteel's distribution gains in the domestic *U.S.* and *North America* market.

allegations against Mr. Lee are plainly an afterthought and lack any good faith basis. The only challenged statements attributed to Mr. Lee are that he signed a 10-Q and accompanying SOX certification on November 8, 2021, just days after the start of the Class Period, discussing BioSteel's financial results and Canopy's internal control over financial reporting for Q2 2022. (FAC ¶¶ 83-86.) But there are zero particularized allegations showing that Mr. Lee knew or recklessly disregarded that information about BioSteel's quarterly financial results or Canopy's internal control over financial reporting was false or misleading on November 8, 2021 (*supra* at 21-24, 28 n.15). Even Plaintiffs' CW allegations, which assert only that alleged inventory "accumulation started in late 2021" (*id.* ¶ 36) and "would have been discussed" at meetings attended by Mr. Lee (*id.* ¶ 167), cannot create any inference of scienter as to Mr. Lee's November 8, 2021 statements. Plaintiffs also incorrectly allege that Mr. Lee made a statement about BioSteel on a May 27, 2022 conference call (*id.* ¶¶ 174-75) as Plaintiffs elsewhere admit that Mr. Lee was not at Canopy at that time (*id.* ¶ 192). Mr. Lee's departure within weeks of the start of the nearly 20-month Class Period as part of an executive restructuring is not suggestive of any wrongdoing whatsoever (*supra* at 23-24), and he is not liable for any statements made after he left Canopy. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 148 (2011).

## IV. COUNT II ALLEGING CONTROL PERSON LIABILITY SHOULD BE DISMISSED

Plaintiffs' Section 20(a) claim alleging control liability should be dismissed because Plaintiffs fail to plead a primary violation of Section 10(b). *Chapman*, 466 F. Supp. 3d at 414.

## CONCLUSION

Defendants' motion to dismiss should be granted and the First Amended Complaint should be dismissed with prejudice.

Dated: New York, New York
March 7, 2024

Respectfully submitted,

/s/ Alexander C. Drylewski

Alexander C. Drylewski
(alexander.drylewski@skadden.com)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

James R. Carroll (*pro hac vice*)
(james.carroll@skadden.com)
Rene H. DuBois
(rene.dubois@skadden.com)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800

*Attorneys for Defendants*
*Canopy Growth Corporation,*
*David Klein, Judy Hong and Michael Lee*

## Appendix A

| Challenged Statement | Basis for Dismissal[1] |
|---|---|
| (FAC ¶ 78)<br>November 5, 2021 Form 8-K<br>(Ex. 16 at 3-4, 7.) | Corporate Optimism/Puffery (Br. at 26-27.)<br>• The statements (i) "[t]he Company remains optimistic about its growth opportunities in the U.S. for . . . BioSteel" and (ii) "BioSteel is expected to see its distribution ramp up over the balance of FY2022 and into FY2023" are statements of corporate optimism or puffery.<br>Not False or Misleading (Br. at 27-29.)<br>• The statements (i) "BioSteel is expected to see its distribution ramp up over the balance of FY2022 and into FY2023 driven by increased listings with national and regional chain accounts"; (ii) "brand awareness continues to rise, velocity is tracking in-line with expectations and feedback from distributors and retailers has been positive"; (iii) "BioSteel RTD beverages continued to build distribution throughout Q2 FY2022, with All Commodity Volume ("ACV") increasing to 6.5% in the latest 13-weeks ending October 3, 2021 in IRI"; (iv) "BioSteel has recently secured new distribution with a number of key retailers, and active discussions underway with additional national and regional chain retailers" are not adequately alleged to be false or misleading; and (v) "BioSteel sales in Q2 FY2022 increased 47% over Q2 FY2021 driven by the launch of RTD beverages and expanded distribution in the U.S. market" are not adequately alleged to be false or misleading. |
| (FAC ¶ 80)<br>November 5, 2021 Earnings Call<br>(Ex. 19 at 15.) | Corporate Optimism/Puffery (Br. at 26-27.) |

