UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CANOPY GROWTH SECURITIES LITIGATION | 1:23-cv-04302 (PAE)<br><br>[rel]<br>1:23-cv-05891 (PAE)<br>1:23-cv-06266 (PAE) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

James R. Carroll (*pro hac vice*)
Rene H. DuBois
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800

Alexander C. Drylewski
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

Dated: April 11, 2024

*Attorneys for Defendants Canopy Growth Corporation, David Klein, Judy Hong, and Michael Lee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... ii

PRELIMINARY STATEMENT .................... 1

1. The Opposition's Attempt To Rehabilitate Plaintiffs' CWs Fails .................... 1

2. The Opposition's Remaining Scienter Arguments Fail .................... 6

3. The FAC Supports A Far More Compelling Inference Of Non-Fraudulent Intent .................... 9

4. Many Of The Challenged Statements Are Not Actionable .................... 10

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*In re AppHarvest Securities Litigation*,
No. 21-CV-7985, 2023 WL 4866233 (S.D.N.Y. July 31, 2023)........................................5

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)........................................8

*In re Avon Securities Litigation*,
No. 19-CV-01420, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)........................................3, 5

*In re Bear Stearns Cos., Securities, Derivative, & ERISA Litigation*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................8

*City of Omaha Police & Fire Retirement Systems v. Evoqua Water Technologies Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)........................................3

*City of Warren Police & Fire Retirement System v. World Wrestling Entertainment Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)........................................3

*In re Fairway Group Holding Corp. Securities Litigation*,
No. 14-CV-0950-LAK-AJP, 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015)........................................2

*In re Fannie Mae 2008 Securities Litigation*,
891 F. Supp. 2d 458 (S.D.N.Y. 2010)........................................10

*In re ForceField Energy Inc. Securities Litigation*,
No. 15-CV-3020, 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017)........................................4

*Freudenberg v. E*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................10

*In re Grupo Televisa Securities Litigation*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019)........................................7

*Lematta v. Casper Sleep, Inc.*,
No. 20-CV-2744, 2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022)........................................3

*New Orleans Employees Retirement System v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011)........................................5

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)........................................8

*Plumbers & Pipefitters National Pension Fund v. Davis*,
No. 16-CV-3591, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)........................................7

*In re Salix Pharmaceuticals Ltd.*,
No. 14-CV-8925, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ....................................9

*Steamship Trade Association of Baltimore-International Longshoreman's Association Pension Fund v. Olo Inc.*,
No. 22-CV-8228, 2023 WL 8287681 (S.D.N.Y. Nov. 30, 2023)....................................2

*In re Turquoise Hill Resources Ltd. Securities Litigation*,
No. 13-CV-8846-LGS, 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ............................7

*Venkataraman v. Kandi Technologies Group, Inc.*,
No. 20-CV-8082, 2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022)..................................10

*Wang v. Cloopen Group Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023).....................................................................7

*Woolgar v. Kingstone Cos.*,
No. 19-CV-5500, 2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020)....................................7

*Yannes v. SCWorx Corp.*,
No. 20-CV-03349-JGK, 2021 WL 2555437 (S.D.N.Y. June 21, 2021)..........................10

## PRELIMINARY STATEMENT

Plaintiffs' Opposition effectively abandons any theory that Defendants had a motive and opportunity to commit securities fraud. (Opp. at 12-25.) Faced with a correspondingly greater burden to plead circumstantial allegations of recklessness, Plaintiffs try to stave off dismissal by shifting their focus from the Restatement itself -- which alone does not support any inference of scienter -- to relying on mischaracterizations of what the FAC actually does (and does not) allege. For example, Plaintiffs argue in their Opposition that CW5 had "first-hand" and "direct" knowledge regarding what Defendants knew about BioSteel's alleged operational issues. But a review of Plaintiffs' actual allegations attributed to CW5 reveals that Plaintiffs' recklessness theory relies on pure speculation about what Defendants actually knew at the time they made their challenged statements. Plaintiffs' rehashing of their other scienter allegations adds nothing.

