UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE CANOPY GROWTH SECURITIES LITIGATION

---

23 Civ. 4302 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In this putative class action arising under the federal securities laws, lead plaintiff Chen

Li claims that Canopy Growth Corp. ("Canopy") and three of its officers—David Klein, Judy

Hong, and Michael Lee—misled the market as to the success of its sports drink subsidiary,

BioSteel. Li brings this lawsuit on behalf of all persons (other than defendants) who acquired

Canopy securities between November 5, 2021 and June 22, 2023 (the "Class Period"). Li claims

violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")

and the corresponding rule of the Securities and Exchange Commission ("SEC"), 17 C.F.R.

§ 240.10b–5 ("Rule 10b–5").

Pending now is defendants' motion to dismiss the First Amended Complaint ("FAC")

under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants the

motion and dismisses the FAC in its entirety.

I.      **Background**[1]

    A.      **Factual Background**

        1.      **The Parties**

Canopy is a Canadian corporation based in Ontario, Canada. FAC ¶ 8. It specializes in

the manufacture and sale of consumer-packaged goods, in particular those derived from cannabis

---

[1] These facts are drawn primarily from the FAC. For the purpose of resolving the motion to
dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in

1

and hemp. *Id.* ¶ 14. It conducts business through subsidiaries, including BioSteel, a sports nutrition and hydration brand. *Id.* ¶¶ 14, 16. The individual defendants are Klein, Canopy's CEO, Lee, Canopy's CFO until November 18, 2021, and Hong, Canopy's CFO since November 18, 2021. *See id.* ¶¶ 9–11.

Lead plaintiff Li acquired Canopy securities during the Class Period. *Id.* ¶ 6.

### 2.     Canopy's Acquisition of BioSteel

In October 2019, in an effort to branch out from its cannabis-related business, Canopy acquired a 72% stake in BioSteel in an all-cash transaction for C$47.7m (approximately $35.8 million in U.S. dollars). *Id.* ¶ 15. The remainder was retained by BioSteel's then-current shareholders and management. *Id.* ¶ 16; *see also* Drylewski Decl., Ex. 2 ("2022 10-K") at F-49. As part of the deal, Canopy reserved the option to purchase half of the remaining equity interest after the third anniversary of the sale (*i.e.*, in 2022) at a specified valuation based on a multiple of BioSteel's net revenue. *Id.* at F-50. In October 2022, Canopy exercised that option and increased its stake in BioSteel to approximately 90%. FAC ¶ 18; *see also* Drylewski Decl., Ex. 3 ("Nov. 2022 10-Q") at 19.

---

favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considered the documents attached to the declaration of Alexander C. Drylewski in support of the motion to dismiss. Dkt. 64 ("Drylewski Decl."). Because these documents were incorporated into the FAC by reference, or are matters of public record, they are properly considered on a motion to dismiss. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit") (citation omitted). The Court considered these documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made." *Clark v. Kitt*, No. 12 Civ. 8061 (CS), 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.").

At the time Canopy bought BioSteel, the former was known for its cannabis-based consumer products—in particular, its flagship brand, Tweed, and its partnership with Martha Stewart—and the latter was known for its sports drinks marketed towards professional athletes. FAC ¶¶ 14–17; *see also id.* ¶ 135 (describing BioSteel as a "homegrown Canadian brand" that "was born in an NHL locker room and resonates with athletes from across the country"). Canopy's purchase of BioSteel was part of its strategy to transcend its role as "a world-leading diversified cannabis and cannabinoid-based consumer product company" and enter the broader "health and wellness consumer space." Drylewski Decl., Ex. 22 ("Nov. 2021 8-K") at 7.

### 3.    BioSteel's Performance During the Class Period

Li's claims concern defendants' statements and alleged omissions about BioSteel's performance and Canopy's internal controls during the Class Period. In short, the FAC alleges that Canopy's various statements about "the growth in our BioSteel business," *id.* ¶ 104, BioSteel's "strong international sales growth," *id.* ¶ 130, and "meaningful year-over-year gains in . . . distribution and sales velocity" for BioSteel, *id.* ¶ 19, concealed internally known problems. These were BioSteel's failure to conclude enforceable contracts with distributors, its excess inventory, and the extreme pressure it faced from Canopy to meet revenue targets. As the basis for its claims, the FAC heavily relies on statements from confidential witnesses ("CWs"). The Court first reviews the backgrounds of the CWs and then reviews each area of alleged misstatements.

#### a.    *The confidential witnesses*

The FAC relies on information from the following CWs:

- Confidential Witness 1 ("CW1") worked in eCommerce roles at Canopy and BioSteel from March 2020 to February 2023. *Id.* ¶ 26. He "ran all of BioSteel's

3

business with Amazon, Walmart, Target and Instacart" until he left Canopy in February 2023. *Id.*

- Confidential Witness 2 ("CW2") was employed as a vice president of sales enablement at Canopy from October 2021 to May 2022, which involved "working with various groups inside Canopy, including sales operations, sales planning, [and] demand forecasting . . . to support Canopy's sales." *Id.* ¶ 28.

- Confidential Witness 3 ("CW3") worked as a regional head of marketing for BioSteel between October 2020 and April 2023. *Id.* ¶ 30. CW3 ran BioSteel's marketing team. *Id.*

- Confidential Witness 4 ("CW4") was employed as a sales director for BioSteel between March 2021 and March 2023 and was "tasked with helping commercialize BioSteel for retail in the United States." *Id.* ¶ 32.

- Confidential Witness 5 ("CW5") worked as a vice president and general manager of the U.S. Region for Canopy between December 2019 and April 2022. *Id.* ¶ 35. He "facilitated Canopy's CBD business in the United States," and the BioSteel portfolio. *Id.* "CW5 initially reported to Klein, and then later reported to Chief Commercial Officer Julious Grant, who reported to Klein." *Id.*

- Confidential Witness 6 ("CW6") was employed as a regional sales director for BioSteel covering the Great Lakes/Midwest between October 2020 and May 2023, *id.* ¶ 41, and "was tasked with managing BioSteel's sales representatives." *Id.*

   *b.*  *BioSteel's distribution issues*

4

Because BioSteel's products (including its sports drink) were sold to consumers via retailers, BioSteel's relationships with those retailers, and with wholesale distributors, were vital to its success. *See id.* ¶ 25. Several CWs allege that various issues marred BioSteel's efforts to distribute its products.