[1] All of the challenged statements in the FAC fail because Plaintiffs do not adequately allege a strong inference of scienter (Br. at 7-25.) For the Court's convenience, this Appendix summarizes the additional, independent reasons why each challenged statement is not actionable as demonstrated in Defendants' Memorandum of Law (cited as "Br. _"), including because: (i) the statement is not adequately alleged to be false or misleading when made ("Not False or Misleading") (*see* Br. at 17-18, 27-29), (ii) the statement is a nonactionable general expression of corporate optimism ("Corporate Optimism/Puffery") (*see* Br. at 26-27), or (iii) the statement is a nonactionable opinion ("Opinion") (*see* Br. at 17-18). Defendants move to dismiss the following challenged statements reporting revenue based solely on the failure to allege a strong inference of scienter: FAC ¶ 101, Ex. 11, 5/27/22 8-K, Ex. 99.1 at 1, 3, 7; ¶ 114, Ex. 12, 8/5/22 8-K, Ex. 99.1 at 1-2, 4; ¶ 124, Ex. 13, 8/5/22 Tr. at 6; ¶ 127, Ex. 14, 11/9/22 8-K, Ex. 99.1 at 1, 5; ¶ 137, Ex. 15, 11/9/22 Tr. at 6; ¶ 144, Ex. 7, 2/9/23 8-K, Ex. 99.1 at 2; ¶ 146, Ex. 8, 2/9/23 10-Q at 50-51.

| Challenged Statement | Basis for Dismissal[1] |
|---|---|
| (FAC ¶ 81)<br>November 5, 2021 Earnings Call<br>(Ex. 19 at 17.) | Corporate Optimism/Puffery (Br. at 26-27.) |
| (FAC ¶ 83)<br>November 8, 2021 Form 10-Q<br>(Ex. 9 at 37.) | Not False or Misleading (Br. at 27-29.) |
| (FAC ¶ 85)<br>November 8, 2021 Form 10-Q<br>(Ex. 9 at 57.) | Not False or Misleading (Br. at 18.) |
| (FAC ¶ 86)<br>November 8, 2021 Form 10-Q<br>(Ex. 9 at Exs. 31.1 & 31.2.) | Opinion; Not False or Misleading (Br. at 17-18.) |
| (FAC ¶ 90)<br>February 9, 2022 Form 8-K<br>(Ex. 20 at 4, 7.) | Not False or Misleading (Br. at 27-29.)<br>• The statements (i) "[s]ignificant gains in BioSteel distribution"; (ii) "[r]ecently announced the signing of BioSteel retail authorizations with Albertsons Company, Rite Aid, Food Lion, Stop & Shop and Sheetz as well as over 20 additional national, regional and local grocery, convenience and drug chains"; (iii) "[a]dditional authorizations are expected to be signed over the coming months"; (iv) and "[m]ultiple sponsorship, #TeamBioSteel athlete ambassador, trade marketing, social media, and sampling program activations underway to drive brand awareness, product trial and purchase" are not adequately alleged to be false or misleading.<br><br>• The statement that quarterly increase in BioSteel sales was "driven by the launch of ready-to-drink 'RTD' beverages and expanded distribution in the U.S. market" is not adequately alleged to be false or misleading. |
| (FAC ¶ 92)<br>February 9, 2022 Form 10-Q<br>(Ex. 10 at 39.) | Not False or Misleading (Br. at 27-29.) |
| (FAC ¶ 94)<br>February 9, 2022 Form 10-Q<br>(Ex. 10 at 61.) | Not False or Misleading (Br. at 18.) |

| Challenged Statement | Basis for Dismissal[1] |
| --- | --- |
| (FAC ¶ 95)<br>February 9, 2022 Form 10-Q<br>(Ex. 10 at Exs. 31.1 & 31.2.) | Opinion; Not False or Misleading (Br. at 17-18.) |
| (FAC ¶ 97)<br>February 9, 2022 Earnings Call<br>(Ex. 17 at 5.) | Corporate Optimism/Puffery (Br. at 26-27.)<br>• The statement "the U.S. is our area of greatest potential, and we've been highly encouraged by both Storz & Bickel and BioSteel performance" is a statement of corporate optimism or puffery.<br>Not False or Misleading (Br. at 27-29.)<br>• The statements (i) "[w]e're seeing continued momentum with the recent signing of retail authorizations by Albertsons, Rite Aid, Food Lion, Stop & Shop, and Sheetz, and over 20 additional authorizations across grocery, convenience and drug chains. Combined, these authorizations add nearly 15,000 stores across the U.S."; and (ii) increase in BioSteel quarterly revenue was "driven by gains in distribution of BioSteel ready-to-drink" are not adequately alleged to be false or misleading. |
| (FAC ¶ 102)<br>May 27, 2022 Form 8-K<br>(Ex. 11 at 1.) | Corporate Optimism/Puffery (Br. at 26-27.)<br>• The statements (i) "[f]ocusing strategic investments to accelerating brand growth with aspiration to be top 4 player in the North American sports drink market" and (ii) "we continue to invest in high potential opportunities – particularly in BioSteel, and further developing our U.S. THC ecosystem, which we believe remains significantly under-appreciated by the market" are statements of corporate optimism or puffery.<br>Not False or Misleading (Br. at 27-29.)<br>• The statement that BioSteel revenue growth was driven by "[i]ncreased distribution of BioSteel hydration products" is not adequately alleged to be false or misleading. |
| (FAC ¶ 104)<br>May 31, 2022 Form 10-K<br>(Ex. 2 at 65-66.) | Not False or Misleading (Br. at 27-29.) |
| (FAC ¶ 106)<br>May 31, 2022 Form 10-K<br>(Ex. 2 at 93.) | Not False or Misleading (Br. at 18.) |
| (FAC ¶ 107)<br>May 31, 2022 Form 10-K<br>(Ex. 2 at 94.) | Not False or Misleading (Br. at 18.) |