### 1. The Opposition's Attempt To Rehabilitate Plaintiffs' CWs Fails

The Opposition acknowledges that courts credit CW allegations only where a plaintiff alleges with sufficient particularity that the CW was in a position to know the information attributed to them. (Opp. at 14; *see also* Defs.' Br. at 10.) The FAC fails to allege such facts.

*First*, Plaintiffs argue that they are not required to plead the CWs' "exact job titles" or "describe the sources' responsibilities and duties in detail" but that they nevertheless assert that their allegations about "CWs' roles, general responsibilities and the time frame they worked at Canopy" are "more than sufficient." (Opp. at 14-15.) Not so. The few allegations regarding the CWs provide no basis to infer that they knew of the alleged excess inventory and distribution issues or how those issues allegedly factored into the Restatement, much less that Mr. Klein, Ms. Hong or Mr. Lee knew or had access to information undermining their public statements:

- **CW1 was a director for BioSteel's e-commerce business**. (FAC ¶ 26.) How would CW1 -- not alleged to be an accountant or employed in finance or accounting -- be in a position to know that (i) "a factor in BioSteel's overstated revenue was product that went

to Europe and was logged as revenue that never should have been recognized" or (ii) that a "significant cause of Canopy's overstatement of revenue was how the Company accounted" for net profit? (FAC ¶¶ 31, 75.)[1]

- **CW2 was a regional sales person** who spent the majority of the time supporting sales of *Canopy* products and who left Canopy in *May 2022*. (FAC ¶ 28.) How would CW2 know anything about the any excess inventory issue of *BioSteel* products or how that alleged excess inventory factored into the *February 2023* write off or *June 2023* Restatement? (FAC ¶¶ 42-43.)

- **CW3 was a regional marketing person** responsible for BioSteel's marketing team. (FAC ¶ 30.) CW3 purports to know that there was pressure "from the top down" to achieve certain sales and that "Canopy" allegedly "ran the books for BioSteel." (FAC ¶¶ 46, 191.) Did the purported sales pressure come from the leadership within BioSteel (the co-founders) or someone at Canopy? The FAC does not say. CW3 also provides no basis to infer that any *Individual Defendant* was involved in or aware of any alleged sales pressures or accounting issues at BioSteel.

- **CW4 was a sales director** who helped commercialize BioSteel products in the *United States*. (FAC ¶ 32.) How would CW4 know that BioSteel's contract with a *European* distributor was allegedly unenforceable and BioSteel was not paid? (FAC ¶ 33.)

- **CW5 was a general manager** who facilitated Canopy's *CBD* business in the *United States* and BioSteel's *CBD* products. (FAC ¶ 35.) How would CW5 know anything about the alleged excess inventory issues regarding BioSteel's *sports drink products* or alleged *European* distribution issues? (FAC ¶¶ 36-44, 167.)

- **CW6 was a regional sales director** covering BioSteel's Great Lakes/Midwest territory. (FAC ¶ 41.) How would CW6 be in a position to know the alleged magnitude or cause of any excess inventory across BioSteel? (FAC ¶ 42.)

The FAC provides no answers to these questions and Plaintiffs' attempt to sidestep their pleading burden by characterizing Defendants' argument as presenting a "factual dispute" about the reliability of their CWs (Opp. at 15) should be rejected.[2]

---

[1] *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) is inapposite because, unlike here, several of the CWs there were in <u>direct accounting positions</u> and were alleged to have <u>personal knowledge</u> about the company's financial reporting.

[2] In *S.S. Trade Ass'n of Baltimore-International Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 2023 WL 8287681, at *11 (S.D.N.Y. 2023), Judge Rakoff found that defendants' argument about the CWs' credibility raised a factual dispute because he had previously opined that, unlike here, the CWs were described with sufficient particularity. The CWs there were