"According to CW1, BioSteel did not have contracts with some of its wholesaler partners, including three to four distributors who received sizable amounts of BioSteel product." *Id.* ¶ 27. Without a contract, BioSteel would ship "containers of product" to a wholesaler but would be "unable to secure payment," *id.* ¶ 33, leaving its inventory in storage, *id.* ¶ 29; *see also id.* ¶ 37 (citing CW3 as stating that BioSteel's inventory "had only a two to two-and-a-half year shelf life," making the "buildup of BioSteel product . . . particularly problematic"). CW1 and CW3 both focus on one of Canopy's European distributors, Alpha Trading Solutions ("Alpha"), based outside of Munich, Germany. *See id.* ¶ 31. "According to CW4, BioSteel's arrangement with Alpha involved only verbal agreements and lacked firm commitments or prepayment." *Id.* ¶ 33. One factor in BioSteel's overstated revenue, according to CW1, "was product that went to Europe"—*i.e.*, to Alpha—"was logged as revenue that never should have been recognized." *Id.* ¶ 31. CW4 claims that "[a]s a result" of the lack of an enforceable contract, although "BioSteel shipped containers of product to Alpha, it was unable to secure payment." *Id.* ¶ 33. This problem was exacerbated by (1) various "disruptions in distribution channels [that] caused shipments to be delayed or never ultimately reach its distributors," *id.* ¶ 29 (CW2), and (2) the fact that BioSteel had "excess and rapidly aging inventory" it needed to "dump," *id.* (CW1).

    *c.    BioSteel's excess inventory*

Several CWs allege that BioSteel began to accumulate, from late 2021 onwards, a "significant amount of excess product that it was unable to sell." *Id.* ¶ 34; *see also id.* ¶ 42 (citing CW2, CW5, and CW6).

5

Because "[w]holesalers and retailers often have strict limits on the remaining shelf lifetime of any product they agree to purchase," *id.* ¶ 38, this buildup "ultimately required Canopy to write down a significant amount of product" in early 2023, *id.* ¶ 45. According to CW6, "a significant reason for BioSteel's excess inventory problem was an overproduction of the product." *Id.* ¶ 46. Both CW2 and CW5 allege that the excess-inventory problem became so bad that BioSteel offered to give away substantial quantities of its products to employees. *See id.* ¶ 40 (citing CW5 as stating that BioSteel offered "dozens of free cases"); *id.* ¶ 43 (citing CW2 as stating that BioSteel offered "palettes to truckloads"). "According to CW5, Canopy conducted Monthly Business Review calls in which the excess inventory problem was discussed," attended by, among others, Klein, Lee, and Hong. *Id.* ¶ 44.

### d.    BioSteel's unduly aggressive sales tactics

The FAC finally alleges that "BioSteel's distribution and inventory problems were compounded by the immense pressure by Canopy to hit aggressive revenue targets." *Id.* ¶ 46. Two CWs are cited on this point. "According to CW3, given the significant funding Canopy had invested into BioSteel, there was tremendous pressure internally, from the top down, to achieve certain revenue numbers. For example, for Fiscal Year 2023, BioSteel had a revenue target that was well over $100 million, when even with the artificial inflation described herein, BioSteel was only capable of generating about $70 million." *Id.* As a result, according to CW1, "BioSteel's sales staff were regularly selling product at discount and cutting deals with wholesalers to work towards aggressive sales goals," which would lead to wholesalers, who were "stuck with excess product purchased at a discount," selling it "unauthorized[] on third-party platforms like Amazon." *Id.* ¶ 47.

6

### 4. Challenged Statements During the Class Period

The FAC alleges that the problems above were not disclosed in various statements by Canopy during the Class Period relating to (1) BioSteel's performance and (2) Canopy's internal controls. The FAC alleges that the former statements were misleading because BioSteel's revenue (and thus Canopy's revenue) had been artificially inflated, and the statements did not disclose BioSteel's failure to conclude enforceable distribution contracts and the fact that BioSteel had significant unsold inventory with limited shelf-life. *E.g.*, *id.* ¶ 82. The FAC alleges that the latter statements were misleading because Canopy's internal controls were ineffective. *E.g.*, *id.* ¶ 87. The Court canvasses each category of statements in turn.

#### a. BioSteel's performance

The following statements by Canopy during the Class Period related to BioSteel's performance—and the likelihood of improved performance over time.

On November 5, 2021—the start of the Class Period—Canopy announced its financial results for Q2 2022. *Id.* ¶ 78.[2] In a press release attached to a Form 8-K filed with the SEC, Canopy expressed "optimis[m]" about BioSteel, and the growth in BioSteel's sales and distribution networks:

> The Company remains optimistic about its growth opportunities in the U.S. for both its BioSteel ready-to-drink ("RTD") beverages and its portfolio of CBD brands. Brand awareness continues to rise, velocity is tracking in-line with expectations and feedback from distributors and retailers has been positive. BioSteel is expected to see its distribution ramp up over the balance of FY2022 and into FY2023 driven by increased listings with national and regional chain accounts.
>
> . . .
>
> BioSteel RTD beverages continued to build distribution throughout Q2 FY2022, with All Commodity Volume ("ACV") increasing to 6.5% in the latest 13-weeks

---

[2] Canopy operates on a non-standard fiscal year, which ends on March 31. FAC ¶ 5 n.1. As a result, Canopy's first quarter ends on June 30, its second quarter on September 30, and its third quarter on December 31. *Id.*

> ending October 3, 2021 in IRI. BioSteel has recently secured new distribution with a number of key retailers, and active discussions underway with additional national and regional chain retailers.
>
> . . .
>
> BioSteel sales in Q2 FY2022 increased 47% over Q2 FY2021 driven by the launch of RTD beverages and expanded distribution in the U.S. market.