| Challenged Statement | Basis for Dismissal[1] |
|---|---|
| (FAC ¶ 108)<br>May 31, 2022 Form 10-K<br>(Ex. 2 at Exs. 31.1 & 31.2.) | Opinion; Not False or Misleading (Br. at 17-18.) |
| (FAC ¶ 110)<br>May 27, 2022 Earnings Call<br>(Ex. 18 at 5-6.) | Corporate Optimism/Puffery (Br. at 26-27.)<br>• The statements (i) "[w]e believe that this challenger brand is quickly turning into a winner"; (ii) "[t]here's considerable runway for both brands and investment will be to further build brand awareness and visibility amongst consumers and building a robust distribution pipeline"; and (iii) "our near-term aspiration is to grow the brand into a top 5 position" are statements of corporate optimism or puffery.<br>Not False or Misleading (Br. at 27-29.)<br>• The statements (i) "BioSteel saw gains in distribution and sales velocity of the ready-to-drink products"; (ii) "[w]e will be making strategic investments in marketing and new product development for our high growth CPG brands of Storz & Bickel and BioSteel"; (iii) "BioSteel is the fastest-growing sports hydration drink in North America"; and (iv) "we significantly increased distribution through continued onboarding of major retailers" are not adequately alleged to be false or misleading. |
| (FAC ¶ 112)<br>May 27, 2022 Earnings Call<br>(Ex. 18 at 7-8.) | Corporate Optimism/Puffery; Not False or Misleading (Br. at 26-29.) |
| (FAC ¶ 115)<br>August 5, 2022 Form 8-K<br>(Ex. 12 at 1.) | Not False or Misleading (Br. at 27-29.) |
| (FAC ¶ 117)<br>August 9, 2022 Form 10-Q<br>(Ex. 21 at 38.) | Not False or Misleading (Br. at 27-29.) |
| (FAC ¶ 119)<br>August 9, 2022 Form 10-Q<br>(Ex. 21 at 50.) | Not False or Misleading (Br. at 18.) |
| (FAC ¶ 120)<br>August 9, 2022 Form 10-Q<br>(Ex. 21, Exs. 31.1 & 31.2.) | Opinion; Not False or Misleading (Br. at 17-18.) |

| Challenged Statement | Basis for Dismissal[1] |
|---|---|
| (FAC ¶ 122)<br>August 5, 2022 Earnings Call<br>(Ex. 13 at 5.) | Corporate Optimism/Puffery; Not False or Misleading (Br. at 26-29.) |
| (FAC ¶ 128)<br>November 9, 2022 Form 8-K<br>(Ex. 14 at 1-2.) | Not False or Misleading (Br. at 27-29.) |
| (FAC ¶ 130)<br>November 9, 2022 Form 10-Q<br>(Ex. 3 at 45.) | Not False or Misleading (Br. at 27-29.) |
| (FAC ¶ 132)<br>November 9, 2022 Form 10-Q<br>(Ex. 3 at 68.) | Not False or Misleading (Br. at 18.) |
| (FAC ¶ 133)<br>November 9, 2022 Form 10-Q<br>(Ex. 3 at Exs. 31.1 & 31.2.) | Opinion; Not False or Misleading (Br. at 17-18.) |
| (FAC ¶ 135)<br>November 9, 2022 Earnings Call<br>(Ex. 15 at 5.) | Corporate Optimism/Puffery (Br. at 26-27.)<br>• The statement "BioSteel is seeing strong market share growth" is a statement of corporate optimism or puffery.<br>Not False or Misleading (Br. at 27-29.)<br>• The statements that increase in BioSteel revenue was "helped by strategic investments that have driven distribution and velocity gains" and "BioSteel is seeing strong market share growth" are not adequately alleged to be false or misleading. |
| (FAC ¶ 148)<br>February 9, 2023 Form 10-Q<br>(Ex. 8 at 76.) | Not False or Misleading (Br. at 18.) |
| (FAC ¶ 149)<br>February 9, 2023 Form 10-Q<br>(Ex. 8 at Exs. 31.1 & 31.2.) | Opinion; Not False or Misleading (Br. at 17-18.) |