*(cont'd)*

*Second*, the Opposition concedes that *none* of the CWs -- most of whom were affiliated with BioSteel -- are alleged to have reported to any Individual Defendant (i.e., Canopy senior executives) or ever communicated directly with any Individual Defendant during the Class Period.[3] (Opp. at 14.) Plaintiffs instead argue that the "notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law."[4] (*Id.*) This argument ignores the fact that courts consistently reject scienter allegations based on a CW's knowledge where, as here, the CWs are not alleged to have reported to any defendant or had direct contact with a defendant during the class period. (Defs.' Br. at 10 (citing cases).) Even the case Plaintiffs rely on supports this well-settled principle. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (discrediting confidential witness allegations where, as here, the CW did "not allege any particular communications she had with [the defendant] or internal documents [the defendant] reviewed").[5]

*Third*, the Opposition argues that CW accounts may be credited "when they corroborate other facts pled in the complaint." (Opp. at 14.) But the only corroboration that Plaintiffs offer

---

alleged to have managed several customer accounts that were directly the subject of alleged inflated figures at issue and their statements were corroborated by documentary evidence. (*Id.*)

3 The Opposition's argument that CW5 should be credited fails (Opp. at 15 n.11) because the FAC never alleges that CW5 directly reported to Mr. Klein or ever communicated any alleged adverse information to him *during the Class Period*. (FAC ¶¶ 35-36, 44, 167.)

4 *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) is distinguishable because, unlike here, the CWs there were in the defendants' reporting lines and held roles that supported that they knew about the defendants' involvement in the alleged fraud.

5 Plaintiffs' cases in which courts credited CW allegations illustrate the inadequacy of their own allegations. (Opp. at 14-15 (citing *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *14 (E.D.N.Y. 2022) (crediting CWs who had "personal knowledge and/or interaction with" individual defendants)); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (crediting CW allegations where CW worked specifically on analysis related to agreement at issue and complaint alleged specific adverse reports).)

are the insufficient CW allegations themselves. (Opp. at 13 citing FAC ¶¶ 34-45 ("For example, CW2[,] CW5, and CW6 confirmed that BioSteel's inventory issues were known throughout [Canopy]" and "CW1, CW2, CW3, and CW4 all affirmed that BioSteel had significant distribution issues . . .").) Plaintiffs do not allege with sufficient particularity that any CW was in a position to know what any Individual Defendant (or any other Canopy individual whose intent can be imputed to Canopy) knew about the alleged inventory and distribution issues. Plaintiffs cannot pile independently deficient CW allegations on top of each other and then claim that those deficient allegations should be credited because they are corroborated by each other.[6]

Even if the FAC had adequately alleged the reliability of their CWs, the Opposition makes clear that Plaintiffs' scienter theory rests entirely on CW5 who left Canopy in April 2022 -- more than a year *before* the end of the Class Period. (FAC ¶ 35.) Relying on a single allegation in the FAC, the Opposition argues that CW5 had "first-hand" and "direct" knowledge of "actual" discussions with the Individual Defendants in which excess inventory issues were "actually conveyed to Defendants between late 2021 and April 2022." (Opp. at 13-16 n.11 citing FAC ¶ 44.) But the Opposition mischaracterizes what the FAC actually alleges:

> 44. According to CW5, Canopy conducted Monthly Business Review calls in which the excess inventory problem was discussed. CW5 and Klein, Lee, and Hong participated in Monthly Business Review meetings.

Paragraph 44 does not state that CW5 ever personally participated in any *particular* Monthly Business Review call in which excess inventory issues were *actually* discussed, let alone *what*

---

[6] In *In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *2 (S.D.N.Y. Mar. 29, 2017) on which Plaintiffs rely, the CW allegations were corroborated by criminal indictments, the delisting from NASDAQ and an SEC-instituted fraud action. No such similar corroborating facts are even remotely alleged here.

specifically was discussed, or critically *how* that unspecified information contradicted Defendants' public statements during the Class Period. (Defs.' Br. at 13-14 (citing cases).)[7] To put a finer point on it: what is it that was said by or to Mr. Klein, for example, in even one of these meetings that suggests he spoke a knowing or reckless falsehood? The FAC does not say.[8]