*Id.* That same day, on an earnings call related to Canopy's Q2 2022 results, CEO Klein stated that "we're seeing really good retailer response to BioSteel," and that "we remain as bullish[] as ever[] in aggregate on the BioSteel brands." *Id.* ¶ 80. In response to a question about BioSteel, Klein stated that BioSteel's revenue was "going to see a very hard ramp." *Id.* ¶ 81.

Three days later, on November 8, 2021, Canopy filed its Form 10-Q with the SEC, in which it stated:

> Revenue from BioSteel was $7.5 million in the second quarter of fiscal 2022, a year-over-year increase of $2.4 million due primarily to (i) the expansion of our United States distribution network beginning in the fourth quarter of fiscal 2021; (ii) new "ready-to-drink" product launches during the last year; and (iii) the adverse impact on revenue in the second quarter of fiscal 2021 related to COVID-19 related restrictions on retailers.
>
> Significant gains in BioSteel distribution drove record quarterly revenue in Q3 FY2022.
>
> . . .
>
> BioSteel sales in Q3 FY2022 increased 130% over Q3 FY2021 driven by the launch of ready-to-drink "RTD" beverages and expanded distribution in the U.S. market.

*Id.* ¶ 83.

On February 9, 2022, Canopy announced its financial results for Q3 2022, again touting BioSteel's increased distribution and sales:

> Significant gains in BioSteel distribution drove record quarterly revenue in Q3 FY2022.
>
> . . .

8

> BioSteel sales in Q3 FY2022 increased 130% over Q3 FY2021 driven by the launch of ready-to-drink "RTD" beverages and expanded distribution in the U.S. market.

*Id.* ¶ 90. That same day, Canopy filed its Form 10-Q, in which it stated:

> Revenue from BioSteel was $17.0 million in the third quarter of fiscal 2022, a year-over-year increase of $9.6 million due primarily to (i) the expansion of our United States distribution network beginning in the fourth quarter of fiscal 2021; (ii) new "ready-to-drink" product launches during the last year; and (iii) higher international sales of ready-to-drink products and beverage mixes.

*Id.* ¶ 92. The same day, on an earnings call related to Canopy's Q3 2022 results, Klein stated:

> Looking to the U.S. in the areas of greatest opportunity for long-term growth. I'd like to now highlight the momentum of our CBD business as well as review the advancement of our THC ecosystem. The U.S. is our area of greatest potential and we've been highly encouraged by both Storz & Bickel and BioSteel performance.
>
> . . .
>
> Canopy's hydration beverage brand, BioSteel, also delivered a record revenue quarter, driven by gains in distribution of BioSteel ready-to-drink. We're seeing continued momentum with the recent signing of retail authorizations by Albertsons, Rite Aid, Food Lion, Stop & Shop, and Sheetz, and over 20 additional authorizations across grocery, convenience, and drug chains. Combined, these authorizations add nearly 15,000 stores across the U.S.

*Id.* ¶ 97.

On May 27, 2022, Canopy announced its financial results for year-end 2022, in which BioSteel's performance was a bright spot. *Id.* ¶ 101. Canopy's press release reported that its net revenue was C$520,325,000, of which C$44,600,000 (or 8.5%) was attributable to BioSteel. *Id.* Canopy's net loss was C$320,485,000. *Id.* The press release also stated:

> Increased distribution of BioSteel hydration products drove year-over-year revenue growth in FY2022 of 56% versus FY2021. Focusing strategic investments to accelerating brand growth with aspiration to be top 4 player in the North American sports drink market.
>
> . . .

The Company generated [n]et revenue of $520 million in FY2022, representing a decline of 5% versus FY2021.

. . .

"Achieving profitability is critical and we have undertaken additional initiatives to streamline and drive efficiencies for our global cannabis business. In FY2023, we are focused on executing our path to profitability in Canada, while we continue to invest in high potential opportunities—particularly in BioSteel, and further developing our U.S. THC ecosystem, which we believe remains significantly under-appreciated by the market." — Judy Hong, Chief Financial Officer.

*Id.* ¶ 103. That day, on an earnings call related to Canopy's year-end 2022 results, Klein stated:

BioSteel saw gains in distribution and sales velocity of the ready-to-drink products, which drove a 50% increase in revenue in fiscal '22 versus fiscal '21. We believe that this challenger brand is quickly turning into a winner as we watch members of team BioSteel dominate in the playoffs, including Luka Doncic of the Dallas Mavericks, Connor McDavid of the Edmonton Oilers, and Andrew Wiggins with the Golden State Warriors.

. . .

Our second priority is driving growth of our high potential CPG brands. We will be making strategic investments in marketing and new product development for our high growth CPG brands of Storz & Bickel and BioSteel. There's considerable runway for both brands and investment will be to further build brand awareness in visibility amongst consumers and building a robust distribution pipeline. . . . BioSteel is the fastest growing sports hydration drink in North America. And our near-term aspiration is to grow the brand into a top 5 position as we significantly increased distribution through continued onboarding of major retailers.

*Id.* ¶ 110. On the same call, CFO Hong stated:

In Q4, healthy performance in our [consumer packaged goods] business was offset by softness in our Canadian recreational business, and adjusted EBITDA was further impacted by continued gross margin challenges despite a strong operating expense discipline. . . . [W]e expect the execution of our premiumization strategy in Canada, our cost savings initiatives, and growth in BioSteel and Storz & Bickel will, over time, result in strong revenue growth, attracted margin profile, and free cash flow generation that are in line with premium branded CPG company. So with that in mind, let me offer some perspectives on our outlook for fiscal '23. First, we expect significant revenue growth from BioSteel as the team drive higher distribution and sales velocity, which is supported by sizable marketing investments in fiscal '23.

10

*Id.* ¶ 112.