The Opposition's remaining arguments about the CWs' excess inventory allegations fare no better. (Opp. at 16-17.) The Opposition attempts to tie Canopy's Restatement to CWs' allegations about excessive inventory to assert that Defendants must have known that their "laudatory statements about BioSteel" were false. (Opp. at 16.) But the Opposition concedes that Plaintiffs do not challenge any affirmative statements regarding the amount of BioSteel inventory that was held during the Class Period. (*Id.* at 17.) The FAC also fails to plead any connection between the alleged excess inventory issues and the challenged statements made about BioSteel's sales velocity and retail distribution growth. (Defs.' Br. at 14-15, 27-29.) For the same reasons, the Opposition's conclusory argument that the alleged omissions about excess inventory and distribution "went to the central issue of whether BioSteel was succeeding" and were "linked to [the] revenue restatement" (Opp. at 17) is meritless.[9]

---

[7] Plaintiffs' cited cases are inapposite. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011) (CWs "participated" in monthly calls about and personally "prepared spreadsheets . . . detailing the extent of excess and obsolete inventory"); *In re Avon*, 2019 WL 6115349, at *21 (CW reviewed contemporaneous document shared with defendants at monthly meetings covering central issues); *In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *23-24 (S.D.N.Y. July 31, 2023) (CW who participated in meetings where alleged issues were discussed worked in relevant department and reported directly to defendant).

[8] The Opposition also ignores CW5's allegation that excess inventory issues "would have been discussed during these calls" (FAC ¶ 167), which is far too speculative to allege scienter.

[9] The Opposition's argument that Canopy overstated revenue for BioSteel products shipped to Europe supports Defendants' argument that the revenue recognition issues primarily related to *international* sales and thus was not sufficiently tied to any challenged statements about increased sales and distribution in *North America*. (Opp. at 10 n.9; Defs.' Br. at 28-29.)

Finally, the Opposition's argument that the CWs' allegations need not quantify the magnitude of the alleged excess inventory issues because Plaintiffs are not alleging that excess inventory was mis-quantified is a strawman. (Opp. at 17.) The fatal defect with the CWs' excessive inventory allegations is that they are so vague that they offer no basis to infer that any Defendant was aware of any contradictory information at the time they made their challenged statements. For example, the CWs' statements that "BioSteel ***overproduced a lot*** of its product" or "began to accumulate a ***significant amount***" (FAC ¶¶ 34, 40) says nothing about *what* amount of revenue was allegedly improperly recognized as a result of the unquantified excess inventory, *when* it happened or *what* effect it had on BioSteel's reported revenue or results. This void is not a "detailed evidentiary matter" to be resolved later as Plaintiffs suggest (Opp. at 17), but instead a facial pleading deficiency under the PSLRA and Rule 9(b) that warrants dismissal now.

**2. The Opposition's Remaining Scienter Arguments Fail**

*First*, the Opposition argues that the Court may infer scienter based on conclusory allegations that the Individual Defendants had access to adverse information about Canopy's and BioSteel's reported revenue, Canopy's internal controls and BioSteel's inventory and distribution because they (i) were senior executives that oversaw Canopy's and BioSteel's operations, (ii) held themselves out as knowledgeable about those issues, and (iii) signed SEC filings and SOX certifications. (Opp. at 17-19, 22-23.) Critically missing from any of those allegations are any particularized facts identifying a specific report, document or statement containing the alleged contrary facts about those issues that Defendants knew about or recklessly disregarded *at the time they made their public statements*. Courts uniformly reject similar conclusory allegations as insufficient to plead a strong inference of scienter. (Defs.' Br. at 17-19

(citing cases).)[10] *Second*, the Opposition contends that Defendants must have acted with scienter because Canopy issued the Restatement and made the after-the-fact disclosure that its internal control over financial reporting was not effective as of March 31, 2023. (Opp. at 6-10, 19). But the Opposition ignores that allegations about a restatement of earnings, GAAP violations or weakness in internal controls, without more, are insufficient to allege a strong inference of scienter. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-CV-08846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014); (Defs.' Br. at 8, 18-19.) The Opposition's rhetoric that "Canopy's accounting was replete with material weaknesses and produced wildly inflated revenue numbers" (Opp. at 19) does not provide the something more. Plaintiffs fail to allege any particularized facts showing that any Defendant knew of or recklessly disregarded any misreported revenues or undisclosed internal control weaknesses *before* they were later discovered and disclosed. *Woolgar v. Kingstone Cos.*, 2020 WL 4586792, at *19 (S.D.N.Y. Aug. 10, 2020) (holding that plaintiffs failed to allege how defendants' later disclosure demonstrated they were aware of a weakness in its internal controls during the Class Period).[11]