Four days later, on May 31, 2022, Canopy filed its Form 10-K. It noted the "year-over-year decrease" in net revenue, attributable to a "revenue decline of 11% in our global cannabis segment, . . . only partially offset by growth of 9% in our other consumer products segment, which was primarily driven by the growth in our BioSteel business." *Id.* ¶ 104. It added:

> Revenue from BioSteel was $44.6 million, a year-over-year increase of $16.1 million due primarily to (i) the expansion of our United States distribution network beginning in the fourth quarter of fiscal 2021; (ii) new "ready-to-drink" product launches during the last year; and (iii) higher international sales of ready-to-drink products and beverages mixes.

*Id.*

On August 5, 2022, Canopy announced its financial results for Q1 2023, stating in a press release that its net revenue was C$110.115m, of which C$17.9m (or 16.2%) was attributable to BioSteel. *Id.* ¶ 114. Canopy's net loss was C$2,087,556,000. *Id.* Canopy's Form 8-K, filed that same day, listed as a highlight:

> Record BioSteel revenues in Q1 FY2023 increased 169% versus Q1 FY2022. Secured retail agreement with Walmart Stores covering 2,200 stores in 39 states. Entered partnership to become the Official Hydration Partner of the NHL and NHLPA.

*Id.* ¶ 115. That day, on an earnings call related to Canopy's Q1 2023 results, Klein stated:

> Q1 was a record quarter for BioSteel, with revenue of CAD18 million. And we feel this brand truly has the potential to transform the sports hydration market. A notable highlight in Q1 was welcoming Walmart as a BioSteel RTD retailer in the U.S. This initial agreement will bring BioSteel RTD beverages to 2,200 Wal mart stores across 39 states. Initial shipments began in June and we expect additional shipments to these stores over the coming months. . . . With the ongoing load-in into additional retailers, as well as increases in sales velocity, driven by our brand activations, we are expecting to see a significant jump in BioSteel sales over coming quarters.

*Id.* ¶ 122. On the same call, Hong stated:

11

> In Q1, we had strong performance from our international cannabis businesses, BioSteel had its best revenue quarter ever, and the Canadian business stabilized this revenue.   Gross margin and adjusted EBITDA also improved sequentially compared to Q4, as we begin to execute on our cost savings initiatives that we announced in April.  We generated net revenue of CAD110 million, representing a 19% decline over the prior year, but down just 1% compared to Q4.  Excluding the impact from divestiture of C3, net revenue in Q1 increased 1% as compared to Q4.

*Id.* ¶ 123.

On August 9, 2022, Canopy filed its Form 10-Q, which reiterated its revenue figures, and noted that BioSteel's revenue had increased "year-over-year" by "C$11.2 million due primarily to (i) continued growth in our distribution channels and sales velocities across North America; and (ii) higher international sales of ready-to-drink products and beverage mixes." *Id.* ¶ 117.

Finally, on November 9, 2022, Canopy announced its financial results for Q2 2023, stating in a press release that its net revenue was C$117.863m, of which C$29.922m (or 25.3%) was attributable to BioSteel. *Id.* ¶ 127.  Canopy's Form 8-K, filed the same day, noted:

> Achieved 299% net revenue increase for BioSteel as compared to the prior year, driven by increased investment.  Acquired manufacturing facility subsequent to quarter end, which is expected to support ongoing rapid U.S. expansion for the brand and drive gross margin improvement.

*Id.* ¶ 128.  The Form 8-K further noted Canopy's 10% decline in net revenue, "primarily attributable to increased competition in the Canadian adult-use cannabis market, the divestiture of C3 . . . , and softer performance from This Works, offset by revenue growth at BioSteel." *Id.* Canopy's Form 10-Q, also filed that day, reiterated that Canopy's "year-over-year decrease" in revenue was "partially offset by continued growth in our BioSteel business." *Id.* ¶ 130.  The Form 10-Q explained:

> Revenue from BioSteel was $29.9 million in the second quarter of fiscal 2023, as compared to $7.5 million in the second quarter of fiscal 2022.  The year-over-year increase is primarily attributable to: (i) continued growth in our distribution and retail channels, which resulted in increased sales velocities across North America;

and (ii) strong international sales growth. All of BioSteel's major product lines contributed to the year-over-year revenue growth.

*Id.* That same day, on an earnings call related to Canopy's Q2 2023 results, Klein stated:

> BioSteel delivered another record quarter in Q2, helped by strategic investments that have driven distribution and velocity gains. This resulted in nearly $30 million in revenue in the quarter, which represents sequential, quarterly and year-over-year growth of 67% and 299%, respectively. In the first half of fiscal '23, BioSteel secured distribution with major retailers including Wal mart, Rite Aid and Winn Dixie. This has helped increase ACV to 34% in the US, which represents a sequential increase of 520 basis points according to IRI data for the 13 weeks ended on October 2. Now moving to Canada. BioSteel is seeing strong market share growth. . . . We anticipate additional growth for the brand as the hockey season continues and athletes, both professional and aspiring, enjoy the benefits of clean, healthy hydration, courtesy of BioSteel.

*Id.* ¶ 135.

### b.    *Canopy's internal controls*

In each Form 10-Q filed with the SEC during the Class Period—from Q2 2022 to Q3 2023—Canopy stated as follows:

> There have been no changes in our "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Id.* ¶¶ 85, 94, 119, 132, 148.

> Similarly, in Canopy's Form 10-K for financial year 2022, Canopy stated as follows:

> Management conducted an assessment of the effectiveness of our internal control over financial reporting as of [end of financial year], based on the framework established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on the assessment, management has determined that our internal control over financial reporting as of [end of financial year], was effective.

> . . .

> There were no changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) that occurred

13

during our most recent quarter, that has materially affected, or is reasonably likely
to materially affect, our internal control over financial reporting.

*Id.* ¶¶ 106–07.