*Third*, Plaintiffs' scienter theory based on the magnitude of the alleged fraud is a moving

---

10 Plaintiffs' cited cases on this point are inapposite. *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 234 (S.D.N.Y. 2023) (scienter alleged where defendants executed misleading warrant and company "recalculate[d] . . . fair value of such warrants routinely"); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *1-4 (S.D.N.Y. Apr. 14, 2020) (scienter alleged where defendants received contemporaneous letters, emails, and presentations contradicting their public statements); *World Wrestling*, 477 F. Supp. 3d at 132 (scienter alleged where specific documentary evidence was alleged).

11 Plaintiffs' cases on this point (Opp. at 7 n.4) are inapposite because they all include particularized allegations that the defendants were aware of the internal controls deficiencies *at the time of the alleged misstatements*, which the FAC lacks here. *See*, e.g., *In re Grupo Televisa Sec. Litig.*, *368 F. Supp. 3d 711*, 720-21 (S.D.N.Y. 2019) (company's statements about internal controls were false because internal control deficiencies "could only have resulted from deliberate design, and not from oversight, incompetence, or mistake").

target. In their FAC, Plaintiffs pointed to the alleged magnitude of the Restatement itself, focusing on the total amount of revenue that was restated as allegedly indicative of scienter. (FAC ¶¶ 171-72.) Defendants demonstrated, however, that the Restatement reflected a modest decrease of about 2% of Canopy's consolidated net revenue for fiscal year 2022 and about 4% of net revenue for the nine months ended December 31, 2022. (Defs.' Br. at 6, 9.) The Opposition ignores these facts and instead pivots to the alleged "size and scale" of Canopy's write down of BioSteel's aged inventory, claiming that the "magnitude of the backlog of BioSteel product and the eventual write down of BioSteel's aged inventory" evinces Defendants' scienter. (Opp. at 20). Yet nowhere in the FAC do Plaintiffs allege any particularized facts about the magnitude of the inventory backlog or the size of the write down, let alone the impact of that write down on BioSteel's financials. The Opposition, like the FAC, points only to Defendants' disclosure near the *end of the Class Period* that BioSteel wrote down some inventory. (Opp. at 8 n.5.) That fraud-by-hindsight allegation is wholly insufficient. In any event, courts consistently hold that the size of an alleged fraud alone does not create an inference of scienter, and Plaintiffs' other deficient scienter allegations do not make up the gap. (Defs.' Br. at 9 (citing cases).)

*Fourth*, the Opposition presses Plaintiffs' "core operations" theory relying solely on third-party analysts' speculative opinions that BioSteel was a "driving factor behind Canopy's revenue" (Opp. at 22) but ignores entirely that BioSteel was a non-core subsidiary representing between about 7% and 17% of Canopy's total consolidated net revenue during the Class Period and therefore was nowhere close to being "nearly all" of Canopy's business. (Defs.' Br. at 21.)[12]

---

[12] Plaintiffs' cited cases in support of their magnitude and core operations theories are therefore distinguishable. *See, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496 (S.D.N.Y. 2004) (company lost tens of millions more than its worth); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (segment at issue accounted for 83% of defendant's business); *In re Bear Stearns Cos., Sec.,*

*(cont'd)*

*Fifth*, the Opposition's conclusory argument that the departure of Mr. Lee was "suspiciously timed right after the fraud began" (Opp. at 23) is devoid of substance. Nowhere do Plaintiffs cite any cases where an executive resignation at the very beginning of a nearly 20-month class period somehow supported an inference of scienter. The Opposition also ignores the more plausible nonculpable inference based on public-record facts that Mr. Lee left as part of a broader executive management shift and continued to advise Canopy to support the transition.[13] (Defs.' Br. at 23.) And the Opposition's argument that non-party John Celenza's termination from *BioSteel* around the time of the Restatement supports scienter as to the named Defendants makes no sense and courts have rejected similar allegations. (Defs.' Br. at 23-24.)