### 5.   The Truth Emerges

On February 9, 2023, before the market opened, Canopy announced its financial results

for Q3 2023, in which it made a partial disclosure of issues with BioSteel's performance. *Id.* ¶

140. In a press release, Canopy reported a 28% decrease in revenue year-over-year, *id.* ¶ 140,

and disclosed that its "[g]ross margin in Q3 FY2023 was impacted primarily by [*inter alia*] . . .

lower gross margins in the BioSteel business segment primarily attributable to the write-down of

aged inventory," *id.* ¶ 142. Canopy also announced new cost-reduction initiatives, including

"transitioning to an asset-light model," restructuring "certain corporate functions," and

"significantly reducing the overall size of [the Company's] organization." *Id.* ¶ 140. On this

news, Canopy's share price fell 17.15%. *Id.* ¶ 142.

The FAC alleges that, after this partial disclosure, Canopy continued to make

misstatements (and to omit material facts) about BioSteel's performance. For example, on

February 9, 2023, in its Form 8-K for Q3 2023, Canopy stated that its net revenue had declined

28% to C$101m, *id.* ¶ 144, but still overstated BioSteel's revenue by C$2.818m, *id.* ¶ 145. That

day, Canopy filed its Form 10-Q, also for Q3 2023, which stated as to BioSteel:

> Revenue from BioSteel was $16.4 million in the third quarter of fiscal 2023, as
> compared to $17.0 million in the third quarter of fiscal 2022. The year-over-year
> decrease is primarily attributable to timing shifts in the distribution and sales of our
> products into our key markets.

*Id.* ¶ 146.

The FAC alleges that the truth fully emerged in May and June 2023. On May 10, 2023,

after the market closed, Canopy filed a Form 8-K announcing that investors should no longer

rely upon certain previously issued financial statements because of "certain trends in the booking

of sales by the [BioSteel] business unit" that Canopy had identified "for further review." *Id.* ¶ 151. In the Form 8-K, Canopy disclosed that it was undertaking "an internal review of the financial reporting matters related to BioSteel," that its review "remains ongoing," but that "the Company has preliminary identified material misstatements" related to BioSteel's sales, which it was "unable to quantify" at this time. *Id.* On this news, Canopy's share price fell 20.31%. *Id.* ¶ 152.

Finally, on June 22, 2023—the end of the class period—Canopy filed its Form 10-K for financial year 2023, disclosing that its earlier financial statements had artificially inflated BioSteel's revenue by C$26.6 million (approximately $20.2m USD). *Id.* ¶ 154. In this Form 10-K (also referred to as the "Restatement"), Canopy restated its financial results for fiscal year 2022. *Id.* The Form 10-K disclosed that the revision of the results reflected issues related to revenue recognition for "the Company's 'business-to-business' sales to customers in international markets, including wholesalers, distributors, and retailers." *Id.* It continued:

> The Company concluded that revenue was incorrectly recognized in certain situations in which: (i) the product ordered by the customer had not been shipped, and therefore control of the product had not been transferred to the customer; (ii) the product was shipped without a legally enforceable written, oral or implied contract with the customer that specified each party's rights regarding the goods to be transferred and the payment terms; or (iii) product had been shipped, and ultimately not accepted by the customer, because the product did not have the required remaining shelf life to be sold through by the customer in a primary sales channel.

*Id.* The Form 10-K acknowledged that Canopy's "internal control over financial reporting and our disclosure controls and procedures were not effective as of March 31, 2023." *Id.* ¶ 155.

Canopy identified the following weaknesses:

> • An ineffective control environment, resulting from a lack of the required number of trained operational and IT personnel with the appropriate skills and knowledge and with appropriate assigned authorities, responsibilities and accountability related to the design, implementation and operating effectiveness of

internal control over financial reporting.   The control environment material weakness contributed to the following material weaknesses:

o       The accounting for sales recorded by the BioSteel segment, which resulted in material misstatements relating to revenue and trade receivables, particularly with respect to the timing and amount of revenue recognition. Specifically, we did not design and maintain effective controls to sufficiently assess the timing, amount, and appropriateness of revenue recognition.  This included a lack of segregation of duties in the review of customer orders, inadequate controls over the review and approval of sales returns, and inadequate controls relating to revenue recognition policies and procedures.  This also contributed to the failure to impair goodwill related to the BioSteel reporting unit on a timely basis as changes in the performance of BioSteel were not identified in a timely manner, and the failure to accurately record the redeemable noncontrolling interest.

o       IT general controls deficiencies that aggregated to a material weakness.   These deficiencies specifically related to: (i) logical access management, including untimely periodic access review, access provisioning and modification, removal of user access and change management controls with respect to a payroll system implemented during the year; and (ii) untimely and inconsistent monitoring and oversight of third-party service organizations.  Although we have identified no instances of any adverse effects due to these deficiencies, business processes that depend on the affected information systems or that depend on data from the affected information systems, could be adversely impacted.

*Id.* ¶ 155.  The Form 10-K stated that Canopy would implement remedial measures to address these weaknesses. *See id.* ¶ 156.  On this news, Canopy shares declined 13.81%. *Id.* ¶ 157.

### 6.     Post–Class Period Developments

On September 17, 2023, Canopy announced that it would seek bankruptcy protection for BioSteel. *Id.* ¶ 158.  On November 9, 2023, Canopy sold BioSteel and its affiliated business, BioSteel Manufacturing LLC, to a third party for C$30.4m (approximately $22m USD). *Id.* ¶ 159.

### B.     Procedural History

On May 25, 2023, Christopher Turpel filed a complaint in this Court on behalf of Canopy shareholders.  23 Civ. 4302, Dkt. 1.  On June 21, 2023, Christiann Kantner filed a similar

16

complaint in the Central District of California, which was transferred to this Court. 23 Civ. 6266, Dkt. 1. On July 9, 2023, Columbus Allen Jr., proceeding *pro se*, filed a complaint in this Court identical to Turpel's in all relevant respects. 23 Civ. 5891, Dkt. 1.

On November 30, 2023, the Court consolidated the three cases and appointed Chen Li lead plaintiff and Pomerantz LLP lead counsel. Dkt. 47. On December 7, 2023, the Court set a schedule for the filing of an amended complaint and briefing of a motion to dismiss. Dkt. 49.