**3. <u>The FAC Supports A Far More Compelling Inference Of Non-Fraudulent Intent</u>**

The Opposition asserts that Plaintiffs' theory of fraud against Defendants is "straightforward" (Opp. at 1) but offers no cogent and compelling explanation for why Defendants would intentionally misstate a small amount of revenue in one of Canopy's non-core business segments, only inevitably to have to restate those revenues with no personal benefit to Defendants. Nor does the Opposition address the far more compelling and plausible inference: Defendants believed that BioSteel's reported revenues were accurate at the time and took steps to diligently investigate and correct the misstatements as soon as they became aware of them. Plaintiffs' theory is nothing more than classic "fraud by hindsight": because Canopy had a

---

*Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 446 (S.D.N.Y. 2011) (company's collapse resulted in billions of dollars in losses); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016) (inventory backlog resulted in a $500 million revenue loss).

[13] Plaintiffs' attempt to hold Mr. Lee liable for signing a 10-Q days within the nearly 20-month Class Period (not "in the middle of its fraudulent acts" as the Opposition argues (Opp. at 6, n.3)) -- without any particularized allegations that he knew or recklessly disregarded contradictory information at that time -- is unavailing. (Defs.' Br. at 29-30.)

Restatement and disclosed weaknesses in internal controls, Defendants "must have known" earlier in time that their previous statements were false or misleading. (Defs.' Br. at 9). The Opposition's fraud-by-hindsight cases are readily distinguishable.[14]

**4. Many Of The Challenged Statements Are Not Actionable**

*First*, the Opposition's arguments that Defendants' financial and revenue statements are actionable as false when made (Opp. at 6-7) fail because Plaintiffs do not adequately allege scienter as to any of those statements (*supra at* 1-9; Defs.' Br. at 7-24.) The FAC also does not allege any particularized facts that Defendants had access to contradictory information at the time they made their SOX certifications or internal control statements. (Defs.' Br. at 17-18.) *Second*, the Opposition argues that none of the challenged statements constitute puffery because the statements were "specific" and tied to statements about BioSteel's historical performance, distribution contracts and revenue. (Opp. at 11-12.) In doing so, the Opposition selectively lists statements they contend are not puffery without explaining *why* that is the case. (*Id.*) For example, the Opposition does not explain why the vague statement "we're seeing ***really good*** retailer response to BioSteel" (FAC ¶ 80) is actionable as misleading; it is not. Defendants cited numerous cases that the Opposition ignores where statements containing precisely that sort of vague language have been held to be nonactionable puffery. (Defs.' Br. at 27.) The Opposition also ignores all of the other reasons why many statements are not actionable. (*Id.* at 26-29.)

---

14 *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) (sixteen CWs provided accounts of what <u>they told Defendants</u>, what Defendants knew or what was discussed internally that was adverse to challenged statements); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 (S.D.N.Y. 2010) (complaint alleged contents of <u>individual defendant's emails</u> that contradicted public statements); *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021) (company made allegedly fraudulent statements after contrary public information was released and identified "red flags"); *Venkataraman v. Kandi Techs. Grp., Inc.*, 2022 WL 4225562, at *6 (S.D.N.Y. Sept. 13, 2022) (defendants had knowledge of undisclosed related party transactions).

Dated: New York, New York
April 11, 2024

Respectfully submitted,

/s/ Alexander C. Drylewski

Alexander C. Drylewski
(alexander.drylewski@skadden.com)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

James R. Carroll (*pro hac vice*)
(james.carroll@skadden.com)
Rene H. DuBois
(rene.dubois@skadden.com)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800

*Attorneys for Defendants*
*Canopy Growth Corporation,*
*David Klein, Judy Hong and Michael Lee*