On January 22, 2024, Li filed the operative FAC. Dkt. 56. On March 7, 2024, defendants moved to dismiss, Dkt. 62, and filed a memorandum of law in support, Dkt. 63 ("Def. Br."). On March 28, 2024, forgoing the opportunity provided by the Court in its scheduling order to file a Second Amended Complaint, Li opposed defendants' motion. Dkt. 65 ("Pl. Br."). On April 11, 2024, defendants filed a reply. Dkt. 66 ("Def. Reply Br.").

## II. Applicable Legal Standards

### A. Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the Court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

17

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of PSLRA, 15 U.S.C. § 78u-4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, a plaintiff must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

**B.     Elements of the FAC's Claims**

The FAC brings claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b-5. FAC ¶¶ 207–23.

18

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b) of the Exchange Act, a complaint must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted). A complaint must ultimately allege conduct involving manipulation or deception; § 10(b) does not cover "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108). If a plaintiff has not adequately alleged a primary violation—that is, a viable claim under another provision of the Exchange Act—then the § 20(a) claims must be dismissed. *See id.*

19

## III.    Discussion

Defendants concede that at least some statements on which the FAC bases its claims—in particular, Canopy's statements prior to its Restatement that touted BioSteel's revenues—were actionable misrepresentations. Def. Br. at 25–26 & n.15. But defendants argue that the FAC does not adequately allege scienter. The Court agrees and thus grants the motion to dismiss.

### A.    Legal Standard for Scienter

Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences." *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original). The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks and citation omitted).

A complaint "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Where a complaint does not sufficiently allege that defendants had a motive to defraud the public, it "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001). A complaint can plead recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). But "to adequately plead scienter, plaintiffs must also provide

20

sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (quoting *Novak*, 216 F.3d at 308). "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).

### B. Application

The FAC has several bases for its claim of scienter. But, viewed individually or together, they do not support even a weak inference of scienter.

### 1. Confidential Witnesses

The FAC primarily relies on the allegations attributed to CWs. FAC ¶¶ 24–47; *see also* Pl. Br. at 13–18. For several reasons, these allegations do not give rise to a strong inference of scienter.

First, for a CW's statements to support a strong inference of scienter, a complaint must describe the witness "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. The FAC does not do so. The CWs it cites are primarily former lower-level sales and marketing employees, not executives or managers with direct knowledge of the company's financials, accounting, or the individual defendants' states of mind. Courts discount CW allegations where the complaint fails to establish the witnesses' basis of knowledge for the pleadings attributed to them. *See, e.g., Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589–95 (S.D.N.Y. 2011). Such is the case here. As pled, CW1 and CW3 worked in BioSteel's eCommerce and marketing departments, respectively, but they claim to know about complex accounting issues regarding revenue recognition and costs of goods sold. FAC ¶¶ 26, 30–32, 75,

21

191. Likewise, CW4 was an American sales director, but he claims to know the details of BioSteel's European distribution contracts. *Id.* ¶¶ 32–33. And CW5's job was to "facilitate" sales of Canopy and BioSteel's cannabis-related products, but he claims to know the inventory levels of BioSteel's (cannabis-free) sports drinks. *Id.* ¶¶ 35–40. The FAC does not explain the basis on which these CWs ostensibly came to have first-hand knowledge of the matters relevant to scienter which they addressed. *Cf., e.g., Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 400 (S.D.N.Y. 2020) (complaint failed to plead how "territory manager," "proposal coordinator," and "regional manager" had knowledge about "whether [defendant] would be required to adjust its [expenses] pursuant to GAAP accounting").

Second, to the extent that a CW has an established basis of knowledge, to plead scienter, a complaint must allege "specific instances" in which the individual defendants "received information . . . contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010); *see also In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 324 (E.D.N.Y. 2013) (collecting cases). "[E]ven confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge." *Glaser*, 772 F. Supp. 2d at 589–90. The FAC does not include such allegations.

Quite the contrary, five of the FAC's six CWs are not alleged to have had any contact whatsoever with Canopy's senior executives. The exception is CW1, who claims to have told unspecified "Canopy management" about a cost-of-goods-sold issue at an unspecified time. FAC ¶ 76. But this sole allegation is devoid of any details about who was told what, and when. And it comes from a witness who does not claim to have been privy to Canopy's financials (or

22

even an accountant). It cannot support a cogent inference of scienter as to any individual defendant. *See, e.g.*, *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 400 (S.D.N.Y. 2020) (scienter inadequately pled where CW "was copied on emails to 'senior management' concerning product failures" but complaint failed to "identify the 'senior management' on those emails"). And the issue that CW1 allegedly raised with "management"—that Canopy "did not subtract the actual" cost of manufacturing BioSteel's sports drinks in "calculat[ing] its net profit," FAC ¶ 75—does not have an apparent relationship with the misstatements that the FAC puts at issue. Those instead relate to Biosteel's improper recognition of revenue and distribution challenges. *Id.* ¶ 154. The FAC does not explain why CW1's account, even if assumed to have a basis in firsthand knowledge, is probative of the individual defendants' states of mind as to the challenged misstatements.

CW5's allegation that "the excess inventory problem was discussed" at "Monthly Business Review" meetings with the individual defendants does not sustain the FAC's scienter claim either. *Id.* ¶ 44. The FAC does not allege that CW5—the sole CW whom it cites on this point—even attended the specific meetings at which inventory was discussed. It states, instead, vaguely, that CW5 generally "participated" in these meetings, *id.*, and that "CW5 affirmed that BioSteel's excess inventory issues, known from at least late 2021, *would have been discussed* during these calls," *id.* ¶ 167 (emphasis added). But allegations that "defendants 'would have' or 'should have' had . . . knowledge [are] insufficient" under the PSLRA. *Glaser*, 772 F. Supp. 2d at 591; *see also, e.g.*, *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 219 (S.D.N.Y. 2020) ("allegations based upon rumor [and] conjecture" fail "to satisfy the heightened pleading

23

standard of [the PSLRA]" (citation omitted)).[3]  Critically absent from the FAC are any specifics about when these alleged meetings occurred and what information was conveyed in them, let alone how such information contradicted defendants' challenged statements.  The FAC instead invites the Court to speculate that something must have been said, at an unspecified time within the Class Period, that put the individual defendants on notice that their statements were false.  The PSLRA requires more.  *See, e.g., Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (CW allegations failed to support inference of scienter where complaint failed to establish "what specific contradictory information [the individual defendants] possessed or when they possessed it"); *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (same where complaint's CW allegations "contain[ed] no time frame within which the meetings occurred[] . . . and no information regarding how extensively or in what manner the reports were discussed"); *Chapman*, 466 F. Supp. 3d at 400 (same where complaint's CW allegations "fail[ed] to identify information provided at the meeting [with individual defendants]" or to explain how such information would have contradicted defendants' public statements).  CW5's account thus is not a basis on which to infer the relevant knowledge on the part of the individual defendants.

Third, and most fundamentally, the CWs' accounts of alleged inventory and distribution issues at BioSteel are too vague to support an inference of scienter.  The CWs generally assert that the subsidiary had "a lot of" excess product that reached "significant" levels and was "so bad" that the company gave it away for free.  FAC ¶¶ 40, 43, 45.  But without specifics as to the

---

[3] Plaintiff alternatively surmises that the individual defendants— by virtue of being senior executives—"would necessarily [have] know[n]" of the issues within BioSteel, Pl. Br. at 17–18. That argument fails for the same reason.  As courts in this Circuit uniformly have recognized, "accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Loc. 773 Pension Fund*, 694 F. Supp. 2d at 300.

purported inventory buildup or its financial impact or the means by which these facts were conveyed to the individual defendants, the inference of scienter is conjectural. The most concrete allegation is that of several CWs that there was a problematic European distributor (Alpha). *Id.* ¶¶ 31, 34. CW1 further alleges that the product BioSteel shipped to Alpha "was logged as revenue" but "never should have been recognized." *Id.* ¶ 31. But the FAC does not say when these shipments occurred, their approximate value, their effect on BioSteel's revenue, or, most critically, who was aware of these problems before the Restatement.

The CWs thus "offer their thoughts and opinions as to various . . . issues experienced by the company," but these ruminations do "not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *see also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (the Second Circuit has "uniformly" required "allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements" (emphasis in original)). Consistently, courts have rejected, as an insufficient basis for scienter, similarly vague statements attributed to CWs. *See, e.g., In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 242 (S.D.N.Y. 2023) (no scienter where complaint alleged generally that individual defendants "had a weekly call" with a CW and "discussed a variety of metrics" but "fail[ed] to state when exactly these meetings" occurred and how the information "discussed during those meetings" related to challenged public statements); *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (no scienter where complaint failed to "specify exactly what information was contained in" the company's daily sales reports); *In re Adient plc Sec. Litig.*, No. 18 Civ. 9116 (RA), 2020 WL

1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (no scienter where complaint failed to "allege what information was contained in" the "standard operational packet" distributed to individual defendants, despite general allegations that the reports were "very detailed" with a "particular focus" on the division at issue).

In sum, the CW statements in the FAC do not "constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. They are "too speculative to give rise to a strong inference of scienter." *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund*, 724 F. Supp. 2d at 462.

### 2.    Alternative Theories of Scienter

Lead plaintiff argues that three other features of the FAC support inferring scienter.

First, he argues, the individual defendants' public statements about BioSteel during the Class Period reveal their familiarity with BioSteel's business, and thus they must have had known in real time that BioSteel's statements about inventory levels and distribution contracts were false and misleading. Pl. Br. at 18–19. For multiple reasons, that theory fails. For one, the individual defendants' cited public statements overwhelmingly did not concern these subjects or even specific revenue numbers. The statements instead were high-level, generalized business updates touting the brand's sales and marketing. *See, e.g.*, FAC ¶¶ 78, 110, 135 (discussing "distribution ramp up," growth "driven by" product launches, and BioSteel's status as a "challenger brand"). That a CEO or CFO would express general optimism and highlight the successes of an acquired subsidiary does not, without more, support the inference of real-time knowledge of the operational data necessary to know that the challenged statements were wrong. And the FAC does not support lead plaintiff's characterization of the individual defendants as having "held themselves out" through such statements as, across-the-board, "extremely knowledgeable about BioSteel," Pl. Br. at 19. Nor does the claim that a defendant is a "key

26

officer" well-versed in the operations of a division support, without more, the inference that he must have known about fraud in that division. *See In re ShengdaTech, Inc. Sec. Litig.*, No. 11 Civ. 1918 (LGS), 2014 WL 3928606, at *9 (S.D.N.Y. Aug. 12, 2014) (collecting cases). Lead plaintiff's theory that defendants *ex officio* should have known of fraud within the company's ranks is one of "fraud by hindsight," *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019), a species of claim that the PSLRA was enacted to deter.[4]

Second, lead plaintiff argues that Canopy's "sudden reversal of fortune" and the "size and scale" of the inventory and internal control problems it disclosed in 2023 support the inference that the individual defendants must have known about these issues far earlier, and that the "core-operations doctrine" supports this inference. Pl. Br. at 20–22. But the size and scale of Canopy's revenue adjustment in the Restatement was relatively modest—a decrease of 4% in consolidated net revenue between April and December 2022. Drylewski Decl., Ex. 1 at 4. A revision on this scale does not imply that BioSteel's "problems were known to defendants well before they were disclosed to investors." Pl. Br. at 20; *see, e.g., In re Lottery.com, Inc. Sec. Litig.*, No. 22 Civ. 7111 (JLR), 2024 WL 454298, at *35 (S.D.N.Y. Feb. 6, 2024) (no scienter despite 50% downward revision in revenue); *Glaser*, 772 F. Supp. 2d at 596–97 (no scienter despite 72% downward revision in net income); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009) (no scienter despite 80% downward revision in profit). Indeed, even if the frame of reference were broadened so as to

---

[4] For the same reason, lead plaintiff is wrong to argue that the fact that the individual defendants signed Canopy's SEC filings and SOX certifications suggests their scienter, Pl. Br. at 22. That argument "would allow plaintiffs to plead the scienter of whole classes of defendants solely by alleging a misstatement." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 485 (S.D.N.Y. 2006); *see also Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (collecting cases in which courts in this Circuit have held that signing SEC filings and SOX certifications "add nothing substantial to the scienter calculus").

focus not just on the share of overall revenue that was misstated but on the share of Canopy's revenue within BioSteel as a whole, BioSteel only contributed between 7% and 17% of Canopy's consolidated revenue. For the "core-operations doctrine" to apply, the "operation in question [must] constitute nearly all of a company's business." *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 460 n.3 (S.D.N.Y. 2019) (citation omitted). That is not the case here. *Cf., e.g., In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840 (RJS), 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) (core-operations inference not warranted where segment comprised only 30% of overall business); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019) (core-operations inference not warranted where segment comprised only 25% of overall business). Lead plaintiff's "repeated allegation concerning the magnitude of the write-downs is insufficient to plead scienter." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010); *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 578 (S.D.N.Y. 2012) ("[A] fraud's large size, standing alone, is insufficient to show recklessness.").

Third, lead plaintiff argues that the departures of Canopy CFO Lee (a defendant here) and BioSteel co-founder and CEO John Celenza (a non-party) support an inference of scienter. Pl. Br. at 23. But "[f]or executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) (citation omitted). The FAC does not so plead. As to Lee, the FAC alleges only that Lee resigned and was replaced as CFO by defendant Hong at an unspecified point in November 2021, shortly after the start of the Class Period. FAC ¶¶ 89, 192. Lead plaintiff's claim that Lee's resignation was "suspiciously timed right after the fraud began," Pl. Br. at 23,

28

and must have bespoken awareness of the unrevealed fraud, is mere speculation. The FAC does not allege any facts that Lee resigned because of any prior misstatement, let alone those at issue in this case, or even that his departure was abrupt or unplanned. As to Celenza, the FAC alleges that Celenza was "ousted" in March 2023 "following a testy exchange" with Canopy's CEO, an ouster which lead plaintiff asserts was "suspiciously close in time" to Canopy's later disclosures of material weaknesses in May and June 2023. FAC ¶¶ 153, 193. But the FAC tellingly does not plead facts as to the context, or content, of Celenza's allegedly "testy exchange," let alone facts tying this event to BioSteel's alleged misstatements or accounting issues. That a subsidiary executive was terminated at a point before the parent disclosed errors and began an internal investigation does not connote that the parent's executives had earlier acted with fraudulent intent. *Cf. Schiro*, 396 F. Supp. 3d at 303 ("When corporate misconduct is disclosed, members of management resign for all sorts of reasons, including that they were negligent in overseeing the responsible employees or simply because the optics of changing management are better for investors and regulators."). These departures do not bolster lead plaintiff's case.

### 3.    Overall Assessment of Scienter

As the Supreme Court has emphasized, a court reviewing a complaint under the PSLRA should not "scrutinize each allegation in isolation," but instead must "assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. Here, however, none of the FAC's theories of scienter offer *any* basis for inferring knowledge—conscious behavior or recklessness—on the part of the individual defendants. "[Z]ero plus zero cannot equal one." *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018). And the FAC does not plead any particularized facts supporting defendants' motive and opportunity to commit the fraud. *ATSI*, 493 F.3d at 99. Because the FAC's allegations, viewed together, do

not supply strong circumstantial evidence of conscious misbehavior or recklessness, *ATSI*, 493

F.3d at 99, its § 10(b) claims must be dismissed.[5]

### C.    The FAC's § 20(a) Claims

The FAC also brings claims against the individual defendants under § 20(a) of the

Exchange Act. FAC ¶¶ 218–23. To state a claim under § 20(a), a plaintiff must adequately

allege "a primary violation by the controlled person." *Carpenters Pension Tr. Fund*, 750 F.3d at

236 (quoting *ATSI*, 493 F.3d at 108). Because the FAC has not done so, its § 20(a) claims must

also be dismissed. *See, e.g., In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12–13

(S.D.N.Y. 2016) (dismissing § 20(a) claim based on failure to adequately allege a primary

violation).

### CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss. The Court

dismisses the FAC with prejudice.[6] The Clerk of Court is respectfully directed to terminate all

pending motions, to enter judgment in favor of defendants, and to close this case.

---

[5] Because the FAC fails to plead facts giving rise to a strong inference of scienter as to any of the individual defendants, its claims against Canopy also fail. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) ("Where a defendant is a corporation, [a plaintiff must] plead facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'"). Lead plaintiff does not suggest that this is one of those "exceedingly rare instances" of such "dramatic" fraud that "collective corporate scienter may be inferred" in the absence of scienter on the part of an individual defendant. *Id.*

[6] Lead plaintiff has not sought leave to amend, and the Court declines to grant such leave *sua sponte*. *Cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994) ("[W]e do not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought."). On the contrary, lead plaintiff has already amended his complaint once and was given another opportunity to amend his complaint after defendants filed their motion to dismiss, while being admonished that "no further opportunities to amend will ordinarily be granted." Dkt. 49. And no aspect of the record suggests that repleading would remedy the deficiencies in the FAC set out here. "In the absence of any identification of how a further amendment would improve upon the complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g., Panther*

30

SO ORDERED.

_____

Paul A. Engelmayer
United States District Judge

Dated: July 17, 2024
          New York, New York

---

*Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim."). "Permitting a new round of repleading in this litigation would . . . further delay already long-delayed litigation and prejudice defendants in their bid for closure." *Stanley v. City Univ. of N.Y.*, 18 Civ. 4844 (PAE), 2023 WL 2714181, at *26 (S.D.N.Y. Mar. 30, 2023); *see also, e.g., Morency v. NYU Hosps. Ctr.*, 728 F. App'x 75, 76 (2d Cir. 2018) ("[T]he liberality with which a court grants leave to amend does not impart to litigants the privilege of re-shaping their legal theories endlessly." (citation omitted)). The Court thus dismisses the FAC with prejudice.

31